**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**JANE DOE,**

      **Plaintiff,**

**vs.**                          **Case No. 20-cv-1041-SCY-JHR**

**TAOS MUNICIPAL SCHOOLS;
LILLIAN TORREZ, ROBERT TRUJILLO,
and LISA ABEYTA-VALERIO,  in their individual capacities;**

      **Defendants.**

**<u>Jury Trial Requested</u>**

**[REDACTED]
<u>SECOND AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS,
NEGLIGENCE, AND OTHER TORTIOUS CONDUCT</u>**

COMES NOW the Plaintiff, by and through undersigned counsel, and brings the following causes of action under 42 U.S.C. § 1983, the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, the New Mexico Tort Claims Act (NMTCA), NMSA 1978, §§ 41-4-1 to 41-4-30, and New Mexico common law.

**<u>INTRODUCTION</u>**[1]

In the fall of 2018, an older male student at Taos High School in Taos, New Mexico sexually harassed, sexually assaulted, and brutally raped Plaintiff Jane Doe, a young and vulnerable fourteen-year-old girl just starting her freshman year at the school. Plaintiff is proceeding under the pseudonym "Jane Doe" pursuant to a court order (Doc. 89) for the reasons stated in her motion

---

[1] The Introduction and section headings in this pleading are provided as a "road map" and "mile markers" to assist the reader in navigating the document. Neither the Introduction nor the section headings in this pleading are intended to constitute enumerated paragraphs to which an admission or denial is expected in a responsive pleading pursuant to Fed. R. Civ. P. 8(b). Accordingly, Plaintiff will not move to deem admitted any statement contained in the Introduction or section headings based on a failure to deny it, as a responsive pleading to those statements is not required.

(Doc. 87) filed April 20, 2022. Her assailant is referenced by the initials "T.R." in this Second Amended Complaint, because many of his school records referenced herein concern the period before he turned 18 years of age during his senior year. Similarly, a second survivor of T.R.'s sexual assaults is referenced under the pseudonym "Jane Doe 2" for the same reasons which apply to Plaintiff and T.R.

After discovery commenced in this case in June 2021, Plaintiff subpoenaed confidential records from the Taos Police Department and District Attorney's Office concerning T.R.'s rape, sexual assaults, and harassment of Plaintiff and Jane Doe 2. Additionally, Plaintiff received confidential school records regarding T.R. from Defendant Taos Municipal Schools (TMS) pursuant to a Stipulated Order (Doc. 26) regarding the process for disclosing them under the Federal Educational Records Privacy Act (FERPA) (Doc. 26) and a Stipulated Confidentiality Order, as amended (Doc. 35, 59, 61.) Based on that evidence, Plaintiff learned that Defendant TMS and several of its administrators, including each of the individual Defendants, had actual notice and knowledge that T.R. was a sexual predator who had assaulted and harassed numerous younger, female students at school over the course of his high school years. Plaintiff also learned that each Defendant consciously acquiesced in this pattern of behavior by T.R. and protected him so that he could continue to prey on new victims each school year until they arranged for him to graduate in May 2019. Accordingly, Plaintiff filed her First Amended Complaint to expand her allegations so they cover T.R.'s predatory behavior during each of his four years of high school, and to show the extensive involvement of each Defendant in enabling T.R.'s predatory behavior, protecting him from being held accountable for it, and failing to protect the unsuspecting victims whom they placed in his dangerous path of abuse.

While Plaintiff was briefing and awaiting a ruling from the Court on her motion for leave to file her First Amended Complaint, the parties began conducting depositions, and Plaintiff

discovered additional new evidence bearing on her claims. Accordingly, Plaintiff now files this Second Amended Complaint to include significant new facts discovered during this period.

**PARTIES**

1.     Plaintiff Jane Doe is proceeding under a pseudonym pursuant to the Order Granting Plaintiff's Motion for Substitution by Interlineation and to Continue Proceeding Under a Pseudonym (Doc. 89) filed April 25, 2022. Jane Doe is referred to as "Plaintiff" or "Jane Doe" throughout this First Amended Complaint. Her true identity is under seal.

2.     Defendant Taos Municipal Schools (hereinafter TMS) is a "governmental entity" and "local public body" as those phrases are defined in the NMTCA, NMSA 1978, §§ 41-4-3(B) and (C), as amended. Under NMSA 1978, § 22-5-4(E), Defendant TMS has the capacity to sue or be sued. Defendant TMS is responsible for the administration of public schools within its geographic boundaries. At all times material hereto, Defendant TMS received federal funding and financial assistance. At all times material hereto, Defendant TMS employed Defendants Torrez, Trujillo, and Abeyta-Valerio. Plaintiff's state-law claims against Defendant TMS arise under provisions of New Mexico's common law of torts for which immunity is waived under NMSA 1978, § 41-4-6. Under the NMTCA, Defendant TMS is vicariously liable for the acts and omissions of Defendants Torrez, Trujillo, and Abeyta-Valerio. At all times relevant, Defendant TMS was responsible for adopting and implementing the policies, customs, and practices of its employees and agents, including Defendants Torrez, Trujillo, and Abeyta-Valerio. Defendant TMS is a public school district in the State of New Mexico and a "person" under 42 U.S.C. § 1983.

3.     Defendant Lillian Torrez (hereinafter Torrez) was, at all times material hereto, employed by Defendant TMS as superintendent of TMS. Upon information and belief, Defendant Torrez resides in Taos County, New Mexico. At all times material hereto, Defendant Torrez was a "public employee" as that phrase is defined in the NMTCA, NMSA 1978, § 41-4-3 (F), as amended.

Defendant Torrez acted in the course and scope of her duties as a TMS employee and under color of law. She is sued in her individual capacity for purposes of Plaintiff's claims under 42 U.S.C. § 1983.

4.     Defendant Robert Trujillo (hereinafter Trujillo) was, at all times material hereto, employed by Defendant TMS as a principal at Taos High School until the end of the 2018-2019 school year. Upon information and belief, Defendant Trujillo resides in Taos County, New Mexico. At all times material hereto, Defendant Trujillo was a "public employee" as that phrase is defined in the NMTCA, NMSA 1978, § 41-4-3 (F), as amended. Defendant Trujillo acted in the course and scope of his duties as a TMS employee and under color of law. He is sued in his individual capacity for purposes of Plaintiff's claims under 42 U.S.C. § 1983.

5.     Defendant Lisa Abeyta-Valerio (hereinafter Abeyta-Valerio) was, at all times material hereto, employed by Defendant TMS as an assistant principal at Taos High School. Upon information and belief, Defendant Abeyta-Valerio resides in Taos County, New Mexico. At all times material hereto, Defendant Abeyta-Valerio was a "public employee" as that phrase is defined in the NMTCA, NMSA 1978, § 41-4-3 (F), as amended. Defendant Abeyta-Valerio acted in the course and scope of her duties as a TMS employee and under color of law. She is sued in her individual capacity for purposes of Plaintiff's claims under 42 U.S.C. § 1983.

6.     Emy DeHerrera was formerly named as a Defendant in this action, but is no longer named as a Defendant in this Second Amended Complaint. During the relevant time period, she was employed as a special education teacher and served as the nominal head of the Exceptional Programs Department at Taos High School. She did not become a dean or administrator at Taos High School until after the end of the 2018-2019 school year.

7.     With respect to Plaintiff's state-law claims, the acts and omissions complained of herein all constitute a basis for liability against Defendants, within the scope of the waivers of immunity proscribed by the NMTCA, NMSA 1978 §§ 41-4-1 to 41-4-30. Defendants were given

and received actual notice of these claims under Section 41-4-16 of the NMTCA.

## JURISDICTION AND VENUE

8.      Jurisdiction over the federal claims is proper under 28 U.S.C. §§ 1331 and 1343 because it presents a federal question under 42 U.S.C. § 1983. Supplemental jurisdiction over the state claims is proper under 28 U.S.C. § 1367(a) because the state claims and the federal claims derive from the same common nucleus of operative facts.

9.      Venue is proper in New Mexico under 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred within this district.

## FACTUAL BASIS FOR PLAINTIFF'S CLAIMS

A.      **DEFENDANTS CREATED DANGEROUS CONDITIONS ON SCHOOL PREMISES BY MERGING THE CHRYSALIS ALTERNATIVE SCHOOL INTO THE TAOS HIGH SCHOOL CAMPUS DURING THE 2015-2016 SCHOOL YEAR AND FAILING TO ESTABLISH OR IMPLEMENT POLICIES FOR PREVENTING AND PROVIDING REMEDIES FOR SEXUAL HARASSMENT, SEXUAL VIOLENCE, AND DISCRIMINATION BASED ON SEX.**

10.     During the time period relevant to this Second Amended Complaint, Defendant TMS operated an alternative high school known as "Chrysalis" for special education students, some of whom had serious behavioral problems. Before the 2015-2016 school year, the Chrysalis Alternative School was located in a smaller building with a single main hallway that was located on a separate campus apart from the main Taos High School campus.

11.     This separate location allowed school personnel to more closely supervise the special education students with serious behavioral problems who attended the Chrysalis Alternative School, and to prevent them from posing a risk to the safety and welfare of the general population of students attending Taos High School as well as other populations of special education students attending classes at Taos High School.

12.     As a separate school, Chrysalis was supposed to have its own principal who reported

directly to the Superintendent of the school district, as other schools in the district did. But none of the school employees at Chrysalis had an administrator's license or were employed as the school's principal. The lack of adequate supervision by the Superintendent, as well as the lack of a properly licensed school administrator at the Chrysalis Alternative School, led to problems with employee discipline at the school.

13.     Tom Duke was employed as a teacher at the Chrysalis Alternative School during part of the time it was located on a separate campus apart from the main Taos High School campus. While employed there, he observed other male teachers engage in inappropriate behavior with female Chrysalis students, such as allowing female students to sit on a male teacher's lap and touching them inappropriately. Mr. Duke reported this sexually inappropriate behavior to the "head teacher" at Chrysalis. Another female teacher at Chrysalis also witnessed the inappropriate behavior and reported it to the Superintendent of the school district at the time.

14.     After realizing that neither the "head teacher" at Chrysalis nor the Superintendent of the school district were going to do anything in response to their reports of sexually inappropriate behavior by male teachers at the school, Mr. Duke and the female teacher left their positions at the Chrysalis Alternative School and sought employment elsewhere. Mr. Duke applied with Defendant Trujillo for a position at Taos High School, but Defendant Trujillo told him he "was not Tiger material" and did not offer him a position there. Instead, Mr. Duke accepted a position at Ranchos Elementary School for a year and eventually obtained a position as a math teacher for special education students at Taos High School when he reapplied there years later in 2016.

15.     After the 2014-2015 school year, Defendant TMS, acting through individual Defendants Torrez, Trujillo, and Abeyta-Valerio, decided to merge the population of students with serious behavioral problems into the main Taos High School building and campus, resulting in the closure of the smaller, safer facilities where the Chrysalis Alternative School was formerly located.

This decision was opposed by the students' parents, as well as teachers, counselors, and social workers employed by Defendant TMS, who raised serious concerns about merging the Chrysalis Alternative School into the main Taos High School campus.

16.     As a result of the merger of the Chrysalis Alternative School into the main building and campus of Taos High School, each Defendant created a situation in which students with serious behavioral problems were allowed to roam through that building and campus, where they presented a significant danger to the safety and welfare of other students.

17.     Defendants TMS, Torrez, and Trujillo failed to implement additional security measures on the main campus and buildings of Taos High School to address or manage the additional risks posed by having students in the Chrysalis classes attending school there. For example, Defendant TMS personnel did not install additional security cameras or assign additional personnel to conduct surveillance of students in the hallways or outdoor areas of the Taos High School campus throughout the school year.

18.     Defendants TMS, Torrez, Trujillo did not adequately staff the Chrysalis Alternative School with properly trained and supervised special education teachers, aides, or support staff who were qualified, equipped, and given the necessary resources to handle the special education students with serious behavioral problems who attended the Chrysalis classes during the 2015-2016 school year and subsequent school years when they were housed in the main building of Taos High School.

19.     During the 2015-2016 and 2016-2017 school years, Defendant TMS and the Principal of Taos High School, Defendant Trujillo, hired and employed Stefanie Johnstone and Paula Martinez as teachers for the Chrysalis alternative school within Taos High School. Ms. Johnstone was not licensed as a special education teacher, was not told that she was hired to work in special education, and had not taught special education students or children with extreme behavior issues before being hired to run the Chrysalis school. Ms. Martinez was an educational

assistant who did not have any form of teacher's license when she was hired as a special education teacher for the Chrysalis school. Neither Ms. Johnstone nor Ms. Martinez were afforded proper training or supervision by Defendant TMS or any of the individual Defendants.

20.     Additionally, as described in further detail below, neither Defendant TMS nor any of the three  individual Defendants in this case had proper forms, procedures, personnel, and training for reporting, investigating, documenting, or resolving student reports of sexual harassment, sexual violence, and discrimination based on sex during the time period relevant to this Complaint. The disciplinary referral form used by the school's teachers had a series of boxes with pre-printed categories of misconduct, but none of them included sexual harassment, sexual violence, or discrimination based on sex. There was no process established at Taos High School for referring student reports of sexual harassment, sexual violence, or discrimination based on sex to an impartial investigator or promptly contacting the complaining students to discuss the availability of supportive measures or explain the process of filing a formal complaint under applicable laws or regulations prohibiting sexual harassment and discrimination based on sex.

**B.     T.R. IS TRANSFERRED TO HIS GRANDPARENTS' CUSTODY IN TAOS AND INVITED TO ENROLL AT TAOS HIGH SCHOOL AFTER SEXUALLY ASSAULTING AND HARASSING FEMALE STUDENTS IN ANOTHER SCHOOL DISTRICT DURING THE 2015-2016 SCHOOL YEAR.**

21.     T.R. first enrolled at Taos High School during the 2016-2017 school year, where he was placed in the Chrysalis school described above after Defendant TMS personnel, including the three individual Defendants, obtained, reviewed, or were otherwise informed of T.R.'s school records from prior school years at other schools.

22.     Records obtained by Defendant TMS personnel indicated to them that T.R. was a freshman in 9th grade at another school outside of New Mexico during the 2015-2016 school year. Those records further showed that during the 2015-2016 school year, T.R. had numerous

disciplinary problems, including at least five documented incidents of sexual harassment, bullying, and bus violations. He was suspended multiple times and eventually expelled for misconduct that involved touching a female student's buttocks without her consent, which he admitted.

23.     By the end of the 2015-2016 school year, T.R. was transferred to the custody of his grandparents, who resided in Taos, New Mexico, and had close family and social ties with Defendants Lisa Abeyta-Valerio, Robert Trujillo, and other employees of Defendant Taos Municipal Schools.

24.     Additionally, Defendants Trujillo, Abeyta-Valerio, and other school administrators employed at Taos High School had longstanding social relationships with one another based on their status as Taos High School alumni and former student athletes at the school. Defendant Trujillo was formerly the athletic director, as well as a former teacher, coach, and student athlete at the school. Defendant Abeyta-Valerio was also a Taos High School graduate and former cheerleader who devoted much of her time to coaching the school's championship cheerleading team for many years. Her spouse, Gilbert Valerio, was also a Taos High School graduate who was on the school's wrestling team during a period when the team and several of its members were highly ranked in the state. Robert Valencia, the Director of Facilities for Defendant TMS, was also the head wrestling coach at Taos High School during the time period relevant to this Second Amended Complaint.

25.     Defendants Trujillo and Abeyta-Valerio also had family relationships with T.R.'s grandparents and attended family functions with them. T.R.'s grandfather is the great uncle of Defendant Abeyta-Valerio's sister-in-law, Valerie Valerio, who was the assistant principal of Taos Middle School. Defendant Abeyta-Valerio also communicated with T.R.'s grandmother through social media. T.R.'s grandmother is a sister of Defendant Trujillo's aunt through marriage. Defendant Trujillo also knew T.R.'s grandfather because he had other children who were students at Taos Municipal Schools while Defendant Trujillo worked there.

26.     It was through this network of family and social relationships that Defendant TMS, acting through the three individual Defendants and their family members, came to invite T.R. to enroll at Taos High School for the 2016-2017 school year and become a member of the school's wrestling team that year. T.R.'s grandfather was a Taos High School graduate who once competed on the school's wrestling team and knew other members of the Taos wrestling community. Defendant Abeyta-Valerio and her spouse, Gilbert Valerio, had a son in the same grade as T.R. who also was enrolled at Taos High School and competed on the school's wrestling team. T.R.'s grandfather was also a former TMS employee, who worked as a teacher at Taos High School from 1977 to 1981. Upon information and belief, T.R.'s grandmother was active in local politics and campaigned on behalf of local elected officials, including the Taos County District Attorney.

C.      **KNOWING THAT T.R. SEXUALLY ASSAULTED AND HARASSED FEMALE STUDENTS DURING THE PRIOR SCHOOL YEAR, DEFENDANTS ENROLLED HIM AS A STUDENT AT TAOS HIGH SCHOOL DURING THE 2016-2017 SCHOOL YEAR, WHERE HE SEXUALLY ASSAULTED AND HARASSED MORE FEMALE STUDENTS.**

27.     Knowing of T.R.'s record of assaulting and harassing female students at another school the previous year, as well as the lack of adequate security measures on the Taos High School premises, each Defendant created a danger to female students at Taos High School by inviting T.R. to enroll there beginning in the 2016-2017 school year under the conditions described herein.

28.     Upon his enrollment at Taos High School for the 2016-2017 school year, T.R. continued the pattern of sexual harassment and misconduct described in his school records from the previous year. Each Defendant received notice and knowledge of that pattern of sexual harassment and misconduct through disciplinary referrals and other reports communicated by teachers and students, as well as various documents required for special education students, such as Individualized Education Plans (IEPs) and Behavior Intervention Plans (BIPs), which were circulated and discussed among school administrators at Taos High School as well as school

administrators in the school district's main office.

29.     Those special education requirements also gave rise to numerous meetings at which T.R.'s inappropriate behavior towards female students was discussed. Defendants Trujillo and Abeyta-Valerio, as well as other school administrators, were present during meetings where this behavior was discussed and were aware of the issues raised by it, but they declined to take appropriate corrective action.

30.     By the beginning of September 2016, T.R. had already received a disciplinary referral for possession of alcohol at school and was transferred to the Chrysalis Alternative School within the main building of Taos High School. He received a second disciplinary referral later that month for behavior categorized on the school's disciplinary referral form as "excessive talking," "unacceptable language," and behavior that was "rude/discourteous" and "disruptive/uncooperative."

31.     By the end of September 2016, Ms. Johnstone (a teacher in the Chrysalis Alternative School described above) reported to Defendant Abeyta-Valerio that T.R. was engaged in a pattern of behaviors at Taos High School that included touching girls, and that at least one female student in Ms. Johnstone's class had complained about his sexual advances and was no longer coming to school. Ms. Johnstone reported that T.R. told other students: "I'll never get in trouble because my family knows Ms. Abeyta." Defendant Abeyta-Valerio responded to Ms. Johnstone's reports by stating that she also heard concerns about that type of behavior from other people, but she took no action to put a stop to it.

32.     By mid-October 2016, Ms. Johnstone again reported T.R.'s disturbing pattern of touching girls without their consent to Defendant Abeyta-Valerio and Daniel Ingroff (a school social worker employed by Defendant TMS). Ms. Johnstone's reports stated that two students reported to her that T.R. is "touching girls all the time" and that he tried to start a fight at lunch with a girl. Ms.

Johnstone also conveyed the students' report that their female friends have asked T.R. to stop touching them, as well as another student's report that T.R. was bothering her, following her in the halls, and making her uncomfortable. Ms. Johnstone then conveyed three more statements reporting T.R.'s behavior to Defendant Abeyta-Valerio.

33.    A BIP document dated October 19, 2016, reports that: "As per past reports and present information, [T.R.] demonstrates problems with poor boundary control, with female peers especially. It has been reported that [T.R.] may attempt to touch female peers in an inappropriate fashion, as evidenced by student reports that have been filed with staff at THS. The use of unwanted inappropriate language that has sexual overtones also has been reported by students. Anger management is also an issue with [T.R.], where he may become enraged when called on his behavior and leave the scene."

34.    Another document prepared by Mr. Ingroff in November 2016 assessed that: "It is apparent from reports from staff and historical information that [T.R.] can be manipulative, and may try to engage in contact/verbal communications of a sexual nature with female peers, and then deny that these contacts happened." By this point, Mr. Ingroff knew, acknowledged, and reported that there was clearly an issue with T.R.'s behavior toward female students, students were complaining about it, and teachers were complaining about it too.

35.    T.R.'s pattern of behavior described above did not stop after it was documented in the BIP and Mr. Ingroff's subsequent assessment. On Nov. 17, 2016, Ms. Johnstone reported to Defendant Abeyta-Valerio and Mr. Ingroff that the previous day T.R.

> did not show for third period until about 11, and it was reported to me by a student that he was following a girl in the hall who did not want to be followed…. [T.R.] lied to me and stated that he was with Mr. Ingroff. Later in the day, Ms. [Erica] Olson reported to me that [T.R.] was making inappropriate sexual gestures and comments with his wounded hand in her class.

This morning, [T.R.] was yelling down the hallway about masturbating. I heard it from [Defendant DeHerrera's] room as he passed by. He was yelling things to another boy who was walking faster and faster to get away from him.

I went to [Ms. Carmela Vargas-Gonzales's] room for a referral slip, and she had already started documenting on him, so I've added to it. When I walked in, [T.R.] was asking her if she could pay her to pass the class since "teachers don't make money anyway."

[Ms. Vargas-Gonzales] called [T.R.'s grandmother] about [T.R.'s] behavior back in September, and I spoke with her about his tardiness and truancy two weeks ago. [Mr. Ingroff's] report about his inappropriate behaviors was given to her last week…. We also made it explicit that [T.R.] knows right from wrong. He is not performing these behaviors in a state of anger – these are behaviors that he is initiating. From what I've witnessed, he is harassing and bullying both students and teachers.

Please let me know what we can do from here.

One of the other teachers referenced in Ms. Johnstone's report, Ms. Vargas-Gonzales, submitted a disciplinary referral to Defendant Abeyta-Valerio dated November 21, 2016, which also reported similar behavior and requested a meeting. Defendants were unresponsive to these reports and requests, and they provided no supervision to either the teachers or students involved.

36.     Another special education teacher referenced in Ms. Johnstone's report, Erica Olson, also confided to Ms. Johnstone that they were having ongoing behavioral issues with T.R. and that they reported these behaviors to Defendant Abeyta-Valerio. Ms. Olson further confided to Ms. Johnstone that Defendant Abeyta-Valerio was not addressing her concerns.

37.     Despite these concerns, Defendants allowed T.R. to train, participate, and compete on the Taos High School wrestling team during the winter season of the 2016-2017 school year. One of Defendant Abeyta-Valerio's sons trained and competed alongside T.R. on the wrestling team that year. Mr. Valencia, the Director of Facilities at TMS whose responsibilities included maintaining and upgrading the video surveillance system at Taos High School, was the head wrestling coach for both T.R. and Ms. Abeyta-Valerio's son.

38.     Through his participation on the school's wrestling team, T.R. obtained training on

13

techniques for controlling and manipulating another person's body, as well as strength training and conditioning, which he then used in his assaults on female students at Taos High School. He also obtained greater access to the school building and athletic facilities, which he used to develop knowledge of favorable locations on school premises to stalk and carry out sexual assaults on female students. By placing him on the school's wrestling team, Defendants also enhanced T.R.'s social status at the school and gave him the protection of a male peer group which served to deter other students outside of that peer group from complaining about his misconduct.

39.     When the second semester of the 2016-2017 school year started in January 2017, Ms. Johnstone had arranged for an educational assistant employed by the school district, Joe Winter, to sit with T.R. during some of his classes at Taos High School. This arrangement did not resolve any of T.R.'s behavior problems and did not last long because Mr. Winter also had behavior problems.

40.     Mr. Winter was supposed to function as an educational aide or assistant serving special education students at Taos High School, but he was totally unqualified for that position, refused to perform it, and was left unsupervised. The only discernible reason for Defendant TMS to employ him was that his spouse was the school district's Human Resources Director.

41.     On January 11, 2017, Ms. Johnstone reported some of Mr. Winter's misconduct to Defendant Trujillo and Emy DeHerrera, including misconduct which occurred in Ms. Olson's classroom. According to Ms. Johnstone's report, T.R. said that Mr. Winter "is saying 'weird things to me in the hallway.' So far, it's all political. Bashing Obama, Clinton, and Gov. Martinez. [T.R.] does not want to be around him. Erica [Olson] had to ask [Mr. Winter] to leave this morning because he was bashing Obama while she was showing the kids the Presidential Farewell in class…. Erica [Olson] has asked that [Mr. Winter] not return to her room." Ms. Johnstone further reported that: "I'm at a loss for what to do with him. I've asked him to just stick with the subs and help out with

classroom management for now."

42.     On January 19, 2017,  Ms. DeHerrera asked Defendant Abeyta-Valerio to "have a talk" with T.R. and reported that: "Last week we moved Joe [Winter] from inside the classroom to in the hall to give TR space and focus his responsibilities on in-class learning. Needless to say he is running a muck [*sic*] with the sub, and his anger issues seem to be increasing towards Joe." Defendant Abeyta-Valerio provided no supervision and did not correct these problems.

43.     Mr. Ingroff documented in a BIP dated January 23, 2017, that T.R. "is presently in Chrysalis, with classes outside that area. At this time it appears that [T.R.] might be more inclined to act out in the above ways when he doesn't have close supervision." Under that BIP, T.R. was supposed to have a "1-to-1 with J. Winter, where he is supposed to leave 5 minutes earlier to get to his next class while avoiding problems in the hallways, where historically he has had the most trouble." But that "1-to-1" with Mr. Winter was never properly implemented and was soon abandoned, despite its nominal appearance in the BIP documentation.

44.     After Defendant Abeyta-Valerio continued her pattern of failing to address or respond to concerns about T.R. or Mr. Winter, Ms. Johnstone also tried to raise them with the school's principal, Defendant Trujillo. On January 25, 2017, Ms. Johnstone reported to both Defendants Trujillo and Abeyta-Valerio that Mr. Winter had assaulted and grabbed another student, leaving a scratch on the student's arm, and that "reports about [Mr.  Winter] are piling up fast and I don't know what to say to these kids when they tell me these kinds of things. I have never dealt with such unprofessional behavior by an employee in a school setting." Ms. Johnstone further reported to these Defendants that Ms. Olson "also reported to me that [Mr. Winter] is antagonizing TR, which explains why TR has been threatening him." Ms. Johnstone asked Defendants Trujillo and Abeyta-Valerio to "[p]lease tell me what the plan is for dealing with this," but received no response.

45.     Ms. Johnstone also wrote a Microsoft Word document several pages in length which

logged the problems she witnessed with Mr. Winter, the individual temporarily assigned to escort

T.R. during part of the second semester of the 2016-2017 school year. She began writing that

document after Jim Ivanovich, the Special Education Director for the school district, told her to log

the problems she was experiencing with Mr. Winter and give the log to Defendant Trujillo. In

accordance with those instructions, Ms. Johnstone printed the log she wrote about the problems she

witnessed with Mr. Winter and gave it to Defendant Trujillo. It is possible the log also may have

been sent to Mr. Ivanovich.

46.     Ms. Johnstone personally witnessed  Ms. DeHerrera complain to Defendant Trujillo

that T.R.'s escort refused to do his job, and this was an issue. Despite these complaints from Ms.

Johnstone,  Ms. DeHerrera, and other teachers, none of the Defendants took any corrective action.

Ms. Johnstone personally witnessed that T.R. remained on the Taos High School campus without

an escort despite one being required according to his BIP. T.R. thus returned to roaming the school

building and campus unescorted, where he continued his pattern of behavior described above.

47.     On February 2, 2017, T.R. received a disciplinary referral from another special

education teacher at Taos High School, Ms. Ines Firmo, who described his misconduct on the

school's disciplinary referral form as "unacceptable language" and behavior that was "annoying to

classmates" and "rude/discourteous."

48.     In a memorandum dated March 21, 2017, Defendant Trujillo stated that he was

officially reassigning Joe Winter to another position so that he was no longer assigned to escort T.R.

Neither Defendant Trujillo nor any of the other Defendants assigned anyone to replace Mr. Winter

as T.R.'s assigned escort. Instead, Defendants entirely abandoned the plan to provide T.R. with an

escort and never assigned anyone to serve as T.R.'s escort for the remainder of the school years that

T.R. was enrolled as a TMS student.

49.     On April 27, 2017, Ms. Johnstone reported to Defendant Trujillo, Defendant Abeyta-

Valerio, and Mr. Ingroff that T.R.

> came to me saying he was leaving early at the start of the 4th period. Ines [Firmo] told me that he stabbed someone with a pencil, so I assumed he was leaving due to his behavior. Thirty minutes later, he popped in and said he couldn't get off campus without a note. I told him I was not writing a note, and if he was leaving then his grandparents could sign him out, or he'd have to talk to Ms. Abeyta-Valerio about it. He disappeared and just returned again at 10:20. No explanation.

> This is the second time he's tried to get off campus early without permission this semester. Last time, he went to myself, Ines [Firmo], and Emy [DeHerrera] trying to get a note, which disrupted all of our classes.

> He's also telling me that he's delivering his work to his teachers, but teachers are telling me that this isn't true, and he's just disrupting their students and roaming the halls.

> Can either of you please address this behavior?

Additional disciplinary referrals and documentation of teacher and student reports regarding T.R.'s behavior during the remainder of the 2016-2017 school year are either illegible or missing from the school records produced by Defendant TMS to date.

50.    During the time Ms. Johnstone worked at Taos High School, she observed that school records for T.R. were not always accurate and did not always reflect where he was actually spending his time during the school day. For example, T.R.'s schedule may show him assigned to "work study," but T.R. would appear on the Taos High School campus unsupervised during the period when he was supposed to be attending his "work study," which was supposed to take place off campus. The school district has never produced any records showing where T.R.'s alleged "work study" assignment took place, who sponsored or hosted it, or what activities T.R. allegedly participated in as part of that assignment.

51.    Ms. Johnstone recalls that other teachers reported that T.R. was sexually assaulting female students in the hallway at Taos High School during the 2016/2017 school year. Ms. Johnstone also recalls that teachers and other school personnel who attended the weekly

"collaboration meetings" in the Special Education Department at Taos High School verbally discussed T.R.'s sexual harassment of female students and other problematic behaviors during those meetings. Other teachers expressed concerns that "one day he's going to rape a girl." Defendant Trujillo, Defendant Abeyta-Valerio, and Katherine Duran, another school administrator working under their direct supervision, continually minimized T.R.'s behavior at the expense of other students' safety. Ms. Duran instructed Ms. Johnstone and other teachers at Taos High School to be minimal in writing anything negative about students in their educational records. These school administrators also commonly employed euphemisms and circumlocution when writing educational records, such as using the phrase "exceptional programs" instead of "special education," and using more generic phrases like "impulse control" in place of "sexual harassment."

52.     Neither Defendant TMS nor any of the three individual Defendants provided Ms. Johnstone or any of the other teachers at Taos High School referenced above with proper training and supervision on how to handle or process the many student reports of T.R.'s sexual harassment, sexual violence, and discrimination against them based on their female sex. Instead, these teachers were left to rely on the school's antiquated disciplinary referral forms, e-mail correspondence, impromptu visits to the principal's and vice-principal's offices, and ineffectual meetings and documentation regarding T.R.'s special education planning to communicate these reports. None of those methods addressed the complaining student's needs for supportive measures or explained the process of filing a formal complaint of sex discrimination under applicable laws or regulations.

53.     Defendants did not provide an impartial investigator to receive or process the many student reports of T.R.'s sexual harassment, sexual violence, and discrimination based on sex, or the reports about Mr. Winter's failure to perform his duties. Instead, such reports were directed to Defendant Abeyta-Valerio, Defendant Trujillo, and other TMS administrators who had a conflict of interest due to their family and social relationships with T.R., his grandparents, Mr. Winter, and his

spouse. Neither Defendant Abeyta-Valerio nor Defendant Trujillo nor any other school administrator at TMS properly documented, investigated, or otherwise handled these student reports of sexual harassment, sexual violence, and discrimination based on sex, or the reports about Mr. Winter, during the 2016-2017 school year at Taos High School.

54.     Ms. Johnstone resigned her position at Taos High School effective at the end of the 2016-2017 school year and did not pursue employment with the school district after that time. She explained that she left her employment with Taos Municipal Schools because the school district was negligent in its transfer of the Chrysalis Alternative School onto the Taos High School campus, which led to "a ton of problems," and when she alerted school administrators to these problems, they did not provide any real solutions to them. The other teacher hired for the Chrysalis program, Ms. Martinez, had already resigned earlier that year. Upon information and belief, Defendant TMS and its administrators did not hire properly qualified, trained, and supervised special education teachers to replace them, and Ms. Martinez was replaced with an uncredentialed substitute teacher for the rest of the school year.

D.     **KNOWING THAT T.R. SEXUALLY ASSAULTED AND HARASSED FEMALE STUDENTS DURING THE PAST TWO SCHOOL YEARS, DEFENDANTS INVITED HIM TO RETURN TO TAOS HIGH SCHOOL DURING THE 2017-2018 SCHOOL YEAR, WHERE HE SEXUALLY ASSAULTED AND HARASSED ADDITIONAL FEMALE STUDENTS, INCLUDING "JANE DOE 2."**

55.     With full knowledge of the pattern of behavior that T.R. exhibited during the prior two school years and the danger his presence on school grounds created for female students at Taos High School, each Defendant invited T.R. to return as a student, attend classes, participate in extracurricular activities, and roam the school premises during the 2017-2018 school year. As in the previous school year, each Defendant received notice and knowledge of that pattern of sexual harassment and misconduct through disciplinary referrals and other reports communicated by teachers and students, as well as various documents required for special education students, such as

Individualized Education Plans (IEPs) and Behavior Intervention Plans (BIPs), which were circulated and discussed among school administrators at Taos High School as well as school administrators in the school district's main office.

56.    As in the previous school year, those special education requirements also gave rise to numerous meetings during the 2017-2018 school year at which T.R.'s inappropriate behavior towards female students was discussed. Defendant Trujillo, Defendant Abeyta-Valerio, and other school administrators were present during meetings where this behavior was discussed and were aware of the issues raised by it, but they declined to take appropriate corrective action.

57.    During the 2017-2018 school year, T.R. was not provided with the 1-to-1 escort referenced in his BIP from the previous school year. His BIP documentation dated August 25, 2017, simply copied and pasted information from the previous year's BIP without regard to the fact that it was not accurate. Defendants entirely failed to address the absence of such a 1-to-1 escort, its effect on T.R. and his female student victims, or any alternative measures during the IEP and BIP planning process for the 2017-2018 school year.

58.    None of the Defendants provided notice of T.R.'s known pattern of past behavior or the danger it presented to incoming teachers, staff, or students who were unfamiliar with that pattern of behavior because they had not attended or worked at Taos High School before the 2017-2018 school year. In particular, none of the Defendants provided such notice to the incoming class of freshman female students, who were the primary targets of T.R.'s sexual aggression and predatory behavior during that school year.

59.    On August 16, 2017, Defendant Abeyta-Valerio received a disciplinary referral from Ms. Firmo which categorized T.R.'s behavior as using "unacceptable language" and being "annoying to classmates" and "verbally aggressive" to other students.

60.    On September 7, 2017, Defendant Abeyta-Valerio received a disciplinary referral

from Ms. Vargas-Gonzales which categorized T.R.'s behavior as being "disruptive/uncooperative" and stated that he "walked out of class."

61.     On September 11, 2017, Defendant Abeyta-Valerio received two disciplinary referrals in the same day stating that T.R. was cutting class, left class without permission, and categorizing his behavior as being "disruptive/uncooperative" and "insubordinate."

62.     On September 19, 2017, Defendant Abeyta-Valerio received a disciplinary referral from Tom Duke, another special education teacher employed at Taos High School, which reported that when he asked his class if they know what Donald Trump was doing at the U.N. that day, T.R. replied "sucking dick."

63.     On September 26, 2017, Defendant Abeyta-Valerio received two more disciplinary referrals regarding T.R. One of those referrals was from Ms. DeHerrera and an educational assistant identified as "Julie," who worked in Ms. DeHerrera's classroom. That referral reported T.R's behavior as being "uncooperative/defiant," and "cutting class/truancy." The referral further stated that "when told [T.R.] why he was running or roaming the halls he said he was in Mr. Gabriel [Daffron's] class and walked away."

64.     The second disciplinary referral dated September 26, 2017, was submitted by Mr. Duke and categorized T.R.'s behavior as "annoying classmates," "talking excessively," "constantly cussing," and being "rude/discourteous" and "disruptive/uncooperative." Mr. Duke's disciplinary referral of that date further reported that T.R. "cusses all the time in class, won't obey when teacher tells him to leave," and "won't back off from girls when told to."

65.     Based on the seven disciplinary referrals regarding T.R. that teachers had reported during the 2016-2017 school year as of September 26, 2017, the school social worker, Mr. Ingroff, issued a manifestation determination with other members of T.R.'s IEP team dated October 2, 2017, which found that T.R.'s conduct was not caused by, or in direct and substantial relationship to, his

alleged disability. By the time of the manifestation determination hearing, Defendants Trujillo, Abeyta-Valerio, Mr. Ingroff, and other relevant members of the IEP team also knew of reports that T.R. had sexually assaulted a female student that school year, as described below.

66.     Mr. Duke personally witnessed T.R. make inappropriate comments to female students in his class. Defendant Trujillo was aware that T.R. had been removed from Mr. Duke's classroom several times for using inappropriate sexual language, but on several of those occasions, Defendant Trujillo returned T.R. to Mr. Duke's classroom and asked that he be let back into his class without taking any disciplinary action.

67.     While employed as a special education teacher at Taos High School, Mr. Duke regularly attended special education staff meetings at which teachers and school administrators discussed T.R.'s sexually aggressive behavior and his targeting of special education students. During one such meeting, Mr. Duke heard Ms. Olson tell Defendant Abeyta-Valerio that T.R. bragged that he would never get in trouble because Defendant Abeyta-Valerio was friends with T.R.'s grandfather. Defendant Abeyta-Valerio and Ms. DeHerrera were present at some of these special education meetings when teachers voiced their concerns that T.R. was exhibiting sexually aggressive, predatory behavior toward female students at the school.

68.      In keeping with Defendant TMS's policy, practice, and custom of minimizing T.R.'s behavior at the expense of other students' safety and not reporting or investigating sexual harassment, sexual violence, or discrimination because of sex, Defendant Abeyta-Valerio did not document or report any of the behavior reported in T.R.'s numerous disciplinary referrals as sexual harassment or discrimination; instead she only used generic descriptions and infraction codes such as "disorderly conduct" or "insubordination" in a conscious effort to avoid the obligation to report or investigate such sexual harassment or discrimination as required under applicable laws and regulations.

69.     As the disciplinary referrals and other reports of T.R.'s pattern of behavior described above were pouring in from teachers and students at Taos High School during August and September 2017, T.R. was using the many occasions on which he was cutting class or leaving his assigned classroom to roam the halls and grounds of Taos High School unsupervised, where he stalked, sexually harassed, and sexually assaulted female students on the Taos High School campus. The student referenced herein as "Jane Doe 2" was one such student.

70.     Jane Doe 2, who has intervened as a plaintiff in this lawsuit, was a fifteen-year-old student in her freshman year at Taos High School during the 2017-2018 school year. Defendants did not provide her with notice of the danger that T.R. presented to her and other female students at Taos High  School. They also did not provide her with training on how to recognize, report, or prevent sexual harassment or sexual assaults.

71.     On or about September 26, 2017, Jane Doe 2 asked to speak to the School's Dean of Students, Casey Tonrey. Jane Doe 2 proceeded to ask the Dean for the definition of rape. Dean Tonrey then summoned Officer Henry Sanchez, the Taos Police Department school resource officer assigned to Taos High School, as well as Defendant Abeyta-Valerio, to interrogate Jane Doe 2 in the vice-principal's office, where students were typically taken to be disciplined. The interrogation was recorded on video with Officer Sanchez pointing his camera at Jane Doe 2. The circumstances of this interrogation gave Jane Doe 2 the impression that she might be subjected to discipline for reporting what had happened to her.

72.     As a result of that interrogation, Jane Doe 2 ultimately disclosed to Dean Tonrey, Officer Sanchez, and Defendant Abeyta-Valerio that T.R. had sexually assaulted her on school premises on at least three occasions. She also disclosed to them the locations where those sexual assaults occurred.

73.     While Defendants did not conduct their own investigation of the sexual harassment,

sexual violence, and discrimination based on sex reported by Jane Doe 2, Officer Sanchez and the Taos Police Department did initiate a criminal investigation of T.R., during which Jane Doe 2 was referred to a safehouse interview where she provided more detail concerning the nature and locations where T.R. sexually assaulted and harassed her that school year.

74.     Jane Doe 2 reported that T.R. was a casual acquaintance and that she told him she already had a boyfriend. T.R. began following Jane Doe 2 around the hallways between classes and entered her respective classes during class time to lure her into the hallways.

75.     Jane Doe 2 further reported that on one occasion in mid-September 2017 when she was wearing a dress because it was "game day" at the school, T.R. met her in a hallway at Taos High School after they each got out of class. T.R. then verbally engaged her, grabbed her hand, pulled her towards and against him, and started kissing her. When she pulled away, he grabbed her again, pushed her back against the wall, pulled her towards him, and resumed kissing her. When she pulled away a second time and walked down an adjacent stairwell, T.R. pursued her to the hallway at the bottom of the stairwell, grabbed her, pushed her up against the wall, and tried to put his hand up her dress and onto her leg. After she twice pushed him away again and said "I don't want to," T.R. assaulted her again in the same location, put his hands around her neck to scare her, and then placed his hand on her left thigh and into her underwear, where he made skin-to-skin contact with her vagina. As she tried to push him away again, he pulled down her dress all the way, but she managed to get away and ascend the stairwell. T.R. then grabbed her arm and threatened to come after her again the next period.

76.     The hallway at Taos High School referenced in the preceding paragraph connects with a wing of the main school building where special education classes were held in the classrooms assigned to Mr. Duke, Ms. Firmo, and other special education teachers. At one end of that hallway, adjacent to Ms. DeHerrera's classroom, there is a stairwell leading downstairs to another hallway

that in turn connects to the school's main gymnasium, as well as a concession stand and art room across from that gymnasium. Through years of roaming the school premises unsupervised, T.R. had learned there was a small niche by the bottom of that stairwell that is not within view of the school's video surveillance system. It was at that location that he digitally penetrated Jane Doe 2 and pulled down her dress as described above.

77.     Jane Doe 2 further reported that after T.R.'s first assault on her described above, her eyes got watery and she told her teacher in her next class not to let T.R. come and get her. As Jane Doe 2 predicted, T.R. came to her class to pursue her, but her teacher told him she could not leave the classroom at that time.

78.     Jane Doe 2 further reported that about two weeks later, on or about September 25, 2017, T.R. followed her into the hallway as she exited her class adjacent to his. He caught up with her as she walked down the stairs and started verbally harassing her, as well as trying to kiss her and put his hands down her pants. She said "no," pushed him away, and departed the area around the time the bell for the next class rang.

79.     Jane Doe 2 further reported that later the same day while she was going to the small, auxiliary gym in the main building at Taos High School, T.R. grabbed her hand and directed her outside the building to an adjacent location on school grounds he called "his tree," where he kissed her and put his hand down her pants. He then led her by the hand to another location at the bottom of a stairwell, where he anally raped her.

80.     Through years of roaming the school premises unsupervised, T.R. had learned that the area at the bottom of the stairwell where he anally raped Jane Doe 2 is not within view of the school's video surveillance system. The top of that stairwell, however, leads directly to the school's "wellness center" as well as a set of doors leading into the school's auxiliary gym. There is a video camera at the top of the stairwell which recorded T.R. and Jane Doe 2 descending the stairs and

then ascending them a short time later on the date when the anal rape described above occurred, but none of Defendant TMS's personnel were monitoring or responding to that video surveillance at the time. They never preserved the video recordings.

81.    Jane Doe 2 further reported that on September 26, 2017, the day after T.R. anally raped her as described above, T.R. again pursued her to a location on school grounds adjacent to the main school building near a covered walkway that led from the main school building to another building which housed the school library. At that location, T.R. blocked her into a corner, verbally harassed her for sex, and then pushed her head down and held her against her will until she performed oral sex on him. After performing oral sex, T.R. continued verbally and physically harassing her to perform sexual intercourse and grabbed her breasts with his hands.

82.    The third location where T.R. sexually assaulted Jane Doe 2 on or about September 26, 2017, is in a courtyard area immediately adjacent to an exterior wall of the wing of the main Taos High School building where special education classes are held. That location is also adjacent to a set of doors which lead out of the hallway from the special education wing of the building to the covered walkway leading to the school library building. There is a tree at that location. Through years of roaming the school premises unsupervised, T.R. had learned that the location where he sexually assaulted Jane Doe 2 a third time on or about September 26, 2017, is not within view of the school's video surveillance system.

83.    After T.R sexually assaulted Jane Doe 2 for the third time on or about September 26, 2017, she walked to her next class, where her teacher noticed that she was crying and asked if she needed to speak with someone. Jane Doe 2 replied that she did, and that is what led to her being sent to meet with Dean Tonrey, where she asked about the definition of rape and was first interrogated as described above. By that time, Jane Doe 2 was afraid of retaliation from T.R. and his peers, as well as being disciplined by Defendant Abeyta-Valerio. Defendants did not discuss the

26

availability of supportive measures with Jane Doe 2 or explain to her the process of filing a formal complaint under applicable laws or regulations for redressing sexual harassment. Instead, they left her to feel that she was to blame for being sexually harassed and assaulted repeatedly by T.R.

84.     Mr. Duke was present at one special education meeting at which the teachers discussed the sexual assault of a female student (Jane Doe 2) by T.R. At that meeting, Defendant Abeyta-Valerio advised the teachers that, in her view, the students were equally guilty. Mr. Duke was so upset, he left the meeting, and it was one of the reasons he later resigned his position as a special education math teacher at Taos High School.

85.     It was obvious to Mr. Duke and the other special education teachers with whom he worked at Taos High School that T.R. was sexually aggressive with female students. School administrators, including Defendants Trujillo and Abeyta-Valerio, were well aware of this problem, but they did nothing to protect Mr. Duke's female students. Instead of protecting the female victim, they chose to blame her for the sexual assault.

86.     Mr. Duke personally witnessed that T.R. remained on the Taos High School campus and continued to engage in the same sexually aggressive behaviors after the disciplinary referrals described above.

87.     As Defendants continued to minimize and downplay T.R.'s sexual assaults and harassment of female students without documenting or investigating it as such on their own, the Taos Police Department (TPD) proceeded with a criminal investigation of T.R., and Jane Doe 2's parents obtained a restraining order against him. A TPD detective interviewed Jane Doe 2's mother on October 12, 2017, at which time she informed the detective that when she served the restraining order on TMS personnel at the vice-principal's office at Taos High School on October 5, 2017, school personnel told her, "we can't enforce that," and they refused to do anything in response to it. A copy of the restraining order documentation was placed in Jane Doe 2's file at TMS, where it was

accessible to each of the Defendants. TMS later produced that documentation in discovery in this case.

88.     Defendants had no procedure in place for how to address an order of protection restricting one student's proximity to another student, and Defendants Torrez, Trujillo, and Defendant Abeyta-Valerio did not provide any training or supervision to their subordinate employees on how to address that situation.

89.     Jane Doe 2's mother observed that Defendants Trujillo and Abeyta-Valerio did not take the reported sexual assault on her daughter seriously and, after picking her daughter up from school on the date she reported the assault, Jane Doe 2's mother did not hear from anyone at the school at all. Nobody called from the administration. On a subsequent visit to Taos High School, however, Jane Doe 2's mother encountered three teachers in the hallway (Ms. Olson, Mr. Duke, and Ms. Firmo), who told them T.R. was well-known for being overbearing with some of the female students. They also told her that "everybody knew" about T.R.'s sexual assaults on Jane Doe 2 because T.R. started telling his friends, and his tales eventually reached the teachers as well. Ms. Olson told Jane Doe 2's mother, "he watches these girls, and anytime they go somewhere, he follows them. He's like a predator-type kid that is always looking for an opportunity to get someone alone. We don't know why he's still here."

90.     Jane Doe 2 returned to her classes at Taos High School for about two weeks after she reported being sexually assaulted by T.R. During this period, her grades started dropping and she was apprehensive about the threat of being confronted by T.R., as well as malicious gossip from other students about the assaults, while on the high school campus. In response to this situation, as well as Defendants' failure to notify them if, when, or under what circumstances T.R. would be back on the Taos High School campus that school year, Jane Doe 2's parents arranged for her to attend Taos High School on a modified schedule, under which she would do most of her school

work from home, attend one class at the school for one period every other day, and attend an after-school program once per week on Wednesdays from 3:00 p.m. to 5:00 p.m., where she could pick up and turn in assignments for her other classes.

91.     Because Defendants and other school officials failed to provide Jane Doe 2 or her parents with any notice of T.R.'s whereabouts on the Taos High School campus, and other students in fact sighted T.R. on campus at various times during the rest of the school year after he assaulted Jane Doe 2, her parents had to devise their own "family plan" in which they enlisted Jane Doe 2's siblings and friends to walk with her so she was not alone while at school and during extracurricular activities. Jane Doe 2 remained afraid to run into T.R. or be caught somewhere by him, and her peers had told her that he still attended Taos High School that school year.

92.     On November 16, 2017, with Defendants' knowledge, a TPD detective and TPD School Resource Officer Sanchez conducted an interview at Taos High School of Ms. Olson, one of the special education teachers who witnessed T.R.'s sexually predatory behavior there. During that interview, Ms. Olson stated that she witnessed an occasion where Jane Doe 2 asked Ms. Olson not to let T.R. see her while in her class, and that T.R. later came to the door to ask for her, at which time Ms. Olson turned him away. Ms. Olson also reported that she had seen T.R. and Jane Doe 2 in the hallway, and that T.R. would always have his hands on Jane Doe 2 while Jane Doe 2 repeatedly told him: "Get your hands off me, get your hands off me. Don't."

93.     Ms. Olson further reported that she had T.R. in one of her classes during both the 2016-2017 school year and the 2017-2018 school year, and both years he acted inappropriately and always spoke about sex in class. She recalled reports that T.R. was "touching, bugging, following girls to class" and "walking by their classroom." She further explained that two students had reported to her that T.R. showed them screen images on his phone of girls performing oral sex on him, and that other teachers were aware of inappropriate sexual behavior between T.R. and female

students at Taos High School. Ms. Olson reported that the behavior she described was a "constant pattern" with T.R. and "common knowledge" among teachers and administrators at the school. Based on her own observations and reports of other teachers and students, Ms. Olson further described T.R. as "a predator type kid that's always just looking for somebody."

94.    In addition to the sexually explicit screen images on T.R.'s phone that Ms. Olson reported to the TPD officers on November 16, 2017, as described above, female students actually showed Ms. Olson images of girls performing oral sex on T.R. that T.R. had sent to them from his phone. The female students were upset that T.R. sent these images to them, and they did not consent to either being depicted on the images or receiving the images from T.R. Upon information and belief, Jane Doe 2 was one of the female students depicted in the images that T.R. sent from his phone. Ms. Olson reported the female students' complaints at the weekly collaboration meetings attended by other teachers, including  Ms. DeHerrera, as well as school administrators, including Defendants Abeyta-Valerio and  Trujillo.

95.    Defendants' response to Ms. Olson's reports about T.R. sending sexually explicit screen images of female students performing oral sex on him was to do nothing and tell the teachers that nothing could be done about those reports. None of the female students' reports were processed as sexual harassment complaints, and instead they were simply ignored. Defendants never reported the allegations about T.R.'s sexually explicit images of female students to the police or child protective services.

96.    After Ms. Olson learned of the allegation that T.R. had sexually assaulted Jane Doe 2, Ms. Olson voiced her concern to Defendant Abeyta-Valerio, reminding her that the multiple reports made by teachers, including Ms. Olson herself, to administrators leading up to those assaults should have justified his removal from the school long ago. Ms. Olson was shocked to learn that T.R. was allowed to return to school as if the assaults had never occurred and once again voiced her

concern to Defendant Abeyta-Valerio. Defendant Abeyta-Valerio responded to Ms. Olson's concerns by dismissing Jane Doe 2's allegations as unproven (despite the video evidence that Defendants had never even bothered to collect) and directing Ms. Olson to focus her efforts on "more strict classroom management" (even though none of the sexual assaults occurred in her classroom).

97.     In a BIP document dated December 14, 2017, an IEP team that included Defendants Trujillo and Abeyta-Valerio acknowledged peer reports that T.R. "is posting things on Facebook about partying, etc., and this is counterintuitive to his being able to make the behavioral changes he needs to be successful at THS." The same BIP document acknowledged "the problems with his returning to the THS environment, where supervision is much more difficult to achieve, not to mention the issues that might occur with peer influences, and more freedom in an open environment."

98.     Notwithstanding their acknowledgement of these problems and their knowledge of T.R.'s social media postings, Defendants allowed T.R. to return to the Taos High School campus on a regular basis throughout the remainder of the school year, even though his IEP documentation nominally assigned him to an after-school program called "IAES." As in the previous school year, T.R.'s school records did not accurately reflect where he was actually spending his time during or after the school day. While he was nominally assigned to the "IAES" after-school program, for example, teachers and students still saw him on the Taos High School campus during the school day at various times, and his class schedule still showed that he was nominally assigned to classrooms at the high school during the regular school day. T.R. was also still publicly listed on the roster for the school's wrestling team for that school year.

99.     Defendants continued to use the IEP and BIP process to minimize and downplay T.R.'s status as a confirmed sexual predator, instead using that process as a pretext to relieve T.R.

of any school rules or requirements with which he did not want to comply, such as attending classes or completing academic assignments. Defendants encouraged and invited T.R. to continue exercising his male privilege to participate in school athletics and other extracurricular activities at the school on his own terms, when it was already documented and proven that his sexually predatory behavior had nothing to do with any alleged disability.

100.    Meanwhile, Jane Doe 2's friendships, athletic activities, and educational opportunities she had developed during her freshman year at Taos High School were disrupted.

101.    The 2017-2018 school year ended with T.R. still enrolled at Taos High School and Jane Doe 2 still enrolled there under circumstances where Defendants expressly refused to comply with or accommodate her restraining order against T.R. or otherwise protect her or notify her of T.R.'s whereabouts on campus. This result evinces and reinforces Defendants' established policies, customs, and practices which served to protect a male student-athlete engaged in sexual harassment, sexual violence, and discrimination based on sex, while blaming his female victims and failing to even process their complaints as such, much less protect them.

102.    Following Mr. Duke's lead earlier in the school year, Ms. Olson also resigned her position as a special education teacher after the end of the 2017-2018 school year. Upon information and belief, Mr. Ingroff also retired or had his cases reassigned to another social worker after the 2017-2018 school year. Another special education teacher who had experienced and reported T.R.'s pattern of behavior described above, Ms. Firmo, is believed to have taken her own life that year and is no longer available as a witness.

103.    Defendants did not replace Mr. Duke, Ms. Olson, or Ms. Firmo with qualified special education teachers who were properly trained and supervised to handle a student such as T.R., much less provide supportive services to his female victims. Similarly, they did not replace Mr. Ingroff or reassign his cases to a school social worker with similar experience and qualifications. Combined

with the loss of Ms. Johnstone and Ms. Martinez the previous school year, the loss of Mr. Duke, Ms. Olson, Ms. Firmo, and Ms. Ingroff had a chilling effect on other educators and staff at Taos High School, as it sent the message that reporting or objecting to Defendants' unjustified treatment of T.R. and his female victims was not a good career move within TMS.

**E.      KNOWING THAT T.R. SEXUALLY ASSAULTED AND HARASSED FEMALE STUDENTS DURING THE PAST THREE SCHOOL YEARS, DEFENDANTS INVITED HIM TO RETURN TO TAOS HIGH SCHOOL FOR THE 2018-2019 SCHOOL YEAR, WHERE HE SEXUALLY ASSAULTED AND HARASSED PLAINTIFF JANE DOE AT THE SAME LOCATIONS ON SCHOOL PREMISES WHERE HE ASSAULTED JANE DOE 2 THE PREVIOUS YEAR.**

104.    With full knowledge of the pattern of behavior that T.R. exhibited during the past three school years and the danger his presence on school grounds created for female students at Taos High School, each Defendant invited T.R. to return as a student, attend classes, participate in extracurricular activities, and roam the school premises during the 2018-2019 school year, as if that past misconduct had never occurred. As in the previous school years, each Defendant received notice and knowledge of that pattern of sexual harassment and misconduct through disciplinary referrals and other reports communicated by teachers and students, as well as various documents required for special education students, such as Individualized Education Plans (IEPs) and Behavior Intervention Plans (BIPs), which were circulated and discussed among school administrators at Taos High School as well as school administrators in the school district's main office.

105.    As in the previous school year, those special education requirements also gave rise to numerous meetings during the 2018-2019 school year at which T.R.'s inappropriate behavior towards female students was discussed. Defendant Trujillo, Defendant Abeyta-Valerio, and other school administrators were present during meetings where this behavior was discussed and were aware of the issues raised by it, but they declined to take appropriate corrective action.

106.    At the beginning of the 2018-2019 school year, Jane Doe 2 returned to classes on the

Taos High School campus and attempted to resume a normal schedule there, only to find that T.R. was back on campus that school year. Jane Doe 2's mother sighted T.R. at the school and went to Defendant Trujillo's office to report that she was not notified T.R. would be returning to Taos High School, despite a requirement in the ████████████ that she receive such notice. As neither Defendant Trujillo nor any other school officials resolved this problem, Jane Doe 2 made the decision to transfer Jane Doe 2 to another school for the rest of the 2018-2019 school year. Jane Doe 2 never returned to Taos High School after that, again losing friendships, educational opportunities, and opportunities to participate in athletics and other extracurricular activities at the school for another school year.

107.    During the 2018-2019 school year, T.R. was not provided with the 1-to-1 escort referenced in his BIP from the 2016-2017 school year. His IEP documentation dated August 29, 2018, does not even include or require a BIP for that school year. Defendants entirely failed to address the absence of such a 1-to-1 escort, its effect on T.R. and his female student victims, or any alternative measures during the IEP planning process for the 2018-2019 school year. They even changed his placement from the after-school program off campus where he was nominally assigned the previous semester and deliberately placed him in classes back on the Taos High School campus.

108.    On August 28, 2018, Mr. Gabriel Daffron, one of the special education teachers on T.R.'s IEP team, sent an e-mail message to Defendants Trujillo and Abeyta-Valerio,  as well as Ms. DeHerrera and Dean Tonrey, warning them that: "I am not very positive about [T.R.'s] ability to adapt and be successful at THS. He already has had numerous problems with staff and students. The IEP is to change his placement to THS, however I think that we also need to revisit IAES." IAES was an alternative placement outside the premises of Taos High School. Mr. Daffron's recommendation to revisit that alternative placement went unheeded, and Defendants placed T.R. on a set schedule with classes at Taos High School.

109.    The school social worker who was newly assigned to T.R. that year, David Hyatt, reported in the IEP documentation dated August 29, 2018, that T.R. "has already had an incident of a female student complaining of unwanted advances, threats, and stalking behavior." Mr. Hyatt "discussed at length the situation and [T.R.] had a hard time understanding the full impact that this behavior could have on him." Mr. Hyatt later acknowledged that other portions of T.R.'s IEP documentation for that semester contained inaccuracies as a result of some of its text being copied and pasted from previous versions, as well as being edited by several IEP team members who had access to an electronic version of that documentation without the necessary training. Nevertheless, Mr. Hyatt confirmed that the incident involving the female student which he reported in the IEP documentation dated August 29, 2018, occurred near the start of the Fall 2018 semester and was accurately reported by him.

110.    Again, there was no consideration of the impact that this behavior could have on the victims of T.R.'s sexually predatory behavior. Despite already receiving a report of another student victim at the beginning of the 2018-2019 school year, Defendants specifically directed that T.R. was to remain on the Taos High School campus that year, where he again roamed the school building and grounds to stalk, harass, and assault female students as he wished.

111.    Defendants Torrez and Trujillo were responsible for hiring, training, and supervising new teachers to fill the positions left open by the departure of other teachers, including Defendants Olson and Duke, the previous school year. They elected to hire Miranda Chavez to teach science classes for special education students, although she did not yet have a special education license, and they assigned her to teach an 8th period Biology class listed on T.R.'s schedule, which was taught in Classroom C-209 across the hallway from the offices of Defendant Abeyta-Valerio and Bob Ortiz, who was assigned the position of security guard at Taos High School.

112.    Defendants Torrez, Trujillo, and Abeyta-Valerio provided Ms. Chavez with no

training on how to teach the special education classes assigned to her and did not notify her of T.R.'s past sexual misconduct involving female students at Taos High School. These Defendants did not even inform Ms. Chavez about the requirements for obtaining an interim license to teach special educations students.

113.    On the first or second day of her 8th period Biology class, Ms. Chavez noticed that her classroom "smelled like weed," and she went across the hall to summon Mr. Ortiz, who identified T.R. as the source of the smell and directed him to "come with me." Although T.R. was still nominally assigned to her 8th period Biology class for the rest of the school year, Ms. Chavez did not see him attend that class again. She did not receive an explanation as to what happened to him as a result of the "smelling like weed" incident described above but assumed he had been suspended for a period of time. Defendants, however, have produced no records of this incident or any discipline imposed on T.R. as a result of it.

114.    As in previous school years, T.R.'s school records did not accurately reflect where he was actually spending his time during or after the school day. For example, his class schedule for the 2018-2019 school year lists Ms. Chavez's eighth period biology class in classrooms in the "F Wing" of the school building formerly occupied by the Chrysalis Alternative School. But as noted above, T.R. was not attending that class after the first few days of the school year, and it was held in Room C-209 across from Ms. Abeyta-Valerio's office, not in the "F Wing."

115.    Moreover, the Chrysalis Alternative School did not exist at any location during the 2018-2019 school year. Its absence was regular discussed at school meetings attended by Ms. Chavez, Ms. DeHerrera, and Defendants Trujillo and Abeyta-Valerio, because Ms. Chavez and many other teachers wished that it would come back so that students with behavioral issues could be placed there. Nevertheless, some of T.R.'s school records for the 2018-2019 school year still refer to his placement in the Chrysalis Alternative School despite the fact that it did not exist at any

location that school year.

116.    Mr. Daffron, who was assigned as T.R.'s "case manager" for the 2018-2019 school year, acknowledged that T.R. and other students in the senior class enrolled in a work study program that school year had "really confusing" schedules, and that not only T.R. but the majority of students sometimes did not follow their assigned schedules. Ms. Chavez observed that Mr. Daffron favored male students and allowed students to "hang out" in his classroom when they were supposed to be engaging in their lessons in other places. T.R. was one of the male students who regularly showed up in Mr. Daffron's classroom, even though he had no assigned classes there according to Mr. Daffron and did not do any schoolwork there.

117.    Shortly after the 2018-2019 school year began, Defendant Trujillo attended weekly "collaboration" meetings of the Special Education Department at THS and solicited teachers for after-school assignments loosely described under the rubric "IAES." In a narrower, technical sense, "IAES" refers to a specific form of alternative placement for a special education student who is suspended from a regular school setting. But on this occasion, Defendant Trujillo was using the term "IAES" more loosely to refer to a general after-school program that supplemented one or more students' existing placements on the school campus. Ms. Chavez volunteered for this general after-school program two days per week, from 3:00 p.m. to 5:00 p.m. in her existing classroom (C-209) on the THS campus. Defendants, in turn, accepted her for this assignment and assigned T.R. as her student for that program at the beginning of September 2018.

118.    Defendants did not, however, provide Ms. Chavez with any background at all about T.R.'s past disciplinary history, his prior sexual assaults on female students, or even why he had been assigned to the after-school program that Ms. Chavez was assigned to teach. Ms. Chavez was not shown a copy of T.R.'s IEP or his BIP, nor was she given any training on how to access these materials. She was not told who T.R.'s case manager was. In response to questions about the

Chrysalis Alternative School, Ms. Chavez was told that it no longer existed any more and was not an option for students with behavioral issues.

119.    Defendants also failed to provide Ms. Chavez with any clear direction on what was supposed to be happening during the after-school program she was assigned to teach, or how to supervise T.R.. Although Ms. Chavez was led to believe that they were supposed to work on class assignments provided by other teachers, in fact Ms. Chavez received no such assignments for T.R., so she instead gave him science assignments because that was the subject she taught at THS.

120.    T.R. did not follow his assigned class schedule during the regular school day or during Ms. Chavez's after-school program. Even though T.R. was absent from Ms. Chavez's regular 8th period  Biology class, he would walk into her other classes on occasion throughout the school day without a reason for being there and disrupt the class. T.R. would also come and go as he pleased from Ms. Chavez's after-school program, and she would see him roaming the campus without an escort at other times too. When T.R. was angry, Ms. Chavez saw him lash out by hitting desks and attempting to slam doors. He would also threaten to hit freshman students in her class.

121.    Ms. Chavez had no way of controlling T.R.'s movements to and from her classroom because he was larger than she was and did not respond to directions. She reported T.R.'s chronic failure to abide by his class schedule, as well as the disruptions caused by his entering classes to which he was not assigned, and his absences from his assigned after-school program to Defendants Abeyta-Valerio and Trujillo, as well as Mr. Ortiz, Dean Casey Tonrey, the attendance office, her department head, and other teachers. They showed very little concern, and nothing was really done about it.

122.    At their weekly "collaboration" meetings, Ms. Chavez and other teachers also discussed T.R.'s disruptions and their inability to keep him in the classroom. No real solutions were ever suggested, and nothing was done about it. Instead, the focus was on finding ways to enable

T.R. to graduate.

123.    By the end of November 2018, T.R. had stopped attending the after-school program in Ms. Chavez's classroom. He was still assigned to classes on the Taos High School campus during certain parts of certain school days, but the remainder of his time during and after the school day was unaccounted for and unsupervised. Even though he was no longer attending his previously scheduled class period with her, T.R. continued to enter Ms. Chavez's classroom during other class periods and disrupt her teaching.

124.    During the after-school period between 3:00 p.m. and 5:00 p.m. each school day, many students were in the THS buildings and on the THS campus for a variety of school-sponsored programs including athletics, culinary arts, and other extracurricular activities. In addition to high school students, middle school students (in 7th and 8th grades) were invited onto the THS campus during this period to practice with athletic teams in which they participated.

125.    During a one-week period during October 2018, regular class schedules and programming at THS are disrupted to accommodate a series of school-sponsored "Spirit Week" activities which culminate in the boy's varsity football game and the homecoming dance. These "Spirit Week" activities also include a "powderpuff" game where male football players swap uniforms with female cheerleaders, and the rest of the student body is encouraged to watch the spectacle as the cross-dressed females play a game of football while the cross-dressed males cheer from the sidelines.

126.    Concurrently with "Spirit Week," freshman and senior students at THS are released from their regular class schedules to participate in an "EQ Retreat" in which students are divided into groups, which are then managed and run by untrained senior students, who are then supposed to lead their respective groups through a series of team-building exercises. In reality, however, the "EQ Retreat" and Spirit Week activities are poorly planned and poorly executed, resulting in a

situation where students are not properly supervised, and teachers do not know what is going on. Both of these events put students in situations where they are unsupervised and unprotected, because nobody knows where they are supposed to be or where they are going or what is going on.

127.    Meanwhile, the Taos Police Department continued its criminal investigation of T.R.'s assaults on Jane Doe 2 the previous school year. On or about October 4, 2018, with Defendants' knowledge, TPD School Resource Officer Sanchez along with a TPD detective and another officer accompanied Jane Doe 2 and her mother on a visit to the Taos High School campus to identify and document the locations where she had been assaulted when she was a student there during the previous school year. The TPD officers took photographs and video recordings of the hallway at the bottom of the stairwell below Ms. DeHerrera's classroom, the bottom of the stairwell below the school's "wellness center," and the outdoor location adjacent to the exterior wall of the special education wing of the main school building.

128.    Apart from the TPD officers' photographs and video recording taken that day, there was still no video surveillance equipment monitoring the locations where T.R. was known to have sexually assaulted Jane Doe 2 and likely took his other victims. The school district's Facilities Director, Mr. Valencia, was supposed to be maintaining and upgrading the video surveillance system to ensure that such dangerous areas were not out of range of functioning security cameras, but instead he devoted his time to coaching T.R. to wrestle and physically subdue his victims.

129.    Before the start of the 2018-2019 school year, Defendants knew and should have known that they failed to provide security cameras to monitor the locations where T.R. sexually assaulted female students and where other criminal activity was known to occur. Even without such security cameras, these locations were well within the boundaries of the school premises where Defendants and their security staff were capable of monitoring by other means, including physical line of sight, but they failed to do so.

130.    None of the Defendants provided notice of T.R.'s known pattern of past behavior or the danger it presented to incoming teachers, staff, or students who were unfamiliar with that pattern of behavior because they had not attended or worked at Taos High School before the 2018-2019 school year. In particular, none of the Defendants provided such notice to the incoming class of freshman female students, who were the primary targets of T.R.'s sexual aggression and predatory behavior during that school year.

131.    It was under the circumstances described above that Plaintiff, a shy, smart, vulnerable fourteen-year-old started her freshman year at Taos High School and began to find her way around the school campus in August 2018. At that time, Plaintiff was excited about school and her extracurricular activities. She was doing well academically, got along with her friends and family, and had no mental health issues.

132.    The class schedule that Defendant TMS personnel assigned to Plaintiff required her to travel by and through the hallway of the special education wing of the main school building where T.R. had several of the classes assigned to him. Her 6th period class was located at one end of that hallway, adjacent to the top of the stairwell where T.R. had first sexually assaulted Jane Doe 2 the previous year. Although Plaintiff was not a special education student, her 9th period class was in the same wing as special education classrooms with an exterior wall adjoining the courtyard location where T.R. had forced Jane Doe 2 to perform oral sex and grabbed her breasts the previous year.

133.    At some point during the first weeks of the 2018-2019 school year, Plaintiff was introduced to T.R., who was a senior at Taos High School that year with a male peer group he had established over the three years he attended the same school. T.R. began stalking and grooming Plaintiff for a sexual relationship.

134.    As a fourteen-year-old freshman, Plaintiff had no sexual experience at that point, and Defendants had provided her with no training on how to recognize, report, or respond to sexual

harassment or sexual assaults. Thus, while she rejected T.R.'s sexual advances and repeatedly informed him that she was not ready for a sexual relationship, in Plaintiff's mind the attention he gave her led her to consider him a "boyfriend" whom she was "school dating" for about two weeks at the beginning of the school year. By "school dating," she meant that she would spend time together with T.R. at school and sometimes communicate via text messaging in the evenings during that two-week period. Plaintiff never saw T.R. outside of school and did not discuss her relationship with him with her family at that time.

135.    T.R. began sexually harassing Plaintiff by trying to persuade her to allow him to touch the private areas of her body and asking her to touch his penis. He also asked her to send nude photos of herself on several occasions and touched her breast and vaginal area over her clothing approximately four times without her consent. T.R. persisted in these forms of harassment despite Plaintiff's repeated statements refusing his demands and indicating that his sexual advances were unwelcome.

136.    After their interactions during the two-week period described above, T.R. ended what Plaintiff then perceived as a "school dating" relationship and "broke up" with her. But even after this "break up," T.R. would still follow Plaintiff around the hallways at school. As he had done with Jane Doe 2, T.R. would enter Plaintiff's classes and try to see her and separate her from her teachers and other classmates.

137.    On or about October 9, 2018, Plaintiff attended an after-school meeting for her culinary arts class, which was located at one end of the hallway near the wing of the building where special education classes were held and adjacent to the top of the stairwell where T.R. had first sexually assaulted Jane Doe 2 the previous year. While on her way from the culinary arts classroom to the locker room where she planned to change into her softball uniform and get ready for softball practice on the school team later that afternoon, Plaintiff heard someone call her name in the

hallway. She tried to keep walking after she realized that it was T.R. who was calling her name.

138.    T.R. caught up with her at the bottom of the stairwell where he had first assaulted Jane Doe 2 the previous school year. In the niche by the bottom of that stairwell, T.R. suddenly started kissing Plaintiff and putting his hands down her pants without her consent. She repeatedly told him "We're not together. I'm not ready for anything like that. I don't want to," and words to that effect. T.R. persisted in putting his hands down her pants, making skin-to-skin contact with her vaginal area. He became upset because of her refusal to consent.

139.    Plaintiff then continued trying to talk herself out of the situation while T.R. pursued her as they walked back up the stairs, down the hallway of the wing of the building where special education classes were held, and out the doors at the other end of that hallway. Unbeknownst to Plaintiff, T.R. was leading her into a trap at the same corner in the outdoor courtyard area where T.R. had forced Jane Doe 2 to perform oral sex on him the previous school year.

140.    Once at that location, T.R. forced himself upon Plaintiff again and began kissing her, grabbing her by the waist, and putting his hand down the front of her pants. Plaintiff became afraid at this point, because T.R. was not listening to her and was ignoring her repeated protests and verbalizations telling him "No!"

141.    T.R. then harassed Plaintiff by telling her to perform oral sex on him. Again, she tried to talk herself out of the situation by making excuses and telling him that she didn't know how. T.R. told her to "lick it like a lollipop" as he placed his hand on the top of her head and pushed her head down. He placed his penis in her mouth, but she felt sick and disgusted and could not continue.

142.    T.R. then pushed Plaintiff back against the exterior wall of the school building and said "Let's have sex." She replied "No!" and tried to make excuses to get away, including saying that she was menstruating. T.R. proceeded to pull her pants down as she tried to get away from him to no avail. He was bigger and stronger than she was, and he had the advantage of the wrestling

skills and techniques that his Taos High School wrestling coaches and teammates had taught him.

143. As Plaintiff resisted, T.R. tried to put his penis in Plaintiff's vagina but could not because of the angle of their bodies. Employing his wrestling skills, he then turned her around to face the wall and stood behind her with his hands on her waist. She tried to hold her pants up but he continued to pull them down though not completely off, as she was standing.

144. From this position, Plaintiff could feel T.R.'s penis against her buttocks, and she tried to squeeze them very tightly to keep him from penetrating her. Against her resistance, T.R. violently pushed his penis into Plaintiff's vagina, causing her pain that "hurt really, really bad." She screamed "Ow that fucking hurts!" and "you need to stop!" But T.R. did not stop and instead replied "It is going to hurt."

145. Eventually T.R. stopped, pulled up his pants, and walked away. Plaintiff initially stood there feeling shocked after he left. Not fully understanding what had happened to her and not knowing what to do at that age, Plaintiff pulled up her pants and went to the locker room bathroom to try to clean herself up with wet toilet paper. She then changed into her softball uniform and, not knowing what else to do, she went to softball practice without telling anyone what had happened. Her mother came to pick her up from school after softball practice.

146. Plaintiff did not know what to do, or whether she should disclose what had happened. She was ashamed and afraid of what her parents would think if she disclosed the assaults to them. Plaintiff was in pain from the rape for the rest of the day. After she got home, she felt "really, really gross" so she took a shower for a very long time, trying to scrub and cleanse her body.

147. The following day, October 10, 2018, Plaintiff confided in two of her close female friends about what had happened. One of her friends observed that Plaintiff was "freaking out" and crying when she made this disclosure. Plaintiff asked them not to disclose anything to anyone, as she was afraid that T.R. would retaliate. Plaintiff also remained afraid to disclose the assaults to

school officials or her parents, as she was afraid her parents would be upset with her, and she didn't want to be known around school as "the girl who got raped."

148. Although she did not understand clearly how pregnancy worked at that age, Plaintiff was afraid that she might have become pregnant as a result of T.R.'s rape. On October 16, 2018, she took a pregnancy test at the school clinic, and the test came back negative.

149. Plaintiff was afraid to go to school after the rape, especially on Tuesdays and Thursdays when she knew T.R. would be at school. She was fearful of him, as he knew her class schedule and would walk into her class even though he was not a student in that class. She felt that T.R.'s continued presence at the school was scary, and that he was still trying to see her.

150. Plaintiff spent the following three (3) months after the rape trying to avoid T.R. She would try to avoid him at school by taking routes to classes and school events where she was less likely to see him.  Plaintiff also asked her friends to walk with her between classes, help her watch for T.R., and hide from him.

151. After the rape, Plaintiff felt alone and was fearful of going anywhere alone. She would take her younger brother with her if she had to go out in public.

152. Plaintiff also experienced difficulties with falling and staying asleep. She had nightmares about the assaults, bouts of crying, and intrusive thoughts and images of the assaults.

153. Meanwhile, T.R. continued to attend Taos High School and roam the school campus without regard to the schedule Defendants had set for him at the beginning of the school year. At the time he sexually harassed and assaulted Plaintiff, T.R. was not under detention or any conditions of pretrial release resulting from the TPD's criminal investigation of his sexual assaults on Jane Doe 2 the previous school year.

154. Due the manner in which juvenile delinquency proceedings are handled under New Mexico law, which requires a preliminary inquiry from the Juvenile Probation and Parole Office of

the Children Youth and Families Department to determine the best interests of the accused child

and the public before a petition can be filed in Children's Court, ████████████████████

███████████████████████████████████████████████████████████████

██████████████████████

155.   ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

156.   ████████████████████████████████████████████████████

████████████████████   On December 11, 2018, Defendant Abeyta-Valerio received a disciplinary

referral from Monica Romero for threatening another female student. The referral form stated that

as he was leaving the testing room for PARCC testing at the school, T.R. tried to shake a female

student's hand, and when she refused, he said "I'm gonna get a new dent in my truck when I find

you. You don't think I'm serious I am." Ms. Romero took these statements as a threat that T.R. was

going to "run her down." Defendant Abeyta-Valerio, however, dismissed it as a joke and allowed

T.R. to continue attending Taos High School.

157.   On January 17, 2019, Defendant Abeyta-Valerio received a disciplinary referral

from Ms. LaBella, which categorized his behavior as "disruptive/uncooperative" and stated that T.R

"comes into my class just to disturb students." Again, Defendants allowed T.R. to continue attending

classes at Taos High School despite this referral.

158.   On January 29, 2019, Defendant Abeyta-Valerio received two more disciplinary

referrals from T.R.'s teachers for being "uncooperative/defiant," and "cutting class/truancy."  One

of the referral forms stated that T.R. "leaves class/campus without permission." The other form

stated that T.R. "keeps leaving class without permission" and "never came back" that day. One of the referral forms indicated that a teacher had already telephoned T.R.'s grandparent to try to locate him. Defendant Abeyta-Valerio's noted on that referral form his "grandparents [were] present while looking for [the] student, he would not answer [the] phone. Left campus." On the other referral form, Defendant Abeyta-Valerio stated she "spoke with [T.R.] on his out of class behavior <u>again</u>, he was asked to stay in class."

159.    Also on January 29, 2019, the same morning T.R. walked out of his assigned classes at Taos High School as described above, Plaintiff was summoned to the office of the school social worker, Mr. Hyatt, in response to a report that Defendant Trujillo received the previous afternoon from another female student and conveyed to Mr. Hyatt. That individual, who was also a student at Taos High School, reported to Mr. Hyatt that she was told by Plaintiff that Plaintiff had been raped on school grounds by T.R. The reporting student also told Mr. Hyatt that she was worried about breaking her friend's confidence by telling him about the rape and did not want Plaintiff to know that she was reporting it to Mr. Hyatt. Mr. Hyatt decided to bring Plaintiff into his office for questioning anyway.

160.    In response to questioning by Mr. Hyatt on January 29, 2019, Plaintiff broke down crying, felt ashamed, and said she worried her parents would find out. She was very concerned about being labeled a rape victim, having to go to court, and what her parents would think of her. Nevertheless, she disclosed the rape to Mr. Hyatt, and Mr. Hyatt in turn summoned TPD officers and her parents to the school. Plaintiff left Taos High School with her parents that day and never returned to attend any of her classes or extracurricular activities there.

161.    Plaintiff subsequently participated in a safehouse interview so that TPD officers could get more information about how T.R. sexually assaulted, harassed, and brutally raped her. She also returned to the Taos High School campus on January 31, 2019, with her mother and an

escort of TPD officers for the purpose of showing them the locations where T.R. sexually assaulted her. She identified the first location as the hallway at the bottom of the stairwell leading to the art room, concession stand, and gym. She identified the second location as the corner of the outdoor courtyard area by the exterior wall of the school building's special education wing. Upon revisiting that location, Plaintiff became tearful and started crying. The TPD officers recognized these locations as the same ones Jane Doe 2 had identified to them on October 4, 2018. One of them remarked that he could not believe that school personnel still had not installed video surveillance equipment to monitor those locations.

162.    The TPD officers also interviewed a few of Plaintiff's female peers, who confirmed that Plaintiff had told them about being assaulted by T.R. One of the peers also stated that she heard around school that T.R. "did this to a freshman last year and tried to do this to a lot of girls." She further reported that she went with Plaintiff to get a pregnancy test at the school clinic, and that when she was walking around the school with Plaintiff, and they saw T.R., Plaintiff made them go the other way or hide.

163.    ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████████

164.    ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████

165.    After she reported T.R.'s sexual assaults as described above at the end of January 2019, Plaintiff's fears increased, as she was afraid T.R. would find her. Plaintiff became more fearful of being around males and groups of people. T.R. had told her that he had many friends in

48

the town, and she was afraid of his friends or family members approaching her when she was out in public.

166.    Knowing that Defendants had failed to protect Jane Doe 2 from T.R.'s assaults the previous year, had done nothing to support her, and had not installed security cameras to monitor the locations of the assaults, TPD Officer Sanchez assisted Plaintiff's mother in arranging for her to transfer to another school for the remainder of the 2018-2019 school year. As a result of the transfer, Plaintiff lost friends and was no longer able to participate in softball or her culinary classes, all of which were important to her.

167.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

168.    ████████████ gave rise to rumors at school, and Plaintiff received inquiries from other students about whether she was the student who had been raped and why she changed schools. Such rumors and inquiries made the situation more difficult for her, as she did not want anyone to know and did not want to be known as "the girl who got raped." She became more hesitant to go out in public, as she felt people were looking at her and whispering. She thought that T.R. was popular and well known in the town because he was born and raised there, while she felt like an outsider. Thus, she was afraid people would view her in a negative light for reporting his criminal behavior.

169.    Plaintiff also stopped participating in social media after the assaults were reported, which resulted in the loss of many friends. During the remainder of the school year, she felt very alone and hated. She also felt dirty, embarrassed, ashamed, and used. She kept having repetitive thoughts about why T.R. had sexually assaulted her.

170.    Plaintiff's mother observed that Plaintiff was anxious and fearful of being around

others, and that Plaintiff would not leave her side when they were out in public together. Plaintiff's

mother also observed that Plaintiff was not comfortable going out on her own and would self-isolate

in her room during this period.

171.    The reporting ████████████ of T.R.'s sexual assaults on Jane Doe also sparked a

renewed interest in T.R.'s sexual assaults on Jane Doe 2 the previous year. Unfortunately, when

Jane Doe 2 was contacted by law enforcement and learned that T.R. had returned to Taos High

School and assaulted another student--████████████████████████████

██████████████████████████--this news retraumatized her and had a negative

impact on her own recovery efforts. Jane Doe 2 was subsequently transported by ambulance for

several months of inpatient treatment outside of Taos County.

172.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

173.    Despite their knowledge of ████████████████████████

██████████████████████ documentation dated February 6,

2019, Defendants never documented T.R's behavior as any type of sexual harassment, sexual

violence, or discrimination based on sex. Instead, Defendant Abeyta-Valerio continued to describe

T.R.'s ████████████████████████████████████

██████████████

174.    Around March or April 2019, Defendants Trujillo and Abeyta-Valerio asked Ms.

Chavez to resume an after-school program for T.R. two days per week from 3:00 p.m. to 5:00 p.m.

They still had not informed her of T.R.'s sexual assaults on Plaintiff earlier that school year or his history of sexually assaulting other female students. Ms. Chavez only learned of the assaults for the first time when T.R. identified himself as the subject of a newspaper article that appeared in the *Taos News*.

175.    The *Taos News* article was entitled "Taos High teen charged with rape" but did not identify the names of any students. Ms. Chavez only learned that T.R. was the Taos High teen charged with rape because T.R. openly identified himself as such in her presence and in the presence of other students and staff. In addition to identifying himself as the subject of the charges, T.R. openly bragged that nothing would happen to him as a result of the legal proceedings. He made disparaging remarks about the Judge's mental capacity and threatened both the newspaper staff and the girls he raped, saying "they were going to regret it." He did not denying having sex with the girls. T.R. made these statements so that anyone within earshot of him could hear them, both inside and outside the school building.

176.    Ms. Chavez was horrified and outraged when she first learned from T.R. that he had sex with female students on campus and was charged with raping them. Had she been notified of this information earlier, it would have affected how she monitored him. She would not have placed herself in a position where she was alone with him, nor would she have volunteered to serve as his teacher in an after-school program.

177.    While providing no support to Plaintiff or Jane Doe 2 after they were sexually assaulted at school, and failing to even notify affected teachers such as Ms. Chavez of the assaults, Defendants made it their priority to ensure that T.R. would be able to fully participate at Taos High School's graduation ceremonies with his male peers at the end of the 2018-2019 school year. Thus, while TPD officers and the District Attorney's Office were investigating and preparing to prosecute T.R. for the sexual assaults, Defendants were manipulating his educational records to get around

normal graduation requirements and allow him to publicly participate in graduation despite his failure to meet those requirements.

178.    On May 23, 2019, Defendant Abeyta-Valerio went so far as to send an e-mail message to Defendants Torrez, Defendant Trujillo, and Ms. DeHerrera, as well as another TMS administrator, "[j]ust to confirm that everyone is aware that [T.R.] will be participating fully in all graduation events. We spoke about it last week in the meeting upstairs, and I just want to confirm that we are all aware and the Board is aware as well." Defendant Trujillo replied: "Thank you, Ms. Abeyta-Valerio." Defendant Torrez replied emphatically: "The Board is aware!" Defendant Abeyta-Valerio later acknowledged that it sent a terrible message to female students to allow T.R. to participate in graduation events in light of his sexual assaults which had been publicly reported in the *Taos News* by that time, and she claimed it was not her decision alone to allow such participation. She claimed that she and other school personnel acquiesced in T.R.'s participation in graduation events at Taos High School because T.R. and his grandparents wanted him to participate.

179.    Thus, while Jane Doe 2 underwent inpatient treatment outside the county and Plaintiff was self-isolating after closing her social media accounts, each of the Defendants actively aided and abetted T.R.'s misconduct and rewarded him for it with full participation in Taos High School graduation events for the Class of 2019, which T.R. then gleefully posted on his own social media accounts, proudly showing himself dressed in full graduation regalia.

180.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

181.    T.R. subsequently moved out of state and was later charged with other crimes in that state, including driving under the influence and unlawful carrying of a pistol. He pleaded guilty to the charge of driving under the influence, and the firearm charge was dismissed on condition that he forfeit the pistol he was carrying at the time he was arrested for both offenses.

182.    Plaintiff continues to suffer from the effects of T.R.'s sexual assaults and Defendants concerted efforts to aid, abet, and reward him for the pattern of behavior he exhibited during his three years as a Taos High School student. She continues to feel uncomfortable while out in public, as she fears she could run into T.R. whose family still resides in Taos. She feels anxious whenever she sees a male who resembles T.R., fearing that it might be him.

183.    Plaintiff continues to experience frequent intrusive thoughts about the sexual assaults and has difficulty getting them out of her head. She tries to stay busy with work and school to distract herself from these thoughts. According to Plaintiff's forensic psychology expert, Dr. Donna Peters, it will likely take a course of two to three years of trauma-focused treatment to resolve these post-traumatic effects of her experience described above. Those experiences, and her efforts to presently cope with them through avoidance, may lead to further effects or impairments as she gets older, enters adult intimate relationships, or has a child of her own.

184.    Plaintiff's injuries as described above are aggravated by knowing that Defendants continued to allow T.R. to roam around the school and do whatever he wanted after he had raped another female student the previous school year, and that they arranged for him to graduate from Taos High School while she was forced to change schools, change friends, and change her activities. Defendants' deliberate indifference to the sexual assaults made Plaintiff feel "unheard and dismissed."

F.     **DEFENDANTS HAVE LONGSTANDING POLICIES, CUSTOMS, PATTERNS, AND PRACTICES EVINCING THEIR DELIBERATE INDIFFERENCE TO KNOWN SEXUAL ASSAULTS AND HARASSMENT OF FEMALE STUDENTS AT TAOS HIGH SCHOOL.**

185.    Before T.R. enrolled at Taos High School, Defendant TMS and the three individual Defendants had already established policy decisions, customs, practices, and patterns of behavior in the school's administration which served to dismiss, downplay, and minimize sexual harassment, sexual violence, and discrimination based on sex at the school, as well as to create danger for the school's female student population. As described above, each of the individual Defendants formed part of a governing clique that had been running Taos High School for years. That governing clique resulted from rampant cronyism and nepotism at TMS which had existed even longer. Membership in the clique was based on each Defendants' social and family relationships as former Taos High School alumni and student athletes, and their shared beliefs and practices which reinforced traditional gender roles and stereotypes of male aggression and female submission.

186.    As noted in Section B above, Defendants Trujillo and Abeyta-Valerio had known each other since elementary school, graduated from Taos High School the same year, and attended the same college after high school. Defendant Abeyta-Valerio also attended college and participated on the same cheerleading team as Defendant Trujillo's spouse, who was a former teacher, coach, and assistant principal at Taos Municipal Schools. Defendant Abeyta-Valerio and Defendant Trujillo's spouse remained close personal friends after college and while employed by Defendant Taos Municipal Schools. Defendant Abeyta-Valerio's father was a former superintendent of Taos Municipal Schools and was employed there his entire career. Several of her uncles were teachers and administrators at Taos Municipal Schools. Her spouse was a former wrestler and wrestling coach at the school district. Her brother was also a wrestling coach there. Defendant Trujillo's mother, aunt, sister, and several of their first cousins also worked for Defendant Taos Municipal

Schools.

187.    Other Taos Municipal Schools employees who attended Taos High School concurrently with Defendants Trujillo and Abeyta-Valerio included Esther Winter, the school district's Human Resources Director, her spouse Joe Winter, who was the educational assistant nominally and temporarily assigned to escort T.R. in January 2017; Carmela Vargas-Gonzales, one of the special education teachers at Taos High School; and Katherine Duran, the school district's transition coordinator assigned to supervise work-study for special education students, including T.R. Robert F. Trujillo, a physical education teacher and former girls' basketball coach at Taos High School, attended the same college with Defendants Trujillo, his spouse, and Defendant Abeyta-Valerio. All of these individuals formed part of an "in group" or governing clique at Taos Municipal Schools by virtue of their longstanding past associations and relationships with one another.

188.    When Defendant Torrez became Superintendent of Taos Municipal Schools in 2014, she too joined this governing clique and consistently ratified the policies, practices, customs, and opinions of its members, including Defendants Trujillo and Abeyta-Valerio. Other longstanding members of the clique, including Joe Winter and Robert F. Trujillo, were given special treatment and exempted from requirements and standards applicable to other TMS employees by virtue of their membership in that clique. Defendants and other members of the governing clique at TMS viewed outsiders and newcomers such as Ms. Johnstone, Mr. Duke, Ms. Olson, and Ms. Chavez with suspicion and harbored a discriminatory animus against them, while similarly situated teachers who had been at the school longer and were loyal to the clique, such as Ms. Vargas-Gonzales, were viewed by its members as exemplary employees without regard to their objective performance.

189.    T.R. also received special, favorable treatment from this governing clique by virtue of his grandparents' family relationships with Defendants Trujillo and Abeyta-Valerio, as well as T.R.'s grandfather's past employment and educational relationship with Defendant Taos Municipal

Schools as a former school employee, alumni, and student athlete at Taos High School. In her November 16, 2017, interview with Taos police officers, Ms. Olson reported that T.R. was receiving unusually more leniency than other students, and she did not understand why he had been given so many chances. She remarked that other teachers had expressed concerns that other students would be gone if they had T.R.'s "track record." Teachers also observed that T.R.'s grandfather was frequently on the Taos High School campus visiting with Ms. DeHerrera and school administrators to obtain favorable treatment for T.R.

190. One of those administrators, Kat Duran, told Ms. Johnstone that she had a personal relationship with T.R.'s grandparents. School records indicate that Ms. Duran nominally assigned T.R. to a "work study" program during the years he was enrolled at Taos High School, but the school district has not found or produced any records documenting where that alleged "work study" program occurred, who sponsored or hosted it, or what activities T.R. participated in as part of his alleged "work study."

191. The discriminatory animus that members of Defendant Taos Municipal Schools' governing clique harbored toward outsiders was so palpable that even years later when they were deposed in this action, teachers such as Ms. Olson and Ms. Johnstone expressed concerns about facing retaliation for their testimony and were visibly upset when Defendant Trujillo attended their depositions in person. Mr. Duke also testified that several other teachers he spoke with expressed fears of providing their own testimony and chose not to do so. Fear of retaliation is one of the major reasons why employees and students do not come forward to report sexual misconduct, so a school district where administrators prompt such fears and fail to offer protection against retaliation cannot operate effectively to report, investigate, or remedy such misconduct.

192. Fear of retaliation by, and lack of cooperation from, members of the governing clique described above also hindered law enforcement investigation and prosecution of T.R. for his sexual

assaults on the Taos High School campus. In this regard, law enforcement officers assigned to investigate the assaults on Plaintiff Jane Doe and Jane Doe 2 largely had to rely on information provided by outsiders such as Ms. Olson and the victims' mothers to develop corroborating evidence for prosecuting T.R., while Defendants Trujillo and Abeyta-Valerio provided only minimal information recounting each victim's disclosure of the assaults, and Defendants TMS and Torrez provided no information at all. Each of these Defendants possessed a large volume of information and records in their custody and control which would have aided in the prosecution of T.R., but they failed to provide it to law enforcement, and much of it was only revealed during discovery in this civil action years later.

193.    The discriminatory and danger-creating purposes and effects of the governing clique described above are evident in their formal policymaking, lack of training and supervision, and lack of surveillance and monitoring at Taos High School.

194.    While Defendant TMS may claim to have generic, formal documents entitled "policies" on "sexual harassment" or related subjects, the decisions of the school district's official policymakers, including Defendants Torrez, Trujillo, and Abeyta-Valerio, inserted a deliberate and intentional disconnect or procedural void between such generic written policy statements and the actual practices and day-to-day decision-making of district personnel. Through this intentional disconnect or procedural void, Defendants could nominally claim to have a formal document called a "policy" on "sexual harassment" or related subjects while at the same time denying teachers and students access to any viable means of invoking or implementing such alleged "policies."

195.    This intentional disconnect or procedural void is evinced in the policy decisions, customs, practices, and pattern of behavior described above with respect to reports about T.R. provided by Jane Doe 2, Plaintiff, other female students, and the teachers such as Ms. Johnstone, Mr. Duke, Ms. Olson, and Ms. Chavez who conveyed such student reports to school administrators

and sought guidance and supervision from them. Instead of directing those reports toward invocation of formal policies against sexual harassment, or laws and regulations which set forth procedures for impartial investigation and provision of supportive services to victims of such harassment, Defendants TMS, Torrez, and Trujillo consistently made official policy decisions to delegate responsibility for processing those reports to the biased and conflicted Defendant Abeyta-Valerio, who in turn entirely ignored the female victims' needs and rights. Instead, Defendant Abeyta-Valerio consistently used her delegated authority to make official policy decisions which redirected the school district's resources away from the female victims and toward enabling the male perpetrator's condut to ensure that he could continue to attend and graduate from Taos High School, as well as participate in the school's favored male athletic programs in accordance with his grandparents' wishes. The other Defendants, in turn, ratified and consciously acquiesced in these decisions.

196.    Although Defendant TMS's official written policy and procedure in effect during the school years at issue assigned the role of "compliance officer" for sexual harassment complaints to the Superintendent, Defendant Torrez, the school district had a *de facto* custom and practice of delegating that role to the Principal of Taos High School, Defendant Trujillo. Defendant Torrez ratified that custom and practice during the years she served as Superintendent, without ever training Defendant Trujillo or his administrative team on how to perform the assigned functions of a "compliance officer," which included investigating and documenting sexual harassment complaints, as well as determining whether to hold an administrative hearing and imposing discipline on the perpetrator. As a result, Defendant Trujillo and other members of his administrative team, including Defendant Abeyta-Valerio, lacked any training or supervision on how to perform these functions with respect to sexual harassment complaints, and they were not even aware of the specific contents of Defendant TMS's  official written policy and procedure on the subject. As a result of Defendants

TMS and Torrez's failure to train or supervise Defendants Trujillo or Abeyta-Valerio in this regard, the school district's official written policy and procedure with respect to sexual harassment was never even invoked, much less followed, during the school years at issue in this Second Amended Complaint.

197.    In addition to the custom or practice of delegating the Superintendent's assigned role as "compliance officer" for sexual harassment complaints to Defendant Trujillo as the Principal of Taos High School, Defendants TMS and Torrez also had a custom or practice of delegating policymaking authority for student disciplinary matters, including sexual misconduct, to the principal of each school, who in turn delegated policymaking authority for classroom management to individual teachers. Defendant Trujillo exercised this delegated policymaking authority by, among other things, editing and publishing a "student agenda" for Taos High School students which listed general school policies but did not include specific policies on sexual misconduct or how to report it. Defendants TMS, Torrez, and Trujillo also had a custom or practice of overdelegating responsibility for "classroom management" policies to each individual teacher, as well as overdelegating student eligibility and participation policies for school-sponsored athletic activities such as the wrestling team to individual coaches and athletic personnel. In practice, many teachers and coaches did not have any written policy, and the few who did wrote policies which varied widely from one another and did not specifically address sexual misconduct. Without undertaking any systemic review of individual teachers' "classroom management" policies to determine whether they were consistent with one another or with official policies adopted by the school board—much less whether they were following their own or the school board's policies--Defendants TMS, Torrez, and Trujillo blindly ratified whatever *de facto* policies each teacher chose to implement in their respective classrooms. They also ratified the decision to allow T.R. to continue participating on the school's wrestling team despite his clear violations of team policies and the obvious nexus between

the wrestling skills he acquired on that team and the techniques he used to subdue the victims of his sexual assaults.

198.    Each Defendant failed to train and supervise their respective subordinate employees on proper policies and procedures for imposing discipline on special education students whose misconduct was not a manifestation of their disability, reporting or sharing information about student misconduct with others who had a legitimate and lawful need to know, conducting investigations of sexual misconduct, assigning an impartial decision-maker to conduct such investigations, remedying sexual misconduct after it occurred, or taking steps to prevent further instances of sexual misconduct under circumstances where it was certain to recur and result in the violation of students' constitutional rights in the absence of such training and supervision. Instead, each Defendant created a mistaken impression among their subordinates to the effect that special education students could never be placed on an out-of-school suspension for more than 45 days, and that school employees were forbidden to report or share relevant information about a student's pattern of misconduct with others who had a legitimate and lawful need to know. Lacking proper training and supervision on investigative requirements, techniques, and remedial measures, each Defendants' subordinate employees were left to rely on their own biases and prejudices—as well as their loyalty to members of the governing clique—as the primary or exclusive basis for making decisions about reported sexual misconduct at Taos High School.

199.    Within the "Exceptional Programs" Department (a/k/a Special Education Department) at Taos High School, some of the newer teachers such as Ms. Johnstone and Ms. Olson also looked to Ms. DeHerrera for guidance with respect to issues arising from T.R.'s misconduct during the time she served as the Department Chair. Ms. DeHerrera, however, had no authority to supervise other school employees or discipline T.R. outside her own classroom. Instead, she could only report such matters up the chain of command to Defendants Abeyta-Valerio, Trujillo, and

Torrez, who failed to train or supervise her as described above. Thus, designating Ms. DeHerrera as a nominal "Department Head" without any real authority to investigate or remedy T.R.'s sexual misconduct toward female students only contributed to the customs and practices of the governing clique described above.

200.    Each Defendant's failure to train and supervise as described above formed a pattern or practice over the course of several school years, during which each Defendant knew of and acquiesced to the harm it was causing to the younger female students at Taos High School whom T.R. groomed and then violently preyed upon. By the time Plaintiff Jane Doe enrolled at Taos High School in August 2018, this pattern and practice had culminated in a situation where subordinate employees were repeatedly and erroneously told that there was nothing the school district or higher-level administrators could do about T.R.'s misconduct, and new teachers such as Ms. Chavez were assigned to teach in a special after-school program for T.R. without being provided any information about his past misconduct or resources for addressing its recurrence.

201.    Under the school district's policies, as well as the customs and practices of each individual Defendant, they were responsible for supervising students and disciplining them for misconduct that occurred on the Taos High School campus during scheduled class periods and at all other times before and after classes when school-sponsored activities were taking place on campus. Defendant Torrez specifically knew and understood that a student could be subject to discipline for sexual misconduct occurring on school grounds regardless of whether the misconduct happened before, during, or after scheduled class periods, yet she failed to take any measures to provide for T.R.'s supervision on campus at any of these times. Defendant Abeyta-Valerio also was well aware of the need for student supervision during after-school activities on campus, as she was responsible for supervising the cheerleaders' practice at Taos High School, which occurred during after-school hours on school days. During the Fall 2018 semester when T.R. sexually assaulted

Plaintiff Jane Doe, Defendant Trujillo specifically assigned T.R. to an after-school program on the Taos High School campus from 3:00 p.m. to 5:00 p.m. on certain school days, while failing to advise Ms. Chavez, the teacher assigned to that after-school program, of T.R.'s known history of sexual misconduct, the likelihood of recurrence, or any remedial measures. Each Defendant also knew that "Spirit Week" activities were scheduled during after-school hours at Taos High School in October 2018 but failed to provide adequate supervision or disciplinary measures for T.R. during that period.

202.   Each Defendant also knew that the Taos High School campus lacked reliable surveillance technology to aid school employees in supervising students while they were on campus but outside of their assigned classrooms. During the time period relevant to this Second Amended Complaint, the school's security cameras and related equipment for video monitoring and recording were subject to numerous outages and malfunctions, which were reported up the chain of command to each individual Defendant. Defendants Torrez and Trujillo largely delegated their responsibility for this equipment and its security functions to Defendant Abeyta-Valerio. But Defendant Abeyta-Valerio knew and reported that there was no one assigned to monitor the security cameras during or after the school day, in part because the school security guard in whose office the video monitor was located was instead assigned to staff the campus's front gate during most of his working hours.

203.   Moreover, it was known to all Defendants during this period that there were numerous "blind spots" which did not come within the field of view of any of the security cameras at Taos High School, and these "blind spots" included the areas which T.R. used for conducting his sexual assaults on Plaintiff Jane Doe and Jane Doe 2. Defendants took no steps to remedy these "blind spots" after they were identified as locations where T.R. sexually assaulted Jane Doe 2 during the 2017-2018 school year. Even before that time, Ms. Johnstone and other school employees knew and reported that students would congregate in the "blind spots" around the school library when they wished to engage in misconduct outside the view of school personnel.

204.    Defendants also knew and acquiesced to a custom and practice of not maintaining what little evidence the school's video surveillance did manage to record. The school's video surveillance system only had the capacity to maintain video recordings for a matter of days before they were erased and written over, and by the time this litigation commenced, Defendants had lost the entire contents of the video recordings on the school district's servers and connected devices due to an alleged cybersecurity breach. Although the school district's video surveillance system may have recorded footage from other vantage points which showed T.R. travelling to or from the locations of his sexual assaults, none of those recordings were ever preserved by any of the Defendants.

205.    Despite knowing and acquiesing to a practice in which the school's security camera system was not monitored regularly and its recordings were not identified and preserved in a timely manner, the individual Defendants nevertheless relied on the alleged absence of video evidence as a pretextual basis to dismiss reports of T.R.'s sexual misconduct and avoid investigating it. For example, Defendant Abeyta-Valerio dismissed Jane Doe 2's reports that T.R. sexually assaulted her as mere "he said, she said" allegations because the assaults were not recorded on the school's security cameras, while ignoring and suppressing the sizable body of other evidence corroborating those allegations. In effect, Defendants created a dangerous situation where surveillance and supervision of T.R.'s activities on campus was lacking and then relied on the absence of such surveillance and supervision as an excuse to make decisions in his favor based on their own personal biases, prejudices, and loyalty to the governing clique to which they and T.R.'s grandparents all belonged.

206.    The lack of training and supervision in the area of implementing formal policies and regulations against sexual harassment and the like, as well as its role as a moving force in causing the constitutional violations alleged here, is further evinced by the numerous messages and reports

from Ms. Johnstone, Mr. Duke, Ms. Olson, Ms. Chavez, and other teachers in which they sought guidance from each of the Defendants about what to do with the student reports of T.R.'s sexual predations. Not once did any of the Defendants respond to these untrained teachers' pleas for help or advise them on how to assist a female student in invoking a formal sexual harassment complaint, obtaining supportive services, or utilizing procedures for addressing such harassment set forth in applicable laws and regulations. Instead, Defendants TMS, Torrez, and Trujillo overdelegated their responsibilities to Defendant Abeyta-Valerio, who simply dismissed the victims as lacking credibility in accordance with the biases and gender stereotypes of the governing misogynous clique described above. Lacking adequate training or supervision from the other Defendants on how to classify reports of student misconduct, Defendant Abeyta-Valerio also effectively erased the students' reports by renaming T.R.'s pattern of behavior under generic categories such as "disorderly conduct" or "insubordination," which disconnected their subject matter from formal sexual harassment policies or regulations.

207.    The lack of security cameras and other surveillance practices at the locations where T.R. was known to stalk and trap his female victims was the result of decisions by Defendants' official policymakers to engage in a practice of willful blindness, which in turn evinces deliberate indifference to the safety risks that T.R.'s presence on the unmonitored school premises posed to those victims. After all Defendants declined to improve video surveillance when the Chrysalis Alternative School and T.R. were moved onto the premises of Taos High School, Defendant Abeyta-Valerio proceeded to use the intentional absence of such video surveillance as a means of dismissing the reports of female students as nothing more than unsupported allegations, in accord with her own biases and gendered stereotype of these low-status females as not credible.

208.    Instead of focusing resources on maintaining and upgrading video surveillance and other security practices at Taos High School after the Chrysalis Alternative School was moved onto

the school's premises and T.R. used the school premises as a venue for stalking his young female prey, Defendants instead made the official policy decision to assign the school district's Facilities Director (Mr. Valencia) to coaching the boys' wrestling team and teaching T.R. the skills and techniques to capture and subdue his female prey. Similarly, Defendant Abeyta-Valerio allotted her time and resources so little or none of them were devoted to systemically improving video surveillance and security on campus, and a disproportionate amount of her time and resources were instead devoted to her obsession with coaching and winning championships for the girls' cheerleading team.

209.    That T.R.'s sexual harassment, assaults, and discriminatory behavior against the school's female student population continued unabated over the course of three school years evinces Defendants' persistence in a course of conduct known to be ineffective. That persistence in turn evinces their deliberate indifference to the discrimination and dangers presented by T.R.'s continued presence as their invitee on the premises of Taos High School.

210.    Such an ineffective course of conduct is illustrated by, among other things, the failed and abandoned attempt to have a completely unsuitable and incompetent educational assistant, Mr. Winter, serve as a 1-to-1 escort for T.R. Even assuming that a properly trained and qualified 1-to-1 male educational aide could provide a reasonable accommodation for a male student whose sexualized behavior problems at school were causally linked to a recognized disability through a relevant and reliable evidence-based diagnosis, Mr. Winter did not fit that description. There was already a manifestation determination that T.R.'s sexual predations were not caused by any disability or inability to understand right from wrong. And, in any event, Defendants abandoned the 1-to-1 escort idea almost immediately after it was first tried with Mr. Winter. They never sought or obtained a suitable, qualified replacement for Mr. Winter as T.R.'s escort, nor did they find such a suitable, qualified replacement for Ms. Johnstone as Chrysalis Alternative School director when she

complained about Mr. Winter, reported that this escort idea was not working, and later resigned. Each Defendant repeated this ineffective course of conduct during each subsequent school year, when more teachers resigned and were replaced with new employees who were not provided with sufficient notice, training, or supervision to address T.R.'s misconduct or prevent its recurrence.

211.    Just as Defendants allocated their time and resources to traditionally gendered student athletic programs instead of security cameras and video surveillance at Taos High School, Defendant TMS's official policymakers made the decision to withhold staffing and resources such as qualified 1-to-1 escorts to protect female students from sexual harassment and instead decided to devote the school's staffing and resources to their favored athletic programs enhancing the status and gender-stereotyped roles of male student-athletes such as T.R.

212.    That is not to say student athletics are not worthy of an appropriate and equal allocation of resources. Plaintiff's participation on the school's softball team was important to her. Jane Doe 2 attached similar importance to her participation on the school's volleyball team. Such school team sports understandably satisfy a teenager's emotional need for peer acceptance, social recognition, and belonging at that age. But Defendants' discriminatory and danger-creating policy decisions, customs, practices, and patterns of behavior described above effectively forced Plaintiff and Jane Doe 2 to abandon and lose their chosen team sports activities at Taos High School, while at the same time giving precedence, priority, and privilege to T.R.'s continued participation on the school's wrestling team and his perverse desire to engage in aggressive physical contact.

213.    Even setting aside Defendants' treatment of T.R.'s female victims and looking exclusively at the way they approached student discipline, the discriminatory and danger-creating purpose and effect of their customs and practices in that area are still evident. In her November 2017 interview with TPD officers after Jane Doe 2 reported being assaulted by T.R., Ms. Olson noted the unusual extent to which T.R. was given "second chances" unlike many other students who received

more serious disciplinary measures for lesser infractions of school rules. Ms. Olson also noted the unusual attention and deference that Defendants fawned on T.R.'s grandfather as an esteemed patriarch within their governing clique.

214.   The discriminatory and danger-creating policy decisions, customs, and practices described above amounted to a *de facto* policy decision that systematically devolved responsibility for responding to and impartially investigating student reports of sexual harassment, sexual violence, and discrimination based on sex across multiple officers and employees of Defendant TMS. This policy decision was unconstitutional because it failed to ensure that any single officer or employee of the school district was positioned to prevent or remedy the constitutional violations described above. To the extent that Defendant Torrez was absent from the events, meetings, and communications regarding T.R. and his female student victims described above, that absence was itself a deliberate omission evincing her decision to neither assume nor assign such responsibility to a single officer or district employee positioned to prevent or remedy those constitutional violations. Given her involvement with transferring the Chrysalis Alternative School onto the Taos High School campus and the closure of the Chrysalis Alternative School for the 2018-2019 school year, as well as the high level of turnover among school employees assigned to Chrysalis and the ongoing controversies regarding the misconduct of T.R. and school employees assigned there (including Joe Winter), Defendant Torrez could only have avoided knowledge of T.R.'s sexual misconduct by willfully blinding herself to it.

215.   The school district's discriminatory and danger-creating policy decisions, customs, practices, and patterns of behavior described above are not limited to one student, one perpetrator, or one school year but rather affect entire classes or groups of students and perpetrators divided along gender lines across several school years.

216.   These discriminatory and danger-creating policy decisions, customs, practices, and

patterns of behavior directed female students into submissive, sidelined roles exemplified by the school's cheerleading team run by Defendant Abeyta-Valerio, while male students were directed into aggressive, physical-contact sports such as the football and wrestling team in which Defendant Abeyta-Valerio's male family members and other male personnel at TMS were heavily involved.

217.    Students who were perceived as not adequately conforming to these gender-assigned roles, such as Plaintiff and Jane Doe 2, were regarded by each Defendant as not credible or worthy of support, while students who did conform to them, such as T.R., were given preferential treatment and unlimited support notwithstanding their sexual predations and other misconduct.

218.    Female students at Taos High School had experienced the adverse discriminatory effects of the policy decisions, customs, practices, and patterns of behavior described above in other situations before T.R. arrived at the school. Defendants TMS, Torrez, Trujillo, and Abeyta-Valerio had also received and mishandled reports of sexual misconduct and harassment by teachers and coaching staff at Taos High School.

219.    These Defendants refused to properly investigate or discipline teachers and coaching staff for such inappropriate behavior. On the contrary, such teachers and coaching staff who conformed to the discriminatory customs, policy decisions, and practices created and implemented by the governing clique at TMS were often rewarded, promoted, and held out as role models to set the tone for other teachers and students at Taos High School in the years when T.R. roamed the school premises stalking and assaulting his younger female victims.

220.    Consistent with this custom and practice, TMS teachers and staff who knew of and acquiesced in Defendants' three-year pattern and practice of enabling T.R.'s behavior and protecting him from appropriate consequences as described above were retained, given favorable assignments, or even promoted as a reward for their acquiescence.

221.    Meanwhile, teachers such as Ms. Johnstone, Mr. Duke, Ms. Olson, and Ms. Chavez,

who made a good-faith effort to objectively report violations of school rules against sexual harassment, sexual violence, and discrimination based on sex at the school despite the lack of adequate training or supervision from Defendants, were made to feel unheard and dismissed, and many of them subsequently resigned. The adverse treatment they received from Defendants had a chilling effect on the teachers who remained, clearly conveying the message that defiance of Defendants' discriminatory, danger-creating policy decisions, customs, policies, and practices described above would not result in a successful career path at TMS.

222.    There is a well-documented relationship between sexual misconduct by school employees and sexual misconduct by students within the same school. Each type of misconduct facilitates and enables the other, contributing to an "anything goes" environment at the school. Additionally, sexual misconduct by school employees—as well as school administrators' acquiescence toward it--reinforces sex and gender stereotypes among students and sets a bad example for students to follow with respect to their own approach towards persons to whom they are sexually attracted. Such a harmful relationship between employee misconduct and student misconduct existed at Taos High School during the time period relevant to this Second Amended Complaint and contributed to the violation of female students' constitutional rights, including those of Plaintiff Jane Doe and Jane Doe 2.

223.    The instances where Defendants received and mishandled reports of sexual misconduct and harassment by teachers and coaching staff at Taos High School include but are not limited to the following:

a.       While employed as a special education teacher at the Chrysalis Alternative School before the location of that school was moved onto the Taos High School campus, Mr. Duke and a female teacher employed there observed and reported sexually inappropriate behavior by two male teachers toward female students at the school as described in Section A above. Even though they

reported the matter to school administrators, nothing was done about the problem, and Defendants have produced no records about it to date. Instead, the male teachers who engaged in the misconduct continued working at the school until they resigned *en masse* in response to the school district's decision to move the location of Chrysalis onto the Taos High School campus years later.

      b.      In October 2008, a male physical education teacher at Taos High School, who was also employed as the girls' basketball coach and had past associations with the governing clique described above as an alumni of the school, was ██████████████████████████ while state police investigated a report that he sent a graphic sex video to a female student. That teacher and coach resumed his employment as a P.E. teacher and girls' basketball coach at Taos High School until December 2015, when Defendants Torrez, Trujillo, and other school employees and coaching staff received numerous additional reports of his sexually inappropriate behavior towards female students, including those on the team he coached, as well as former students. An administrator from the school district's central office interviewed some of the female students, ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ she chose to accept his resignation as the girls' basketball coach in lieu of terminating his employment or banning him from other coaching duties. None of the Defendants reported the female students' reports about the P.E. teacher to law enforcement, child protective services, or licensing authorities. The P.E. teacher continued his employment at Taos High School during the school years T.R., Jane Doe 2, and Plaintiff Jane Doe were enrolled there, and he was assigned to teach P.E. classes for all three of those students.

c.      On numerous occasions throughout his employment with Defendant Taos Municipal

Schools, Defendants and other school administrators received reports of misconduct by the

███████████████████████████████████ during part of the second semester of the

2016-2017 school year, as described in Section C above. ██████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ The year

before that, the education assistant received █████████████████████████████████

███████████████████████████████████████████ at Taos High School. Thus,

he was clearly unqualified to serve as an ████████████ at the time he was assigned to do so, and

Defendant Trujillo acknowledged that fact ████████████████████████████████

██████ Despite these measures, the educational assistant was allowed to continue his employment at

Taos High School by virtue of his personal relationships with Defendant Trujillo, as well as the

school district's Human Resources Director, who were all former high school classmates. It was

only after Defendant Trujillo resigned his position as Principal of Taos High School following the

2018-2019 school year that the educational assistant finally ██████████████████████████

███████████████████████████████████████████████████████████████

████████████████ Defendants have thus far refused to disclose additional facts regarding the

educational assistant's history of misconduct, including the reports that eventually gave rise to his

resignation after the 2018-2019 school year. Upon information and belief, none of the educational

assistant's misconduct was ever reported to law enforcement, child protective services, or licensing

authorities.

d.      During the second semester of the 2017-2018 school year—the semester after T.R.

assaulted Jane Doe 2 and the semester before he assaulted Plaintiff—Defendants received reports

that a male teacher at the school was observed having an inappropriate, physical relationship with

a female student. According to a police report dated May 24, 2018, TPD officers interviewed a female teacher and student at Taos High School who reported to Defendant Abeyta-Valerio that a male teacher at the school had a female student in her senior year seated on his lap, and the two of them were observed texting and flirting frequently. At one point, the student was seen on the teacher's lap hugging him, crying, and resting her head on his shoulder. She was reportedly voted "teacher's pet" by the other students. Another student observed the same male teacher favor female students over male students by changing the female students' grades for the better, but not the male students' grades. At the time these allegations were brought to the attention of Defendant Torrez, the male teacher was serving as a union representative and was already embroiled in a monetary dispute with the school district. He had recently resigned his teaching position to run for office as a member of the Taos Town Council. By the time the allegations reached law enforcement and licensing authorities for investigation and a decision whether to prosecute, the male teacher had successfully been elected to the Town Council and allowed his provisional teaching license to expire before those authorities could complete any action to revoke or suspend it. Then the male teacher was also elected to the Taos Municipal School Board, thus further insulating him from enforcement action by Taos police or school administrators who fell under his supervision and control as an elected official, and deterring former students and teachers from cooperating in any investigation of the past misconduct reported above.

e.      The female teacher who made the report against the male teacher in May 2018 as described above said she "thought there was something going on at school because we were told in an Employee meeting that the District or Administration would no longer be investigating alleged abuse." That statement further evinces and is consistent with Defendants' approach to T.R.'s pattern of sexual misconduct over the three years he stalked the female student population at Taos High School. Even though no disciplinary action was taken against the male teacher who was the subject

of the allegations, Defendants TMS, Torrez, and Trujillo pursued disciplinary action ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ State licensing authorities subsequently dismissed

the complaint that these Defendants filed against the female teacher. When one of Plaintiff's

attorneys attempted to speak with the female teacher who reported the allegations described above,

Defendant Abeyta-Valerio learned of the attempt and referred the female teacher to Defendants'

counsel, who effectively silenced her so she would not speak any further about the matter.

     f.     In November 2018, Defendant Trujillo received a report that a male assistant football

coach at Taos High School sent inappropriate communications to a female student via social media.

Defendant Trujillo ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ and Defendants never reported the matter

to police, child protective services, or licensing authorities.

     224.     Upon information and belief, there are other instances of sexual misconduct at Taos

High School which Defendants have not yet disclosed in discovery, and Defendants and their

counsel have engaged in a concerted effort to silence witnesses so they will not come forward with

further information about this topic. Records regarding these matters may have been lost or

destroyed by the school district.

### COUNT I: PLAINTIFF'S FEDERAL CIVIL RIGHTS CLAIMS AGAINST DEFENDANTS TORREZ, TRUJILLO, AND ABEYTA-VALERIO IN THEIR INDIVIDUAL CAPACITIES

**A.    Violation of Plaintiff's Substantive Due Process Right to Bodily Integrity**

225.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

226.    Defendants Torrez, Trujillo, and Abeyta-Valerio each had a duty not to create or

exacerbate any danger to Plaintiff or to otherwise make her more vulnerable to harm.

227.    Defendants Torrez, Trujillo, and Abeyta-Valerio each had a duty to refrain from deliberate or reckless conduct that could create the opportunity for a third party to cause harm to Plaintiff.

228.    Defendants Torrez, Trujillo, and Abeyta-Valerio each had a constitutional duty to refrain from conduct which made Plaintiff more vulnerable to acts of violence and to avoid taking action which increased Plaintiff's vulnerability to such violence.  The risk T.R posed to Plaintiff and other female students at the high school was obvious and known.  Defendants were aware of T.R.'s sexually aggressive behavior towards female students, and rape of Jane Doe 2, and responded in ways that created and exacerbated danger, and increased Plaintiff's vulnerability to the same.

229.    Defendants Torrez, Trujillo, and Abeyta-Valerio engaged in reckless conduct fraught with substantial risk, in conscious disregard of that risk, and that created an immediate and serious risk of harm to Plaintiff, who was a member of a limited, identifiable, and exclusive group. Defendant's conduct shocks the conscience.

230.    The actions Defendants Torrez, Trujillo, and Abeyta-Valerio undertook were not related to any legitimate governmental objective or purpose.

231.    Defendants Torrez, Trujillo, and Abeyta-Valerio were not involved in any situation demanding split-second judgment.  Rather, they had adequate time for thoughtful deliberation.

232.    As a consequence of the actions Defendants Torrez, Trujillo, and Abeyta-Valerio took, Plaintiff was placed in a position of danger which was not of her own making.  The sexual assault and harassment perpetrated against Plaintiff were the natural and inevitable consequence of Defendant's failure to effectively discipline and/or monitor T.R., and Defendant's failure to surveil areas within Taos High School known to harbor sexual assaults—areas Defendants knew T.R. had already used to abuse another young female student.

74

233.    By engaging in the conduct and unreasonably dangerous practices described above, Defendants Torrez, Trujillo, and Abeyta-Valerio placed Plaintiff in a foreseeably dangerous position which, in the context of the situation, was shocking to the conscience.

234.    As a direct and proximate result of the deliberate indifference of Defendants Torrez, Trujillo, and Abeyta-Valerio, Plaintiff has been deprived under the color of law of the rights, privileges and immunities guaranteed under the United States Constitution, including deprivation of the Fourteenth Amendment substantive due process right to bodily integrity and to be free from student-on-student sexual assault.

235.    The conduct of Defendants Torrez, Trujillo, and Abeyta-Valerio was intentional, unreasonable, reckless, wanton and deliberately indifferent to Plaintiff's constitutional rights.

236.    The constitutional rights violated by Defendants Torrez, Trujillo, and Abeyta-Valerio were clearly established prior to the school year in question, and any reasonable school administrator would have been aware that the conduct described herein would violate Plaintiff's constitutional rights.

237.    Specifically, as of 2018, it was established that citizens had the right to be free from state action that affirmatively creates or exacerbates a danger to them, to be free from deprivations of their substantive due process rights, and to be free from intrusions into their bodily integrity.

238.    The above-described conduct of Defendants Torrez, Trujillo, and Abeyta-Valerio was the direct and proximate cause of the deprivation of Plaintiffs' clearly established Fourteenth Amendment rights, as well as the damages and injuries resulting therefrom.

239.    The acts and omissions of Defendants Torrez, Trujillo, and Abeyta-Valerio as described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and reckless disregard of Plaintiff's constitutional rights as described above.

240.    The law provides for Plaintiff to receive an award of compensatory and punitive damages from Defendants Torrez, Trujillo, and Abeyta-Valerio for the violation of her constitutional due process rights as described above, as well as an award of reasonable attorney fees, costs, expenses, and interest as provided by law.

**B.      Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection**

241.    Plaintiff incorporates all of the preceding paragraphs as if stated fully herein.

242.    Plaintiff also has the right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution, which includes the right to be free from a public school administrator's deliberate indifference to student-on-student assaults and harassment at a public school because of a student's sex.

243.    While enrolled as a student at Taos High School and on the school's campus, Plaintiff Jane Doe, as well as Jane Doe 2 and several other female students enrolled at Taos High School during the school years from 2016-2017 through 2018-2019 were subjected to assaults and harassment by T.R. because of their sex, while he was also enrolled as a student there. In addition, T.R. subjected female students to assaults and harassment because of their sex at another school the year prior to his enrollment at Taos High School.

244.    Defendants Torrez, Trujillo, and Abeyta-Valerio knew about T.R.'s assaults and harassment of female students because of their sex from the time he first enrolled at Taos High School, because his assaults and harassment of female students at another school was reported on the school records that these Defendants reviewed and discussed when he enrolled at Taos High School, and because teachers, students, and others at Taos High School continued to report T.R.'s assaults and harassment of female students to these Defendants each year he was enrolled at Taos High School.

245.    Defendants Torrez, Trujillo, and Abeyta-Valerio were deliberately indifferent to

76

T.R.'s pattern and practice of sexually assaulting and harassing female students because of their sex throughout his four years of high school. These Defendants had the authority to address and curtail T.R.'s assaults and harassment of female students at Taos High School and failed to do so over a period of years. Instead, they acquiesced in T.R.'s sexual assaults and harassment of female students at Taos High School because of their sex by refusing to reasonably respond to his behavior and acting in a manner that was clearly unreasonable in light of known circumstances.

246.   The deliberate indifference of Defendant Torrez, Trujillo, and Abeyta-Valerio as described above was motivated by a discriminatory intent and purpose which favored T.R. because of his male sex and disfavored the students he assaulted and harassed because of their female sex. Their discriminatory intent and purpose can be inferred from their failure to stop T.R.'s assaults and harassment of female students at Taos High School and by their efforts to downplay those assaults and harassment over a period of years.

247.   As a direct and proximate result of the deliberate indifference of Defendants Torrez, Trujillo, and Abeyta-Valerio as described above, Plaintiff has been deprived under the color of law of the rights, privileges and immunities guaranteed under the United States Constitution, including deprivation of her right to equal protection of the laws under the Fourteenth Amendment.

248.   The constitutional rights violated by Defendants Torrez, Trujillo, and Abeyta-Valerio were clearly established prior to the school year in question, and the conduct described herein was so obviously invidious, discriminatory, and wrong that any reasonable school administrator would have been aware that it would violate Plaintiff's constitutional rights.

249.   Specifically, as of 2018, it was established that the Equal Protection Clause of the Fourteenth Amendment protects the right to be free from a public school administrator's deliberate indifference to student-on-student assaults and harassment because of a student's sex.

250.   The above-described conduct of Defendants Torrez, Trujillo, and Abeyta-Valerio

was the direct and proximate cause of the deprivation of Plaintiffs' clearly established right to equal protection under the Fourteenth Amendment, as well as the damages and injuries resulting therefrom.

251.    The acts and omissions of Defendants Torrez, Trujillo, and Abeyta-Valerio as described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and reckless disregard of Plaintiff's constitutional rights as described above.

252.    The law provides for Plaintiff to receive an award of compensatory and punitive damages from Defendants Torrez, Trujillo, and Abeyta-Valerio for the violation of her constitutional rights to equal protection as described above, as well as an award of reasonable attorney fees, expenses, costs, and interest as provided by law.

### COUNT II: PLAINTIFF'S FEDERAL CIVIL RIGHTS CLAIMS AGAINST DEFENDANT TAOS MUNICIPAL SCHOOLS

**A.      Violation of Plaintiff's substantive due process right to bodily integrity.**

253.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

254.    Defendants TMS, acting through its official policymakers and employees, including Defendants Torrez, Trujillo, and Abeyta-Valerio, had a duty not to create or exacerbate any danger to Plaintiff or to otherwise make her more vulnerable to harm.

255.    Defendants TMS, acting through its official policymakers and employees, including Defendants Torrez, Trujillo, and Abeyta-Valerio, had a duty to refrain from deliberate or reckless conduct that could create the opportunity for a third party to cause harm to Plaintiff.

256.    Defendants TMS, acting through its official policymakers and employees, including Defendants Torrez, Trujillo, and Abeyta-Valerio, had a constitutional duty to refrain from conduct which made Plaintiff more vulnerable to acts of violence and to avoid taking action which increased Plaintiff's vulnerability to such violence.  The risk T.R posed to Plaintiff and other female students

at the high school was obvious and known.  Through its official policymakers and employees, including the three individual Defendants named above, Defendant TMS, was aware of T.R.'s sexually aggressive behavior towards female students, and rape of Jane Doe 2, and responded in ways that created and exacerbated danger, and increased Plaintiff's vulnerability to the same.

257.   Defendant TMS's official policy decisions, customs, practices, and patterns of behavior described above were a moving force behind the reckless conduct of its employees, including the  three individual Defendants listed above, that was fraught with substantial risk, in conscious disregard of that risk, and that created an immediate and serious risk of harm to Plaintiff, who was a member of a limited, identifiable, and exclusive group.  Defendant TMS's role in that conduct as described above shocks the conscience.

258.   The actions of its employees, including the  three individual Defendants listed above that resulted from Defendant TMS's official policy decisions, customs, practices, and patterns of behavior described above were not closely related to any legitimate or substantial governmental objective or purpose.

259.    The actions of its employees, including the  three individual Defendants listed above that resulted from Defendant TMS's official policy decisions, customs, practices, and patterns of behavior described above were not involved in any situation demanding split-second judgment. Rather, they had adequate time for thoughtful deliberation.

260.   As a consequence of Defendant TMS's official policy decisions, customs, practices, and patterns of behavior described above, Plaintiff was placed in a position of danger which was not of her own making.  The sexual assault and harassment perpetrated against Plaintiff were the natural and inevitable consequence of Defendant TMS's official policy decisions, customs, practices and patterns of behavior which failed to effectively discipline and/or monitor T.R., and failed to surveil areas within Taos High School known to harbor sexual assaults—areas Defendant

TMS knew T.R. had already used to abuse another young female student.

261.    By engaging in the official policy decisions, customs, practices, and patterns of behavior described above, Defendant TMS placed Plaintiff in a foreseeably dangerous position which, in the context of the situation, was shocking to the conscience.

262.    Additionally, Defendant TMS failed to adequately screen, hire, train, and supervise the teachers, administrators, and staff assigned to educate and discipline T.R., including the three individual Defendants.  The school district's failure to do so precipitated the harassment and sexual assaults of Plaintiff as described above.  Defendant TMS was deliberately indifferent to Plaintiff's constitutional rights as exemplified by its failure to effectively discipline and/or monitor T.R., and Defendant's failure to surveil areas within Taos High School known to harbor sexual assaults— areas Defendant knew T.R. had already used to abuse another young female student.

263.    The actions and inactions of Defendant TMS were the result of customs and policies that permitted or condoned Defendant TMS's reckless and conscience-shocking behavior toward student-on-student sexual abuse and deliberate indifference to Plaintiff's safety and welfare, which caused Plaintiff to be subjected to the sexual assaults and harassment described above. The actions of T.R. were also the result of Defendant TMS's customs and policies that permitted or condoned his sexual abuse of female students at Taos High School.

264.    As a direct and proximate result of the deliberate indifference of Defendant TMS resulting from the official policy decisions, customs, practices described above, as well as the inadequate screening, hiring, training, and supervision described above, Plaintiff has been deprived under the color of law of the rights, privileges and immunities guaranteed under the United States Constitution, including deprivation of the Fourteenth Amendment substantive due process right to bodily integrity and to be free from student-on-student sexual assault.

265.    The violations of Plaintiff's constitutional rights caused by Defendants' official

policy decisions, customs, practices, and patterns of behavior were clearly established prior to the schoolyear in question, and any reasonable school district would have been aware that the conduct described herein would violate Plaintiff's constitutional rights.

266.    Specifically, as of 2018, it was established that citizens had the right to be free from state action that affirmatively creates or exacerbates a danger to them, to be free from deprivations of their substantive due process rights, and to be free from intrusions into their bodily integrity.

267.    The above-described official policy decisions, customs, practices, and patterns of behavior of Defendant TMS and its employees, including the three individual Defendants listed above, was a direct and proximate cause of the deprivation of Plaintiffs' clearly established Fourteenth Amendment rights, as well as the damages and injuries resulting therefrom.

268.    The law provides for Plaintiff to receive an award of compensatory damages from Defendant TMS for the violation of her constitutional due process rights as described above, as well as an award of reasonable attorney fees, expenses, costs, and interest as provided by law.

**B.      Violation of Plaintiff's constitutional right to equal protection of the laws.**

269.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

270.    Plaintiff has a right to equal protection under the Fourteenth Amendment to the United States Constitution, which includes the right to be free from a public school district's official policies, customs, or practices that evince deliberate indifference to student-on-student assaults and harassment because of a student's sex at a public school.

271.    Acting through its official school administrators with the requisite authority, Defendant TMS had one or more official policies, customs, or practices which evinced deliberate indifference to student-on-student sexual assaults and harassment at Taos High School because of a student's sex.

272.    Defendant TMS enabled, protected, and served as a moving force behind T.R.'s

sexual assaults and harassment of Plaintiff, by failing to properly investigate and take corrective action with regard to his longstanding pattern and practice of sexually assaulting and harassing female students over the course of each year he attended high school, and by failing to properly screen, hire, train, monitor, supervise, and discipline the three individual Defendants listed above and other school personnel as further described above.

273.   In addition, there was a continuing, widespread, and persistent pattern and practice of sexual harassment and unwanted physical touching of female students, including Plaintiff, which constituted a custom of Defendant TMS. Official school administrators with the requisite authority were deliberately indifferent to that pattern and practice, and they tacitly authorized the misconduct of sexual predators, including T.R., after receiving notice of such misconduct.

274.   The above-described policies, customs, and practices of Defendant TMS may devolve responsibility across multiple school employees and may be unconstitutional because they fail to ensure that any single employee is positioned to prevent the constitutional violations at issue. In this regard, gross deficiencies in the school district's staffing, facilities, equipment, and procedures combined to evince deliberate indifference and effectively violate Plaintiff's constitutional rights.

275.   Defendant TMS had a duty to exercise due care in the supervision of its staff, teachers, and students.  In addition, Defendant TMS had a duty to properly screen, license, hire, train, monitor, supervise, and discipline staff, teachers, and students invited or assigned to locations on the premises of Taos High School.

276.   Defendant TMS failed to adequately screen, license, hire, train, monitor, supervise, and discipline staff, teachers, and students invited or assigned to locations on the premises of Taos High School where Plaintiff was foreseeably present.

277.   Further, Defendant TMS failed to take necessary actions with respect to T.R.'s

enrollment during his tenure as a student at Taos High School.

278.    Defendant TMS and its official policymakers also failed to adequately train or supervise the school district's employees, including but not limited to the three individual Defendants, with respect to responding to student reports of sexual harassment, sexual assault, and discrimination based on sex in the manner described above. Defendant TMS and its official policymakers were deliberately indifferent to the substantial risk of serious harm that may be caused by that failure, including the violation of Plaintiff's constitutional rights under the circumstances described above. Those circumstances involved a recurring situation that presented plainly obvious and highly predictable risks of a constitutional violation, to which Defendant TMS and its official policymakers responded by continuing to adhere to an approach the school district knew and should have known has failed to prevent a pattern of tortious conduct by its employees, agents, and students in the past.

279.    Defendant TMS's failure to adequately train, supervise, and delineate proper procedure in response to repeated allegations of sexual assaults against female students, and ensure students who have been the subject of such complaints are not permitted to continue such assaults is so permanent and well settled that it constitutes a pattern and practice.  That pattern and practice was a moving force behind the deprivation of Plaintiffs' constitutional rights as described above.

280.    These failures on the part of Defendant TMS caused Plaintiff to be subjected to the physical, sexual, mental, and emotional abuse described above.  Defendant TMS, because it knew or should have known of the predatory actions of T.R. prior to and during his enrollment as a student at Taos High School, was deliberately indifferent to Plaintiffs' constitutional rights, as exemplified by its utter failure to protect Plaintiffs and many other female students, causing them to suffer injuries and resultant damages.

281.    The actions and deliberate omissions of Defendant TMS were the result of a custom

or policy which reflected deliberate indifference to Plaintiffs' and to other female students' safety, while permitting and condoning T.R.'s physical, sexual, mental, and emotional abuse of Plaintiffs.

282.   The sum of multiple officers and employees' actions or inactions taken pursuant to Defendant TMS's policies, customs, or practices described above, including those of the three individual Defendants, amounted to a "moving force" that resulted in the violation of Plaintiff's constitutional rights.

283.   As a consequence of Defendant TMS's defective hiring, defective supervision, and customs or policy decisions, as described herein, Plaintiff has been deprived under color of law the rights, privileges, and immunities secured by the Constitution and the laws of the United States, including the right to equal protection under the Fourteenth Amendment to the United States Constitution.

284.   Defendant TMS's violations of Plaintiff's Fourteenth Amendment right to equal protection of the law in the manner described above served no legitimate educational purpose and was not tailored to serve such a purpose.

285.   Defendant TMS's violations of Plaintiffs' rights to equal protection in the manner described above was a direct and proximate cause of Plaintiffs' injuries and resultant damages, such that the official policies, customs, patterns, and practices described above can be considered a moving force behind the violation of Plaintiffs' constitutional rights, as well as the harms those violations caused to her.

286.   The law provides for Plaintiff to receive an award of compensatory damages from Defendant TMS for the violation of her constitutional rights to equal protection as described above, as well as an award of reasonable attorney fees, expenses, costs, and interest as provided by law.

**COUNT III: PLAINTIFF'S STATE LAW CLAIMS AGAINST
DEFENDANT TAOS MUNICIPAL SCHOOLS, TORREZ,
TRUJILLO, AND ABEYTA-VALERIO**

287.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

288.    The immunity provided by the NMTCA does not apply or is waived with respect to the negligent operation and maintenance of Defendant TMS's buildings, machinery, equipment, and furnishings by its public employees, including the three individual Defendants, Defendant TMS's Facilities Director, Mr. Valencia, and their staff at Taos High School.

289.    In undertaking to educate, warn, communicate with, and protect Plaintiff from harm while she was enrolled as a student at Taos High School, Defendant TMS and each of its employees, including the three individual Defendants and Mr. Valencia, were under a duty to perform in accordance with a reasonably prudent person's standard of care in their operation of the buildings, machinery, equipment, and furnishings at Taos High School. Pursuant to Section 41-4-2(B) of the NMTCA, that duty and standard of care are defined according to traditional tort concepts under New Mexico common law applicable to these Defendants and public employees.

290.    In operating and managing the premises at Taos High School, Defendant TMS and each of its employees, including the three individual Defendants and Mr. Valencia, had a common-law duty to use ordinary care to keep the premises safe for Plaintiff and other occupants, whether or not a dangerous condition was obvious. In performing this duty, Defendant TMS was charged with the knowledge of any condition on the premises at Taos High School which was caused by Defendant TMS, its employees, or its agents. Defendant TMS and each of its employees, including the three individual Defendants and Mr. Valencia, was also charged with the knowledge of any such condition of which they would have known had they made a reasonable inspection of the premises.

291.    Defendant TMS and each of its employees, including the three individual Defendants and Mr. Valencia, had a common-law duty to exercise ordinary care, at all times, to prevent harm to

others, including Plaintiff. This duty required each of them to keep a proper lookout and maintain proper operation and control of the machinery, equipment, and furnishings at Taos High School to avoid placing students in danger and to prevent harm to them.

292.    The common-law duty to keep a proper lookout requires more than mere looking. It also required Defendant TMS and each of its employees, including the three individual Defendants and Mr. Valencia, to actually see what was in plain sight. With respect to that which is not in plain sight or readily apparent, each of them were required to appreciate and realize what was reasonably indicated by that which was in plain sight.

293.    Each Defendant, as well as Mr. Valencia, breached their duties as described above and failed to perform in accordance with a reasonably prudent person's standard of care in the context of operating and maintaining buildings, machinery, equipment, and furnishings to educate, warn, communicate with, and protect Plaintiff and other occupants from harm while they were enrolled as a student at Taos High School.

294.    The negligent operation and maintenance of buildings, machinery, equipment, and furnishings by public employees of Defendant TMS, including each of the three individual Defendants and Mr. Valencia, included, but is not limited to:

A.      Inviting and assigning Plaintiff and other female students to locations on school premises where they were left unmonitored, unduly exposed to sexual harassment, sexual assault, and invidious discrimination based on their sex for significant periods of time, and where they were not provided with instruction or training on safe avenues of retreat, or access to reasonably prudent staff qualified to educate, warn, communicate with, and protect the class of female students, including Plaintiff, who were subject to the foreseeable risk of on-campus sexual harassment, sexual assault, or invidious discrimination based on their sex.

B.      Allowing a known sexual predator to roam the school premises unmonitored and prey upon the class of female students, including Plaintiff, who were subject to a foreseeable risk of sexual harassment, sexual assault, or discrimination based on their sex.

C.      Failure to properly operate and maintain the machinery, equipment, and furnishings reasonably necessary to educate, warn, communicate with, and protect the class of female students, including Plaintiff, who were subject to the foreseeable risk of on-campus sexual harassment, sexual assault, or invidious discrimination based on their sex.

D.      Failure to properly operate and maintain the machinery, equipment, and furnishings reasonably necessary to accurately and completely record and communicate threats and conditions on the premises of Taos High School which jeopardized the personal safety and bodily integrity of the class of female students, including Plaintiff, who were subject to the foreseeable risk of on-campus sexual harassment, sexual assault, or invidious discrimination based on their sex, to qualified members of Defendant TMS's faculty, staff, administrators, or off-site law enforcement personnel in a timely manner.

E.      Failure to properly operate and maintain the buildings, machinery, equipment, and furnishings reasonably necessary to arrange for safe ingress, egress, and movement of the class of female students, including Plaintiff, who were subject to the foreseeable risk of on-campus sexual harassment, sexual assault, or invidious discrimination based on their sex, on and through the premises of Taos High School.

F.      Imposing physical and operational barriers which effectively prevented the class of female students, including Plaintiff, who were subject to the foreseeable risk of on-campus sexual harassment, sexual assault, or invidious discrimination based on their sex, from summoning qualified members of Defendant TMS's faculty, staff, administrators, or off-site law enforcement

personnel in a timely manner.to monitor or respond to emergent situations involving such foreseeable risks.

295.     The negligent operation and maintenance of buildings, machinery, equipment, and furnishings by public employees of Defendant TMS, including the three individual Defendants and Mr. Valencia, as described above was a direct and proximate cause of the injuries and resulting damages claimed by Plaintiff in this action.

296.     The law provides for Plaintiff to receive an award of compensatory damages from Defendant TMS for the negligent operation and maintenance of buildings, machinery, equipment, and furnishings described in this Count, including those articulated in her prayer for relief below, as well as costs as interest as provided by law.

**PRAYER FOR RELIEF**

297.     Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

298.     As a direct and proximate result of the wrongful and unlawful acts and omissions of all Defendants, as described above, Plaintiff was injured and has suffered and continues to suffer damages, including, but not limited to:   physical injury, severe emotional distress, anguish, suffering, humiliation, psychological injuries, indignities, loss of enjoyment of life, deprivation of constitutional rights, invasion of bodily integrity, sexual discrimination and harassment, and other damages.

299.     As a result of the above-described damages and injuries, Plaintiff is entitled to recover an award of full compensatory damages against all Defendants in amounts to be determined at the trial of this cause.

300.     Plaintiff requests damages in an amount sufficient to compensate her for all injuries and harm she suffered, as well as punitive damages as provided by law, along with costs of this action, pre- and post- judgment interest as provided by law, reasonable attorneys' fees as provided

by law, and such other and further relief as proves just.

301.    Plaintiff requests a trial by jury on all issues so triable.

Respectfully Submitted,

ROTHSTEIN DONATELLI, LLP

 */s/ Arne R. Leonard*
CAROLYN M. "CAMMIE" NICHOLS
CAREY BHALLA
ARNE R. LEONARD
500 4th Street NW, Suite 400
Albuquerque, NM 87102
(505) 243-1443
cmnichols@rothsteinlaw.com
cbhalla@rothsteinlaw.com
aleonard@rothsteinlaw.com

and

**Attorney in good standing of the Bar of the State of South Carolina and the District of South Carolina.**

MARK A. PEPER
The Peper Law Firm, PA
548 Savannah Highway
Charleston, SC 29407
843-225-2520
mark@peperlawfirm.com

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of November, 2023, I filed the foregoing pleading electronically through the Court's CM/ECF system, which caused counsel of record for Defendants to be served by electronic means.

 */s/ Arne R. Leonard*
**ROTHSTEIN DONATELLI LLP**