## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JANE DOE,

      Plaintiff,

v.                                     Case No. 1:20-cv-01041-SCY-JHR

TAOS MUNICIPAL SCHOOLS;
LILLIAN TORREZ, ROBERT TRUJILLO,
and LISA ABEYTA-VALERIO,
in their individual capacities,

      Defendants.

### MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Plaintiff Jane Doe alleges that when she was a fourteen-year-old freshman at Taos High School, a senior student, T.R., raped her. She alleges that the school and its employees enabled T.R.'s predatory behavior, protected him from being held accountable, and failed to protect victims from his abuse. With leave of the Court, Plaintiff filed her Second Amended Complaint ("SAC") against Defendant Taos Municipal Schools ("TMS") and individual Defendants Lillian Torrez, Robert Trujillo, and Lisa Abeyta-Valerio.[1] Docs. 296 (unredacted and sealed SAC), 297 (redacted and unsealed SAC). The SAC alleges two Section 1983 counts that involve five different claims: (1) substantive due process violation, based on a danger-creation theory, against the individual Defendants (Count IA); (2) equal protection violation against the individual Defendants (Count IB); (3) substantive due process violation, based on a danger-creation theory,

---

[1] All Defendants are represented by the same counsel and in her response brief, Plaintiff makes a passing reference to a *Dunton* notice she plans to file regarding a potential conflict of interest in this joint representation. Doc. 319 at 35 n.14 (citing *Dunton v. Suffolk Cnty., State of N.Y.*, 729 F.2d 903 (2d Cir. 1984)). Plaintiff has filed no such notice and the Court declines to presently address the issue as it is not sufficiently briefed.

against TMS (Count IIA); (4) substantive due process violation, based on an inadequate screening, hiring, and training theory, against TMS (Count IIA); and (5) equal protection violation against TMS (Count IIB). Doc. 297. Plaintiff also brings a claim for premise liability against all Defendants under the New Mexico Tort Claims Act ("NMTCA") (Count III). Doc. 297.

In response to the SAC, Defendants filed the present motion to dismiss, asserting that the SAC fails to state a claim for substantive due process, equal protection, and negligence and that the individual Defendants are entitled to qualified immunity. Doc. 317 (redacted and unsealed motion), 308 (unredacted and sealed motion);[2] *see also* Doc. 319 (response);[3] Doc. 328 (reply). The Court finds that Defendant Torrez is entitled to qualified immunity as to the equal protection claim and that all individual Defendants are entitled to qualified immunity as to the substantive due process claim. However, Defendants Trujillo and Abeyta-Valerio are not entitled to qualified immunity as to the equal protection claim. The Court further finds that Plaintiff has failed to state a claim against Defendant TMS for substantive due process (under both the danger creation

---

[2] Defendants originally filed the redacted and unsealed version of their motion as Doc. 307. Thereafter, they filed a motion to seal, indicating that they inadvertently overlooked certain information that should have been redacted. Doc. 310. The Court granted this motion, sealing Doc. 307 and allowing Defendants to refile the redacted and unsealed version of their motion. Doc. 316. Thus, the Court denies as moot Doc. 307 and in addressing the present motion to dismiss, will review Doc. 317 as the redacted version of the motion to dismiss and Doc. 308 as the unredacted version.

[3] In her response, Plaintiff argues that the "response should be considered in conjunction with Plaintiff's prior briefing on this subject, including her Motion for Leave to File Second Amended Complaint (Doc. 257, 258, 268, 269), her Response to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 247), her Response to Defendants' Motion to Stay on the Basis of Qualified Immunity (Doc. 244), and her Motion for Leave to File First Amended Complaint (Doc. 102, 135), which are adopted and incorporated herein by reference." Doc. 319 at 1. The prior briefing that Plaintiff seeks to incorporate includes 153 pages of briefing and 186 pages of exhibits. The Court declines to sort through these prior documents (all filed before the SAC) to find arguments that may be relevant to the SAC and will instead only address the arguments Plaintiff raises in her current response.

theory and the inadequate training, screening, and hiring theory) but has stated a claim against Defendant TMS for violation of equal protection. Additionally, the Court finds that NMSA § 41-4-6(A)'s waiver applies to Plaintiff's state-law claim and so denies the motion to dismiss as to the state claim.[4]

## FACTUAL BACKGROUND

For purposes of providing background to this motion to dismiss, the Court recites the following factual allegations from the SAC.[5] In the fall of 2018, T.R., a student at Taos High School ("THS"), sexually harassed, assaulted, and raped Jane Doe, a freshman at THS. Doc. 297 ¶¶ 104, 131, 137-44. At all times relevant to this case, Lilian Torrez was the superintendent for TMS, Robert Trujillo was the principal of THS, and Lisa Abeyta-Valerio was the assistant principal of THS. *Id.* ¶¶ 3-5. Defendants Torrez, Trujillo, and Abeyta-Valerio, and other TMS employees formed a governing clique, bound by cronyism, nepotism, social relationships, and familiarity as former THS alumni and student athletes. *Id.* ¶¶ 185-88. This clique ran TMS. *Id.* ¶ 185. Staff within the clique, or loyal to it, were treated more favorably than those outside the clique, who were treated as newcomers and with discriminatory animus. *Id.* ¶¶ 188, 191.

Before the 2015-2016 school year, TMS operated an alternative high school, known as "Chrysalis," for special education students, some with serious behavioral problems, located on a

---

[4] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 21, 22, 23.

[5] As explained further below, the Court does not accept all of Plaintiff's allegations as fact. Even drawing all inferences in Plaintiff's favor, in some instances Plaintiff's allegations are too speculative, argumentative, or unspecific to be considered fact. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("On considering the legal sufficiency of the complaint, the burden remains with the plaintiff to assert facts sufficient to support the claim, but the court accepts as true all well-pleaded facts and construes all reasonable allegations in the light most favorable to the plaintiff. Nevertheless, we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.") (internal citations omitted).

separate campus from THS. *Id.* ¶ 10. Chrysalis faced problems with employee discipline, including male teachers engaging in inappropriate behavior with female students, and it did not have its own principal. *Id.* ¶¶ 12-13. After the 2014-2015 school year, TMS, over objections from parents, teachers, counselors, and social workers employed at TMS, decided to close the Chrysalis facilities and merge those students with THS students. *Id.* ¶ 15. Upon the merger, Defendants failed to implement additional security measures at THS, such as failing to install additional security cameras or to assign additional personnel to conduct surveillance of students in the hallways or outdoor areas of the THS campus. *Id.* ¶ 17. Once merged with the THS campus, Chrysalis did not adequately staff and train teachers, aids, or support staff to handle the special education students with serious behavioral problems. *Id.* ¶¶ 18-19, 54. Indeed, one teacher resigned at the end of the 2016-2017 school year, citing problems with the transfer of Chrysalis Alternative School into the THS campus. *Id.* ¶ 54.

According to school records (that TMS personnel, including the three individual Defendants, later obtained and reviewed), during the 2015-2016 school year, T.R. was a freshman at another school outside of New Mexico where he had numerous disciplinary problems, "including at least five documented incidents of sexual harassment, bullying, and bus violations." *Id.* ¶¶ 21-22.[6] He was suspended multiple times and eventually expelled for misconduct that involved touching a female student's buttocks without her consent. *Id.* ¶ 22. By the end of the 2015-2016 school year, T.R. transferred to the custody of his grandparents who lived in Taos, New Mexico. *Id.* ¶ 23. T.R.'s grandparents had close family and social ties with Defendants Abeyta-Valero and Trujillo, as well as other employees of TMS. *Id.* ¶¶ 23, 25-26.

---

[6] The SAC does not clarify whether these are five violations of each category (for a total of fifteen violations) or five violations in total that were a mix of the three categories.

Because of these familial and social ties with T.R.'s grandparents, TMS, through the three individual Defendants, invited T.R. to enroll at THS for the 2016-2017 school year and become a member of the school's wrestling team. *Id.* ¶¶ 21, 26.

Upon enrolling at THS for the 2016-2017 school year, T.R. continued his pattern of sexual harassment and misconduct, which Defendants were aware of given the various disciplinary referrals and other reports communicated by teachers and students, the documents such as Individualized Education Plans ("IEP") and Behavior Intervention Plans ("BIP") which were circulated and discussed among school administrators, and the meetings at which T.R.'s behavior towards female students was discussed. *Id.* ¶¶ 28-29, 93. Defendants, however, failed to address these problems and instead minimized T.R.'s behavior. *Id.* ¶¶ 51, 53. T.R. received favorable treatment from the TMS governing clique because of his grandparents' relationship to the school and administrators; for example, one teacher reported that T.R. received more leniency than other students and T.R. had an assignment to work study when no records described his work study. *Id.* ¶¶ 189, 190, 213.

Reports of T.R.'s behavioral problems included a disciplinary referral received at the beginning of September 2016 for possession of alcohol at school, which resulted in his transfer to the Chrysalis Alternative Schools within the main building of THS. *Id.* ¶ 30. That same month, he received a second disciplinary referral for "excessive talking," "unacceptable language," and behavior that was "rude/discourteous" and "disruptive/uncooperative." *Id.* By the end of September 2016, a teacher in Chrysalis (Ms. Johnstone) reported to Defendant Abeyta-Valerio that T.R. was engaged in a pattern of touching girls at school and that at least one female student had complained about sexual advances and was no longer coming to school. *Id.* ¶ 31. Ms. Johnstone further reported that T.R. told other students, "I'll never get in trouble because my

family knows Ms. Abeyta." *Id.* ¶ 31. A special education teacher repeated this comment to Defendant Abeyta-Valerio. *Id.* ¶ 67. Defendant Abeyta-Valerio acknowledged that she heard concerns from other people about this type of behavior, but she took no action. *Id.* ¶ 31.

In mid-October 2016, Ms. Johnstone again reported T.R.'s behavior of touching girls without their consent, reporting this conduct to Defendant Abeyta-Valerio and a TMS social worker (Mr. Ingroff). *Id.* ¶ 32. Indeed, a BIP document from October 19, 2016 reported that T.R. "demonstrates problems with poor boundary control, with female peers especially." *Id.* ¶ 33. In November 2016, Mr. Ingroff assessed that "[i]t is apparent from reports from staff and historical information that [T.R.] can be manipulative, and may try to engage in contact/verbal communication of a sexual nature with female peers, and then deny that these contacts happened." *Id.* ¶ 34. On November 17, 2016, Ms. Johnstone and another teacher again reported to Defendant Abeyta-Valerio and Mr. Ingroff that T.R. was acting inappropriately, including towards a female student. *Id.* ¶ 35. A special education teacher also confided in Ms. Johnstone that she was having ongoing behavioral issues with T.R. and that Defendant Abeyta-Valerio was not addressing her concerns. *Id.* ¶ 36. During this time, T.R. participated in the THS wrestling team (for the winter of the 2016-2017 school year) where he obtained training on techniques for controlling and manipulating another person's body. *Id.* ¶¶ 37-38, 208, 216. Further, participation on the wrestling team provided him greater access to the THS campus. *Id.* ¶¶ 37-38, 208, 216.

In the second semester of the 2016-2017 school year (starting in January 2017), a special education assistant, Joe Winter (the spouse of the school district's Human Resources Director), was placed to sit with T.R. during some of his classes and escort him between classes. *Id.* ¶¶ 39-40, 43. The arrangement did not last long as Mr. Winter was unqualified and there were reports

that he was saying "weird" political things to T.R. *Id.* ¶¶ 39-41. On January 25, 2017, Ms. Johnstone reported to both Defendants Trujillo and Abeyta-Valerio that Mr. Winter was acting unprofessionally, that he had grabbed another student, and that he was antagonizing T.R. *Id.* ¶¶ 44-45. Despite these complaints, and complaints from other teachers that Mr. Winter refused to do his job and that T.R. was not always escorted while on campus, none of the Defendants took corrective action. *Id.* ¶¶ 42, 46. Meanwhile, T.R. also continued to have behavioral problems, as documented in a BIP dated January 23, a disciplinary referral on February 2, and a report on April 27. *Id.* ¶¶ 39, 42-43, 46-47, 49. Indeed, during the time that Ms. Johnstone worked at THS, she observed that school records for T.R. did not always reflect where he was spending his time during the school day. *Id.* ¶ 50. On March 21, 2017, Defendant Trujillo reassigned Mr. Winter to another position and T.R. was not given a new escort for the remainder of the year. *Id.* ¶¶ 48, 210.

T.R. returned as a student to THS during the 2017-2018 school year. *Id.* ¶ 55. As in the previous year, Defendants received notice of T.R.'s continued pattern of sexual harassment and misconduct through the various disciplinary referrals and other reports communicated by teachers and students, the documents such as IEPs and BIPs which were circulated and discussed among school administrators, and the meetings at which T.R.'s behavior towards female students was discussed. *Id.* ¶¶ 55-56, 67, 86, 93. T.R. was not given a one-to-one escort during the 2017-2018 school year, and Defendants did not give notice to incoming teachers, staff, or students regarding T.R.'s pattern of behavior. *Id.* ¶¶ 57-58, 70.

T.R.'s disciplinary referrals during the 2017-2018 school year included a referral on August 16, 2017 for "unacceptable language", being "annoying to classmates", and being "verbally aggressive" to other students; on September 7 for being "disruptive/uncooperative" and

walking out of class; on September 11 for cutting class and behavior that was "disruptive/ uncooperative" and "insubordinate"; on September 19 for inappropriate language; on September 26 for being "uncooperative/defiant" and for cutting class and roaming the halls; and another on September 26 for "annoying classmates" and being "disruptive/uncooperative" including a failure to "back off from girls when told to." *Id.* ¶¶ 59-64. A teacher also witnessed T.R. make inappropriate comments to female students on multiple occasions and on several of those occasions, Defendant Trujillo asked that T.R. be allowed to return to the class without any disciplinary action. *Id.* ¶ 66. The school social worker issued a manifestation determination in October 2017 which found that T.R.'s conduct was not caused by his alleged disability, but T.R. was allowed to remain on the THS campus. *Id.* ¶¶ 65, 86.

T.R. used the occasions in which he cut class to roam the grounds of THS, where he stalked, sexually harassed, and assaulted female students, including Jane Doe 2. *Id.* ¶ 69. In September 2017, a fifteen-year-old freshman at THS, Jane Doe 2, reported to the Dean of Students, a Taos Police Department ("TPD") school resource officer, and Defendant Abeyta-Valerio that T.R. had sexually assaulted her on the school premises on at least three occasions. *Id.* ¶¶ 70-72, 83. Jane Doe 2 explained that T.R. was a casual acquaintance and, although she told him she had a boyfriend, he would follow her in the hallways between classes and try to lure her into the hallways during class time. *Id.* ¶ 74. In November, during an interview after the assault, one teacher stated that she had observed T.R.'s sexually aggressive behavior towards Jane Doe 2. *Id.* ¶ 92. The first assault happened in mid-September 2017 in the hallway at THS, in a small niche outside the school's video surveillance system, when T.R. grabbed and forcibly kissed and touched Jane Doe 2. *Id.* ¶¶ 75-76. After this assault, Jane Doe 2, with watery eyes, told her teacher in her next class not to let T.R. come and get her. *Id.* ¶ 77.

The second assault occurred on September 25, 2017, when T.R. followed Jane Doe 2 into the hallway as she exited a class and tried to kiss her and put his hands down her pants. *Id.* ¶ 78. Later that day, T.R. assaulted her again. *Id.* ¶ 79. As Jane Doe 2 was going to an auxiliary gym on the THS main campus, T.R. grabbed her hand and directed her outside to a place he called "his tree" where he kissed her and put his hand down her pants. *Id.* ¶ 79. He then led her to another location at the bottom of a stairway, a spot he knew was outside the view of the school's video surveillance system, and raped her. *Id.* ¶¶ 79-80. The third occasion on which T.R. assaulted Jane Doe 2 happened the next day, September 26, 2017, when T.R. pursued Jane Doe 2 to a courtyard, again outside the school's surveillance system, and forced her to perform oral sex. *Id.* ¶¶ 81-82.

Defendants did not conduct their own investigation into the assaults of Jane Doe 2 or contact Jane Doe 2's mother on the day Jane Doe 2 reported the assaults; instead, the TPD initiated a criminal investigation. *Id.* ¶¶ 73, 87, 89. Jane Doe 2's parents also obtained a restraining order against T.R., but TMS personnel told her parents that "we can't enforce that." *Id.* ¶¶ 87, 101. Jane Doe 2 returned to school two weeks after the assaults, but because Defendants would not provide Jane Doe 2 with notice of T.R.'s whereabouts on the THS campus, she started a modified schedule, doing most of her schoolwork from home and, when on campus, she would be accompanied by friends or siblings. *Id.* ¶¶ 90-91, 100.

Meanwhile, after the assaults on Jane Doe 2, T.R. was allowed to return to THS campus on a regular basis for the remainder of the year, even though he was nominally assigned to an off-campus, after-school program called IAES. *Id.* ¶¶ 96, 98. And during this time, Defendants downplayed his actions. *Id.* ¶¶ 87, 99, 101. For example, at one special education meeting in which teachers discussed the assault on Jane Doe 2, Defendant Abeyta-Valerio told the teachers

that in her view, the students were equally at fault. *Id.* ¶ 84. Additionally, teachers at THS later told Jane Doe 2's mother that everybody knew about the assaults because T.R. told his friends, that T.R. was well-known for being overbearing with female students, and that "[w]e don't know why he's still here." *Id.* ¶ 89. On another occasion, a teacher reported to Defendant Abeyta-Valerio and Trujillo, as well as other teachers, that T.R. had sent female students sexually explicit images, including one of Jane Doe 2 performing oral sex. *Id.* ¶¶ 93-94. Defendants responded by telling the teacher nothing could be done about the reports, and did not report the images to the police or child protective services. *Id.* ¶ 95. T.R. continued to have behavioral problems, including a December 2017 BIP that reported his posts on Facebook about partying. *Id.* ¶ 97. And although T.R. was assigned to an off-campus, after-school program, teachers and students saw him on campus during the school day. *Id.* ¶ 98.

Before the start of the 2018-2019 school year, Defendants failed to provide security cameras or additional staff to monitor the locations where T.R. sexually assaulted Jane Doe 2, and the security cameras that were in place were subject to outages and malfunctions and often not monitored. *Id.* ¶¶ 128-29, 202, 207-208. Indeed, as part of the TPD investigation into the assaults on Jane Doe 2, on October 4, 2018, Jane Doe 2 identified for TPD the locations on the THS campus where T.R. had assaulted her. *Id.* ¶ 127. Yet, Defendants took no steps to remedy the "blind spots" were T.R. assaulted Jane Doe 2. *Id.* ¶ 203. Defendants also failed to maintain, for more than a few days, the video that the security cameras did capture. *Id.* ¶ 204.

T.R. returned as a student to THS during the 2018-2019 school year, attending classes on the THS campus, including attending an after-school program twice a week from 3:00 p.m. to 5:00 p.m. *Id.* ¶¶ 104, 107, 117. As in the previous year, Defendants received notice of T.R.'s continued pattern of sexual harassment and misconduct through the various disciplinary referrals

and other reports communicated by teachers and students, the documents such as IEPs which were circulated and discussed among school administrators, and the meetings at which T.R.'s behavior towards female students was discussed. *Id.* ¶¶ 104-105. For example, on August 29, 2018, a school social worker documented in an IEP that T.R. "has already had an incident of a female student complaining of unwanted advances, threats, and stalking behavior." *Id.* ¶ 109. Unlike the previous year, however, T.R. was not placed on a BIP during the 2018-2019 school year. *Id.* ¶ 107.

As was the case at the end of the 2017-2018 school year, T.R. was not given a one-to-one escort during the 2018-2019 school year. *Id.* ¶ 107. On August 28, 2018, a special education teacher emailed Defendants Trujillo and Abeyta-Valerio, advising them that T.R. already had numerous problems with staff and students and that "we also need to revisit IAES," an alternative placement outside THS. *Id.* ¶ 108. That recommendation was unheeded and instead Defendants placed T.R. on a regular schedule of classes on THS campus. *Id.* ¶¶ 108, 110. Defendants did not provide notice of T.R.'s pattern of past behavior to incoming teachers, staff, or students. *Id.* ¶ 130. Because T.R. was allowed to return to THS for the 2018-2019 school year, Jane Doe 2 transferred to another school. *Id.* ¶ 106.

During the 2018-2019 school year, T.R.'s school records did not accurately reflect where he was spending his time during the school day; he did not follow his assigned class schedule during the day or during an after-school program; and Defendant Abeyta-Valerio failed to provide for T.R.'s supervision while on campus. *Id.* ¶¶ 114, 120, 123, 201. For example, early in the semester, Ms. Chavez, a new special education biology teacher who did not yet have a special education license or special education training, smelled "weed" in her class and, after informing a security guard, T.R. was taken out of her class and did not return for the rest of the

year, even though he remained assigned to her class. *Id.* ¶¶ 111-14. T.R. would, however, walk

into other classes taught by Ms. Chavez and disrupt class. *Id.* ¶¶ 120-21, 123. Additionally,

T.R.'s school records from 2018-2019 referred to his placement in the Chrysalis Alternative

School, despite the fact that it no longer existed at any location that school year. *Id.* ¶ 115. T.R.'s

case manager from the 2018-2019 school year acknowledged that T.R. had a "really confusing"

schedule and that T.R. would often "hang out" in his classroom even though he had no assigned

class there. *Id.* ¶ 116. Additionally, during a one-week period in October 2018, THS held "Spirit

Week" and "EQ Retreats," poorly planned activities that led to students, including T.R., not

being properly supervised. *Id.* ¶¶ 125-26, 201.

Beginning in September 2018, Defendant Trujillo also assigned T.R. to an on-campus

IAES after-school program, led by Ms. Chavez. *Id.* ¶ 117. This version of "IAES," used in a

loose sense, referred to an after-school program that supplemented one or more students' existing

placements on the school campus. *Id.* It took place two days per week, from 3:00 p.m. to 5:00

p.m. in Ms. Chavez's existing classroom (C-209) on the THS campus. *Id.* But Defendants failed

to provide Ms. Chavez with any background regarding T.R.'s past disciplinary problems and

failed to provide any clear direction on what she was supposed to be doing during the after-

school program. *Id.* ¶¶ 112, 118-19, 200-201. Although he was nominally assigned to IAES, T.R.

would come and go from the program as he pleased. *Id.* ¶ 120. Teachers and students still saw

him on the THS campus during the school day at various times; Ms. Chavez would see him

roaming the campus without an escort at other times too; and his class schedule still showed that

he was nominally assigned to classrooms at the high school during the regular school day. *Id.*

¶¶ 98, 120. Ms. Chavez reported T.R.'s failure to abide by his class schedule as well as his

absences from the after-school program to Defendants Abeyta-Valerio and Trujillo, and discussed these issues with other teachers and staff, but nothing was done about it. *Id.* ¶¶ 121-22.

Plaintiff was a freshman at THS during the 2018-2019 school year. *Id.* ¶ 131. Plaintiff's class schedule required her to travel by and through the hallway of the special education wing where T.R. had several classes. *Id.* ¶ 132. Plaintiff and T.R. met during the first weeks of the 2018-2019 school year and T.R. began stalking and grooming Plaintiff. *Id.* ¶ 133. Plaintiff considered herself to be "school dating" T.R. for about two weeks at the beginning of the school year, meaning she would spend time with him at school and sometimes text in the evening, but never saw him outside of school. *Id.* ¶ 134. She, however, rejected T.R.'s repeated sexual advances and repeatedly informed him she was not ready for a sexual relationship. *Id.* ¶¶ 134-35. After about two weeks, T.R. "broke up" with Plaintiff, but continued to follow her in the hallways at school and enter her classes. *Id.* ¶ 136.

During the after-school period between 3:00 p.m. and 5:00 p.m., many students were still on the THS campus for school-sponsored programs such as athletics and extracurriculars. *Id.* ¶ 124. On October 9, 2018, Plaintiff was one such student, attending an after-school culinary arts class, which was located adjacent to the top of the stairwell where T.R. first assaulted Jane Doe 2. *Id.* ¶ 137. After leaving the class to go to the locker room for softball practice, T.R. caught up with Plaintiff at the bottom of the stairwell (where he had first assaulted Jane Doe 2) and began kissing her and putting his hand down her pants despite her repeated statements such as, "I don't want to." *Id.* ¶¶ 137-38. Plaintiff left and T.R. pursued her outside to a corner of the courtyard where he had previously assaulted Jane Doe 2. *Id.* ¶ 139. There, he continued trying to kiss Plaintiff, put his hand down her pants, and forced his penis into her mouth, despite her repeated no's. *Id.* ¶¶ 140, 141. T.R. then pulled her pants down and vaginally raped her, using wrestling

techniques to hold her up against the wall, despite her screams to stop. *Id.* ¶¶ 142-44. Eventually T.R. stopped and walked away, leaving Plaintiff feeling shocked. *Id.* ¶ 145. Not knowing what to do, Plaintiff went to softball practice and then went home, in pain, but did not tell anyone what had happened. *Id.* ¶¶ 145-46.

The following day, Plaintiff confided in two friends what had happened, but asked them not to disclose anything as she was afraid T.R. would retaliate, that she would be known at school as "the girl who got raped," or that her parents would get mad at her. *Id.* ¶¶ 147, 160. On October 16, 2018, Plaintiff took a pregnancy test at the school clinic, which came back negative. *Id.* ¶ 148. Plaintiff was afraid of T.R. and spent the next three months trying to avoid him at school and school events, including asking friends to walk her between classes or taking her younger brother with her out in public. *Id.* ¶¶ 149-51. She experienced difficulty sleeping, bouts of crying, and intrusive thoughts. *Id.* ¶¶ 152, 169.

Meanwhile, T.R. continued to attend THS and roam the school campus. By the end of November 2018, he stopped attending the IAES after-school program. *Id.* ¶ 123. He engaged in further misconduct that resulted in several disciplinary referrals made to Defendant Abeyta-Valerio: on December 11, 2018, for threatening another student; on January 17, 2019, for "disruptive/uncooperative" behavior; and two on January 29, 2019, for being "uncooperative/ defiant" and "cutting class/truancy." *Id.* ¶¶ 153, 156-58. Defendant Abeyta-Valerio dismissed these referrals and allowed T.R. to continue attending THS. *Id.* ¶¶ 156-58.

On January 29, 2019, the school social worker, Mr. Hyatt, summoned Plaintiff to see him in response to a report from a fellow student regarding the rape. *Id.* ¶ 159. In response to questioning by Mr. Hyatt, Plaintiff disclosed the rape and Mr. Hyatt summoned TPD officers and Plaintiff's parents to the school to take Plaintiff home. *Id.* ¶ 160. In the following days, Plaintiff

participated in a safehouse interview for TPD and identified the locations on THS campus where T.R. assaulted and raped her. *Id.* ¶ 161. TPD officers recognized these as the same locations identified by Jane Doe 2 and one remarked that he could not believe the school still had not installed video surveillance at those locations. *Id.* ¶ 161. TPD officers also interviewed a few of Plaintiff's female peers, one of whom stated that she heard around school that T.R. "did this to a freshman last year and tried to do this to lots of girls." *Id.* ¶ 162.

After reporting the rape, Plaintiff's fears increased, and she was afraid to be found by T.R. or his friends; she thus transferred to another school for the remainder of the 2018-2019 school year. *Id.* ¶¶ 165-66. Even so, Plaintiff heard rumors and received inquiries as to whether she was the student who was raped and why she changed schools, contributing to her fear that people would view her in a negative light for reporting T.R. *Id.* ¶ 168. Feeling alone and hated, she withdrew from social media, which resulted in the loss of many friends; she was not comfortable going out on her own; and she would self-isolate in her room. *Id.* ¶¶ 169-70. The news of T.R.'s assault on Plaintiff reached Jane Doe 2, who was retraumatized and subsequently placed in inpatient treatment for months. *Id.* ¶ 171.

In March or April of 2019, Defendants Trujillo and Abeyta-Valerio asked Ms. Chavez to resume the after-school program for T.R. but did not inform her of T.R.'s sexual assaults. *Id.* ¶ 174. Ms. Chavez only learned of the assaults when T.R. identified himself, in the presence of Ms. Chavez and other students and staff, as the subject of a newspaper article on the topic, bragged that nothing would happen to him, and that the girls he raped "were going to regret it." *Id.* ¶¶ 174-75. Had Ms. Chavez been aware of this information earlier, she would not have volunteered to serve as his teacher in the after-school program. *Id.* ¶ 176.

Defendants worked to ensure that T.R. would be able to fully participate in THS's graduation ceremonies at the end of the 2018-2019 school year. *Id.* ¶¶ 177, 179. They manipulated his education records to get around normal graduation requirements, including on May 23, 2019, when Defendant Abeyta-Valerio sent this email to Defendants Torrez and Trujillo, as well as to other TMS administrators: "Just to confirm that everyone is aware that [T.R.] will be participating fully in all graduation events. We spoke about it last week in the meeting upstairs, and I just want to confirm we are all aware and the Board is aware as well"; to which Defendant Torrez responded, "The Board is aware!" *Id.* ¶¶ 177-78. Defendant Abeyta-Valerio later acknowledged that allowing T.R. to participate in graduation sent a terrible message to female students, but that it was not her decision alone to allow such participation. *Id.* ¶ 178. However, Defendant Abeyta-Valerio made policy decisions which redirected the school district's resources away from female victims and towards enabling T.R. to continue with and graduate from THS. *Id.* ¶ 195. T.R. posted a picture on his social media account, showing himself dressed in full graduation regalia. *Id.* ¶ 179. Defendants' actions in allowing T.R. to continue to roam the school and participate in graduation, while Plaintiff was forced to change schools, made her feel "unheard and dismissed." *Id.* ¶ 184.

T.R. subsequently moved out of state and was later charged with other crimes. *Id.* ¶ 181. Meanwhile, Plaintiff continues to suffer from the effects of the sexual assault, including feeling uncomfortable in public as she fears she could run into T.R., who still has family in Taos, and experiencing frequent intrusive thoughts. *Id.* ¶¶ 182-83.

The governing clique of TMS (including the individual Defendants) had established policy decisions, customs, practices, and patterns of behavior which served to dismiss, downplay, and minimize sexual harassment, sexual violence, and discrimination based on sex,

affecting entire classes or groups of students along gender lines across several school years. *Id.* ¶¶ 185, 193, 215. For example, Defendants received and mishandled reports of sexual misconduct and harassment by teachers and coaching staff at THS before T.R. arrived, but failed to properly investigate or discipline those teachers and coaches, leading to an "anything goes" environment at THS. *Id.* ¶¶ 218-19, 222-24. Defendants also devoted resources to athletic programs, as opposed to resources to protect female students from sexual harassment, and expected students to conform to gender roles, such as females participating in cheerleading and males participating in football or wrestling. *Id.* ¶¶ 208, 211-12, 216-17.

Other examples of Defendants' pattern of downplaying sexual harassment, sexual violence, and discrimination based on sex included that the individual Defendants relied on the absence of video evidence to dismiss reports of T.R's sexual misconduct, even though they knew that the security cameras were not regularly monitored and that security footage was erased after a few days. *Id.* ¶¶ 202-205, 207. Further, law enforcement investigating the assaults on Plaintiff and Jane Doe 2 largely had to rely on information provided by teachers outside the clique and the victims' mothers, while Defendants Trujillo and Abeyta-Valerio provided only minimal information and Defendant Torrez provided no information. *Id.* ¶ 192. Staff who acquiesced in Defendants' pattern of enabling and protecting T.R. were given favorable assignments or even promoted, while staff who tried to report sexual harassment, sexual violence, and discrimination based on sex were made to feel unheard and their concerns were dismissed. *Id.* ¶¶ 220-21.

TMS also did not have the proper procedures or training for reporting or resolving student reports of sexual harassment, sexual violence, or discrimination based on sex, despite having generic, formal documents such as "policies" on "sexual harassment." *Id.* ¶¶ 20, 52, 134, 194. For example, the disciplinary referral form used by TMS teachers had a series of boxes with

pre-printed categories of misconduct, but did not include boxes for sexual harassment, sexual

violence, or discrimination based on sex and Defendant Abeyta-Valerio did not document or

report any of T.R.'s behavior or disciplinary referrals as sexual harassment, sexual violence, or

discrimination based on sex. *Id.* ¶¶ 20, 68, 173, 195, 206. Additionally, there was no process at

THS for referring student reports of sexual harassment, sexual violence, or discrimination based

on sex to an impartial investigator or for contacting the complaining student to discuss the

process for filing a formal complaint. *Id.* ¶¶ 20, 53, 83, 195, 214. Although TMS's official

written policy assigned the role of "compliance office" for sexual harassment complaints to

Defendant Torrez (the Superintendent), the school district had a de facto custom of delegating

that role to the Principal of THS, Defendant Trujillo, who had no training on the functions of a

"compliance officer," such that TMS's official written policy on sexual harassment was never

followed. *Id.* ¶ 196. When several special education teachers left over the years, Defendants did

not replace them with qualified teachers who were trained and supervised to handle students such

as T.R. *Id.* ¶¶ 102-103, 210.

Defendants also had a practice of delegating authority to handle classroom management

and disciplinary matters, including sexual misconduct, to the teachers, many of whom did not

have written policies and who had no real authority to address T.R.'s misconduct. *Id.* ¶¶ 197,

199. Neither TMS nor any of the individual Defendants provided THS teachers or students with

proper training and supervision on how to handle or process the many student reports of T.R.'s

sexual harassment, sexual violence, and discrimination against them based on sex, including how

to handle a restraining order between students. *Id.* ¶¶ 52, 70, 88, 197-99, 206. Instead, THS

employees were repeatedly told that there was nothing the school district could do about T.R.'s

misconduct. *Id.* ¶ 200. Defendants likewise failed to train employees on proper procedures for

discipline, reporting and sharing information, and conducting investigations. *Id.* ¶ 198. This led

to the mistaken impression that special education students could not be placed on out-of-school

suspension for more than 45 days and that school employees could not share information about

student misconduct with others. *Id.* ¶ 198.

## LEGAL STANDARD

### 1. Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for failure

to state a claim upon which the court can grant relief. "[T]o withstand a Rule 12(b)(6) motion to

dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to

relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir.

2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a complaint

does not require detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, it

"requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555.

A court considering a challenge under Rule 12(b)(6) may proceed according to a "two-

pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court "can choose to

begin by identifying pleadings that, because they are no more than conclusions, are not entitled

to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations." *Id.* Second, "[w]hen there are well-

pleaded factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief." *Id.*

For purposes of this second prong, the Court "accept[s] the well-pled factual allegations

in the complaint as true, resolve[s] all reasonable inferences in the plaintiff's favor, and ask[s]

whether it is plausible that the plaintiff is entitled to relief." *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (internal citations and quotation marks omitted). "A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). The court's consideration, therefore, is limited to determining whether the complaint states a legally sufficient claim upon which the court can grant relief. *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The court is not required to accept conclusions of law or the asserted application of law to the alleged facts. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994). Nor is the court required to accept as true legal conclusions that are masquerading as factual allegations *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must, however, view a plaintiff's allegations in the light most favorable to him or her. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013).

In reviewing the sufficiency of the complaint "courts must consider the complaint in its entirety," examining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (emphasis in original). However, particularly in Section 1983 cases, "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original).

2. **Qualified Immunity**

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When an individual defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that 1) the officer violated a constitutional or statutory right and 2) the right was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002); *Martinez*, 563 F.3d at 1088. A court may address these prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid qualified immunity, *Olsen*, 312 F.3d at 1304.

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The action at issue need not have been previously declared unlawful, but its unlawfulness must be evident in light of preexisting law. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Except for egregious circumstances in which every reasonable official would understand the conduct at issue to be unreasonable, unlawfulness is generally demonstrated "when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law." *Id.* at 1069-70 (internal quotation marks omitted). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)

(internal quotation marks omitted); *see also Sturdivant v. Fine*, 22 F.4th 930, 937 (10th Cir. 2022) ("[A] case directly on point is not required so long as existing precedent [has] placed the . . . constitutional question beyond debate.") (internal quotation marks and citations omitted).

The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an official acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 538 U.S. 48, 65 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015). Furthermore, the cases so cited must clearly establish that "the scope of the right encompasses the facts presented." *Quinn*, 780 F.3d at 1012 (internal quotation marks omitted; emphasis removed).

In recent years, the Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases." *White v. Pauly*, 80 U.S. 73, 79 (2017). "The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation marks and citations omitted). "[T]he defense of qualified immunity gives public officials the benefit of legal doubts." *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted). Thus, qualified immunity provides "ample room for mistaken judgments" and protects all but "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 314, 343 (1986).

Taking the motion to dismiss and qualified immunity standards together, "a court must consider "whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011)

(internal quotation marks and citation omitted). "The burden is on the plaintiff to prove both

parts of this test." *Fisher Sand & Gravel, Co. v. Giron*, 465 F. App'x 774, 779 (10th Cir. 2012).

## ANALYSIS

As discussed above, Plaintiff's SAC alleges three counts that involve six different claims:

(1) substantive due process violation, based on a danger-creation theory, against the individual

Defendants; (2) equal protection violation against the individual Defendants; (3) substantive due

process violation, based on a danger-creation theory, against TMS; (4) substantive due process

violation, based on an inadequate screening, hiring, and training theory, against TMS; (5) equal

protection violation against TMS; and (6) premise liability against all Defendants under the New

Mexico Tort Claims Act ("NMTCA"). Because qualified immunity applies only to the individual

Defendants, *see T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017), the Court will begin by

examining whether the individual Defendants are entitled to qualified immunity and then turn to

whether Plaintiff states claims against Defendant TMS.

### 1. Individual Defendants: Equal Protection

Because a Section 1983 complaint with multiple defendants must "make clear exactly

*who* is alleged to have done *what* to *whom*, . . . as distinguished from collective allegations

against the state," *Robbin*, 519 F.3d at 1250 (emphasis in original), the Court will begin by

considering whether the facts in the complaint allege a plausible claim against each individual

Defendant for an equal protection violation. *See Wilson v. Montano*, 715 F.3d 847, 854 (10th Cir.

2013) ("Individual liability under § 1983 must be based on personal involvement in the alleged

constitutional violation."). The Court will then move to prong two of the qualified immunity

analysis—clearly established law.[7]

   a.  <u>Constitutional Violation</u>

"It is well established in this circuit that sexual harassment by a state actor can constitute

a violation of the equal protection clause." *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238,

1250 (10th Cir. 1999). "[A] governmental official or supervisory employee may be held liable

under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Id.*

at 1250. Stating such a deliberate indifference claim requires Plaintiff to "state facts sufficient to

allege defendants actually knew of and acquiesced in [T.R.'s] behavior." *Id.* (internal quotation

marks and citation omitted). "Liability under § 1983 must be predicated upon a deliberate

deprivation of constitutional rights by the defendant and not upon mere negligence." *Id.* (cleaned

up). As set forth above, to survive the individual Defendants' motions to dismiss, Plaintiff must

make specific allegations against each individual defendant. Accordingly, the Court begins its

analysis by summarizing Plaintiff's allegations against each individual Defendant.

**Lilian Torrez.** At the times relevant to this case, Defendant Torrez was the

superintendent of TMS. SAC allegations specifically directed to Defendant Torrez by name are

that she (along with the other individual Defendants) decided to merge the population of students

from Chrysalis Alternative School with THS after the 2014-2015 school year and failed to

---

[7] In her response brief, Plaintiff discusses the development of law around Title IX and § 1983 equal protection claims, including pointing out that the Supreme Court in 2009 made clear that both Title IX and § 1983 equal protection claims are available for school sexual misconduct cases. Doc. 391 at 11-12. In the present case, Plaintiff does not bring a Title IX claim, having previously settled such a claim (*see* Doc. 317 at 32 n.24), and it is not in dispute that Plaintiff can bring a § 1983 claim. The Court need not address Plaintiff's assertion that analysis from various Title IX cases she cites applies with equal force to her § 1983 claim because resolution of Defendants' motion to dismiss does not turn on such application.

implement any additional security measures on the THS campus after the merger. Doc. 297 ¶¶ 15, 17, 202. Defendant Torrez also failed to properly staff Chrysalis after it merged with the THS campus and failed to hire properly licensed special education teachers. *Id.* ¶¶ 18, 111-12. In May 2019, Defendant Torrez acknowledged that the TMS board was aware T.R. would be participating in graduation. *Id.* ¶ 178. TMS's official written policy designated Defendant Torrez as the compliance officer for sexual harassment complaints, but the school district had a *de facto* practice of delegating that role to the THS principal—Defendant Trujillo—and Torrez never trained Trujillo. *Id.* ¶ 196. Lastly, Defendant Torrez failed to properly investigate and discipline teachers and coaching staff accused of inappropriate behavior. *Id.* ¶¶ 218-19, 223.

Missing from these facts are any allegations that Defendant Torrez knew of T.R.'s sexually harassing behavior and acquiesced to it. In an attempt to establish Defendant Torrez's culpability in her harassment and rape, Plaintiff alleges that:

> To the extent that Defendant Torrez was absent from the events, meetings, and communications regarding T.R. and his female student victims described above, that absence was itself a deliberate omission evincing her decision to neither assume nor assign such responsibility to a single officer or district employee positioned to prevent or remedy those constitutional violations. Given her involvement with transferring the Chrysalis Alternative School onto the Taos High School campus and the closure of the Chrysalis Alternative School for the 2018-2019 school year, as well as the high level of turnover among school employees assigned to Chrysalis and the ongoing controversies regarding the misconduct of T.R. and school employees assigned there (including Joe Winter), Defendant Torrez could only have avoided knowledge of T.R.'s sexual misconduct by willfully blinding herself to it.

*Id.* ¶ 214. These allegations, however, are legal conclusions masquerading as factual allegations that are not entitled to an assumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In her response brief, Plaintiff argues that she has sufficiently alleged a claim under the theory of supervisory liability. Doc. 319 at 38-39 (citing *Wilson v. Montano*, 715 F.3d 847, 850 (10th Cir. 2013)). *Wilson* involves a claim that an officer unlawfully detained and deprived the

plaintiff of his Fourth Amendment rights. *Id.* at 850-51. The Tenth Circuit held that supervisory liability for a constitutional violation under § 1983 requires a showing that "(1) the defendant promulgated, created, implemented or possessed personal responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional violation." *Id.* at 856. "[A] causal connection is alleged by claiming a supervisor defendant 'set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive plaintiff of her constitutional rights.'" *Id.* at 857–58 (10th Cir. 2013) (citing *Dodds v. Richardson*, 614 F.3d 1185, 1195-96 (10th Cir. 2010)).

Plaintiff argues that Defendant Torrez delegated her role as compliance officer for documenting, investigating, and responding to sexual harassment complaints to Defendant Trujillo, without properly training Trujillo, and that this resulted in a lack of implementation of the sexual harassment policy. But to be liable under the supervisory liability test, a defendant must act with the state of mind required to establish the alleged constitutional violation. And the requisite state of mind for a sexual harassment case is deliberate indifference and not mere negligence. Thus, even if Defendant Torres was negligent for not properly training Defendant Trujillo on how to perform specific administrative functions of compliance officer, as the SAC alleges (Doc. 297 ¶ 196), the SAC does not include allegations rising to the level of deliberate indifference. The Court therefore finds that the SAC fails to state a claim against Defendant Torrez for violation of Plaintiff's right to equal protection.

**Robert Trujillo.** At the times relevant to this case, Defendant Robert Trujillo was the principal of THS. Doc. 297 ¶ 4. The SAC contains specific, factual allegations that Defendant Trujillo was aware of T.R.'s sexual harassment and sexual assaults and failed to take action. To

begin, Defendant Trujillo knew T.R. was expelled from a previous school after his freshman

year, due to multiple instances of sexual harassment and misconduct that involved touching a

female student's buttocks without her consent, which T.R. admitted. *Id.* ¶¶ 21-22. During T.R.'s

first year at THS (the 2016-2017 school year), Defendant Trujillo knew T.R. continued this

pattern of misconduct, to include sexual harassment of female students. *Id.* ¶¶ 28-29. By

September of 2016, Defendant Trujillo knew the problems were serious enough to move T.R. to

the Chrysalis Alternative School. *Id.* ¶ 30. The misconduct continued, leading to a Chrysalis

teacher deciding to assign T.R. to one-to-one supervision with Mr. Winter. *Id.* ¶¶ 31-36, 39-41.

Defendant Trujillo knew that Mr. Winter had his own behavioral problems, and

Defendant Trujillo reassigned Mr. Winter without replacement supervision of T.R. *Id.* ¶¶ 41, 44,

46, 48. During the 2017-2018 school year, a teacher reported to Defendant Trujillo that T.R. was

making inappropriate sexual comments to female students and that teacher repeatedly removed

T.R. from his classroom for such comments. *Id.* ¶ 66. Nonetheless, Defendant Trujillo asked that

T.R. be let back in the class. *Id.* That same school year, after T.R. raped Jane Doe 2, Jane Doe

2's mother accused Defendant Trujillo of not taking the reported rape seriously because no one

from the administration reached out to her. *Id.* ¶ 89. A teacher later reported to Defendant

Trujillo that T.R. sent sexually explicit photos, including one of Jane Doe 2, to other female

students, but Defendant Trujillo never took any action. *Id.* ¶¶ 95-96. At the beginning of the

2018-2019 school year, Defendant Trujillo failed to inform Jane Doe 2's mother about the

presence of T.R. on the THS campus. *Id.* ¶ 106. Defendant Trujillo was aware of T.R.'s

disruptive and unsupervised behavior at the beginning of the 2018-2019 school year, such as

leaving class, accumulating numerous absences, and failing to abide by his restricted schedule

and that, instead of being where he was supposed to be, he "roam[ed] the campus without an

escort." *Id.* ¶¶ 49, 97, 108, 120-21. And yet, Defendant Trujillo took no action to ensure
appropriate supervision of T.R. during this time. He did not assign a one-to-one escort to T.R.,
require alternative off-campus placement, place T.R. on a BIP, or do anything else to make sure
T.R. was not roaming the halls or other areas of campus when he was supposed to be in class.

The Court agrees with Plaintiff that these allegations are sufficient to state a claim that
Defendant Trujillo knew of and acquiesced to T.R.'s behavior—especially given Defendant
Trujillo's knowledge of T.R.'s expulsion from a previous school for, in part, a sexual assault;
numerous reports of sexual harassment during the 2016-2018 school years; and the rape of Jane
Doe 2 during the 2017-2018 school year. *See Doe on behalf of Doe #2 v. Metro. Gov't of
Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459, 464-66 (6th Cir. 2022) (holding that
deliberate indifference can be shown by allegations of widespread and unaddressed sexual
misconduct before the plaintiff was harassed that lead to the plaintiff's harassment); *id*. at 466
(declining to find the school district "immune from liability as long as no student is assaulted
twice, regardless of its indifference to widespread instances of sexual harassment across its
schools").[8]

In response to these allegations, Defendants highlight the actions TMS took to address
T.R.'s behavior. Specifically, they point out that, following reports that T.R. was harassing
female students during the 2016-2017 school year, a Chrysalis teacher assigned a one-to-one
escort to T.R. to ensure that he was constantly supervised while on the THS campus. Doc. 297
¶ 39. Further, following T.R.'s assault on Jane Doe 2 at the beginning of the 2017-2018 school

---

[8] Although this analysis appears in the Sixth Circuit's discussion of a Title IX claim, the Sixth
Circuit vacated the lower court's dismissal of the § 1983 claim for the same reason it vacated and
reversed the lower court's dismissal of the Title IX claim. *Doe on behalf of Doe #2 v. Metro.
Gov't of Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459, 468 (6th Cir. 2022).

year, TMS personnel placed T.R. on off-campus IAES for the remainder of the school year and assigned him to a program that was supposed to limit his time on campus at the beginning of the next year. Doc. 317 at 37; *see* Doc. 297 ¶¶ 98, 108.

Had Defendants imposed and consistently enforced these measures during the 2018-2019 school year, their argument would carry much greater force. When T.R. started his senior year in 2018-2019, however, he had no one-to-one escort, no BIP, and was assigned to be on the THS campus during the regular class schedule as well as after school. On August 29, 2018, soon after the 2018-2019 school year started, a school social worker documented in an IEP that T.R. "has already had an incident of a female student complaining of unwanted advances, threats, and stalking behavior." Doc. 297 ¶ 109. Further, Defendant Trujillo solicited teachers to supervise after-school assignments, and Ms. Chavez volunteered to oversee this program on the THS campus from 3:00 pm to 5:00 pm two days a week. *Id.* ¶ 117. Defendants accepted this arrangement and assigned T.R. to these classes. *Id.* Even though Ms. Chavez informed Defendant Trujillo that T.R. regularly skipped this class, Defendant Trujillo took no action to ensure that T.R. was supervised during the time he scheduled T.R. to be on campus. *Id.* ¶¶ 120-22. Instead, Defendant Trujillo left T.R. free to roam the THS campus among other students engaged in after-school programs without any type of monitoring or supervision. *Id.*

That is, Plaintiff's allegations support the conclusion that Defendant Trujillo knew measures were necessary to prevent T.R. from sexually harassing and assaulting female students during the 2018-2019 school year, and yet did not continue impose any of the previous measures taken, or implement any substitute measures, during the beginning of the 2018-2019 school year. He did nothing to prevent T.R. from consistently being on campus or to ensure sufficient supervision while on campus. Thus, drawing all reasonable inferences in Plaintiff's favor and

accepting Plaintiff's allegations as true, Plaintiff has stated a claim that, in the weeks leading up to Plaintiff's rape in September 2018, Defendant Trujillo was deliberately indifferent to T.R.'s known sexual harassment.

**Lisa Abeyta-Valerio**. At all times relevant to this case, Defendant Abeyta-Valerio was the assistant principal of THS. Doc. 297 ¶ 5. The SAC alleges that, like Defendant Trujillo, Defendant Abeyta-Valerio knew that T.R. had been expelled from his previous school for sexual assault of a female student. *Id.* ¶¶ 21-22. Over three years, multiple teachers and staff reported to Defendant Abeyta-Valerio that T.R. was touching girls without their consent; that female students had asked T.R. to stop touching them; that he tried to start a fight with a girl at lunch; that one student reported T.R. was bothering her, following her in the halls, and making her uncomfortable; and that at least one female student complained about his sexual advances and was no longer coming to school. *Id.* ¶¶ 31, 32, 35-36. In September 2016, Defendant Abeyta-Valerio knew that T.R. bragged that he would never get in trouble because Defendant Abeyta-Valerio was friends with T.R.'s grandfather. *Id.* ¶ 67. Defendant Abeyta-Valerio knew that T.R.'s harassment merited placement at Chrysalis by the beginning of September 2016, and then one-to-one supervision beginning in January 2017 with Mr. Winter. *Id.* ¶¶ 30-36, 39, 42. Although Plaintiff does not allege any incidents of harassment during the two months Mr. Winter supervised T.R. during the 2016-2017 school year, Defendant Abeyta-Valerio knew that Mr. Winter's supervision ended in March 2017. *Id.* ¶ 48. Crucially, Defendant Abeyta-Valeria knew this led to T.R. assaulting Jane Doe 2 multiple times at the beginning of the 2017-2018 school year. *Id.* ¶ 72. Then, at the beginning of the 2018-2019 school year, Defendant Abeyta-Valeria knew that T.R. needed alternative placement and that, although T.R. was assigned to an IAES class schedule, he was not abiding by it. *Id.* ¶¶ 108, 121. Defendant Abeyta-Valerio failed to take

any action to address these issues, including failing to provide supervision for T.R. after Mr. Winter was reassigned or after T.R. returned to a regular class schedule on campus at the beginning of the 2018-2019 school year, failing to place T.R. on a BIP, and knowingly allowing T.R. to violate the restrictions of his after-school class schedule. *Id.* ¶¶ 31, 32, 35, 36, 42, 59, 67.

Instead, Defendant Abeyta-Valerio downplayed T.R.'s behavior. For instance, she documented his behavior reports as disorderly conduct or insubordination, instead of sexual harassment. *Id.* ¶ 68. In one instance, she told teachers that both T.R. and Jane Doe 2 were equally at fault for T.R.'s sexual assault of Jane Doe 2. *Id.* ¶ 84. In another, she dismissed a teacher's concern that T.R. was allowed to return to THS after the assault on Jane Doe 2. *Id.* ¶ 96. After the assault on Jane Doe 2, a teacher reported to Defendant Abeyta-Valerio that T.R. sent sexually explicit photos, including one of Jane Doe 2, to other female students; nonetheless, Defendant Abeyta-Valerio took no action. *Id.* ¶¶ 94-95. After T.R.'s assault on Plaintiff, Defendant Abeyta-Valerio worked to ensure that T.R. was able to participate in graduation, which she later admitted sent a bad message to female students. *Id.* ¶¶ 177-78.

As with Defendant Trujillo, the Court finds that the SAC plausibly alleges that Defendant Abeyta-Valerio knew of and acquiesced in T.R.'s behavior, leading to Plaintiff's sexual harassment and assault. Defendant Abeyta-Valerio was aware that measures such as one-to-one supervision by Mr. Winter, off-campus placement, or some form of close supervision when T.R. was on the THS campus were necessary to regulate T.R.'s behavior. The SAC plausibly alleges that Defendant Abeyta-Valerio did nothing when the one-to-one supervision ended, or when she became aware that, instead of complying with his after-school class schedule at the beginning of the 2018-2019 school year, T.R. was left free to roam the THS campus without supervision or monitoring of any kind. She did nothing about known issues with incidents of harassment and

assault directed at female students that happened as a result of this lack of supervision and restriction, instead downplaying the behavior and ensuring that T.R. was able to attend graduation. This is sufficient to allege deliberate indifference.

      b.  <u>Clearly Established Law</u>

      Having found that the SAC alleges a plausible claim that two Defendants (Trujillo and Abeyta-Valerio) violated Plaintiff's constitutional right to equal protection, the Court turns to the second prong of qualified immunity—whether the right was clearly established. For this prong, Plaintiff primarily relies on the case *Murrell v. School District No. 1, Denver*, 186 F.3d 1238 (10th 1999). *Murrell* involves a student, Penelope Jones, with spastic cerebral palsy, hearing loss in one ear, and developmental disabilities. Ms. Jones enrolled at a high school in October 1993 where she encountered another special education student, John Doe, who was known to have behavioral problems, including engaging in sexually inappropriate conduct. *Id*. at 1243. Despite known behavioral problems, the school district appointed John Doe to the position of janitor's assistant, where he gained access to unsupervised areas of the school. *Id*. About a month after Ms. Jones enrolled at the school, teachers became aware that Mr. Doe was engaging in aggressive, sexually inappropriate conduct towards Ms. Jones. *Id*. Around the same time, Ms. Jones' mother informed teachers that Mr. Doe was making harassing phone calls to Ms. Jones. *Id*. At one point, Mr. Doe took Ms. Jones to a secluded area of the school and sexually assaulted her. *Id*. A janitor discovered them, and returned them to class, advising their teachers where he found them. *Id*. The teachers, however, failed to inform Ms. Jones' mother about the sexual assault. *Id*. at 1243-44. On another occasion when Mr. Doe sexually assaulted Ms. Jones, she informed her teachers and they told her not to tell her mother about the incident, instead encouraging her to forget that it happened. *Id*. at 1244. When, in November 1993, Mr. Doe again

took Ms. Jones to a secluded area of the school and battered and sexually assaulted her, the teachers only informed Ms. Jones' mother of the non-sexual battery. *Id*.

Ms. Jones eventually left school for a psychiatric hospital, at which point Ms. Jones' mother learned about the sexual assaults. *Id*. The mother then contacted the teachers, who denied that the sexual assaults could have happened and refused to discuss the matter further. *Id*. The mother also provided information of the assaults to the principal, who never responded to the mother and never undertook any investigation. *Id*. Ms. Jones returned to school in December 1993, but stayed only one day because Mr. Doe again battered her and other students ridiculed her because of the prior sexual attacks. *Id*. A meeting took place on December 10, involving the principal, the subject teachers, Mr. Doe's mother, and Ms. Jones' parents, to discuss the sexual conduct, during which the principal was hostile towards Ms. Jones and suggested the sexual contact may have been consensual. *Id*. Ultimately, the principal declined to investigate and instead suspended Ms. Jones. *Id*.

Ms. Jones' mother, as guardian ad litem for Ms. Jones, sued the school district, the principal, and two of Ms. Jones' teachers, alleging that they violated Ms. Jones' right to equal protection for failing to remedy Mr. Doe's sexual harassment. *Id*. at 1242. Applying the deliberate indifference standards, the court held that the plaintiff stated an equal protection claim against the individual defendants by alleging facts "that the principal and the teachers knew about Mr. Doe's harassment of Ms. Jones and acquiesced in that conduct by refusing to reasonably respond to it." *Id.* at 1250. In a footnote, the Tenth Circuit drew a distinction between a failure-to-prevent claim and a failure-to-respond claim. *Id.* at 1250 n.7. "We agree with the School District that a failure to prevent sexual harassment by a student *before it occurs* does not

violate Title IX or the Fourteenth Amendment absent a showing of an institutional policy of indifference. However, a refusal to remedy known sexual harassment is actionable." *Id.*

Several facts in the present case are similar to facts in *Murrell*: T.R., like John Doe, had known behavioral problems, including engaging in sexually inappropriate conduct directed towards female students. T.R., like John Doe, had unsupervised access to the school campus. T.R., like John Doe, sexually assaulted a fellow student in an unsupervised area on school grounds. The following school year, T.R. was unsupervised and allowed to roam the halls as he liked, which led to his sexual assault of Plaintiff in the same manner and in the same place as the previous assault. Thus, viewing the allegations in the light most favorable to Plaintiff, the Defendants here—like the defendants in *Murrell*—failed to reasonably respond to T.R.'s sexual assault of Jane Doe 2, of which they were aware, by failing to either properly supervise T.R. or to restrict his presence on campus during the school year in which Plaintiff was assaulted.

In other words, Plaintiff alleges that she suffered damages because Defendants "knew about [T.R.]'s harassment of [Jane Doe 2] and acquiesced in that conduct by refusing to reasonably respond to it." *Cf. Murrell*, 186 F.3d at 1250. To be sure, this can also be characterized as a failure-to-prevent claim: a failure to remedy or adequately respond to the first sexual assault of Jane Doe 2 necessarily resulted in a failure to prevent the second sexual assault of Plaintiff. But that it can be both a failure-to-prevent claim and a failure-to-remedy claim does not preclude it from being the latter. Plaintiff's claim, whatever additional characterization it may take, is still premised on Defendants' failure to remedy the known danger of T.R.'s sexual assault.

But, Defendants argue, they were not aware of and so could not have disregarded a substantial risk of harm to *Plaintiff* because T.R.'s previous harassment and assaults were

perpetuated against different victims, and nothing put them on notice that Plaintiff specifically was at risk. *See* Doc. 308 at 36 ("For both Plaintiff's substantive due process and her equal protection claim, Plaintiff must allege that each individual Defendant "knew about [T.R.'s] harassment of [Plaintiff] and acquiesced in that conduct by refusing to reasonably respond to it.") (quoting *Murrell*, 186 F.3d at 1250). The section of *Murrell* Defendants quote, however, does not capture *Murrell*'s holding. Instead, the quoted sentence is merely a description of the Plaintiff's claim and so should be read together with the sentence preceding it. Thus, the more complete quotation is:

> In order to state a claim of "deliberate" discriminatory conduct, Ms. Murrell must state facts sufficient to allege "defendants actually knew of and acquiesced in" Mr. Doe's behavior. This is precisely Ms. Murrell's claim—that the principal and the teachers knew about Mr. Doe's harassment of Ms. Jones and acquiesced in that conduct by refusing to reasonably respond to it.

*Murrell*, 186 F.3d at 1250. That is, the language that establishes the rule—the first sentence— focuses on "Mr. Doe's behavior," not the awareness of the harassment of a specific Plaintiff. Throughout its opinion, the Tenth Circuit appears more focused on the defendants' knowledge of the harasser's behavior rather than on the specific awareness of a particular victim. *See, e.g.*, *id.* at 1250 n.7 ("We agree with the School District that a failure to prevent *sexual harassment by a student* before it occurs does not violate Title IX or the Fourteenth Amendment absent a showing of an institutional policy of indifference. However, a refusal to remedy *known sexual harassment* is actionable." (emphasis added)).

In an equal protection claim, focus on a threat to a class rather than on a threat to a specific victim makes sense. As an equal protection claim, this rule of law is designed to protect

a class of individuals (here, female students) rather than one individual.[9] In *Murrell*, the fact

pattern happened to involve a single victim. So, when the Tenth Circuit referenced the facts of

the case, it necessarily focused on repeated acts against the same victim. This is not a holding

that the harassment must be directed against the same victim rather than the class of individuals

seeking protection under the equal protection clause. Although the harassment may be directed

against a single individual, as it was in *Murrell*, nothing in *Murrell* indicates that

unconstitutionality turns on this fact.

Indeed, in a case decided shortly after *Murrell*, the Tenth Circuit clearly established that

it does not. In *Johnson v. Martin*, the Tenth Circuit found supervisory liability for an equal

protection violation based on a pattern of sexual harassment against women, where the

supervisors knew of the harasser's behavior but not the identity of each harassment victim. 195

F.3d 1208 (10th Cir. 1999). In *Johnson*, the plaintiffs alleged that, from 1982 to 1996, James

Martin used his position as Director of the City of Muskogee's Building Codes and Enforcement

Department to commit sexual harassment and assault. *Id.* at 1211. Martin had authority to certify

that various construction projects complied with municipal building codes, and he used this

---

[9]     A fundamental tenet of equal-protection analysis is that a cognizable claim must
        identify a class of persons disadvantaged by the government action. In other
        words, government action challenged on equal-protection grounds must "affect
        some groups of citizens differently than others." *Engquist v. Or. Dep't of Agric.*,
        553 U.S. 591, 601 (2008) (internal quotation marks omitted) (but recognizing that
        in the context of certain types of government decision-making the "group" may be
        a class of one).

*Citizens for Const. Integrity v. United States*, 57 F.4th 750, 765 (10th Cir. 2023). "To prevail on
this [class-of-one] theory, a plaintiff must first establish that others, similarly situated in every
respect were treated differently." *Van Sant & Co. v. Town of Calhan*, 83 F.4th 1254, 1282 (10th
Cir. 2023). Thus, although a plaintiff can allege a class-of-one equal protection violation,
Plaintiff here does not claim that she was intentionally treated differently from others similarly
situated. Instead, Plaintiff alleges that Defendants were deliberately indifferent to the threat they
knew T.R. presented to female students at THS.

authority to obtain sexual favors in exchange for favorable consideration of permit applications and determinations of compliance with city codes. *Id.* Of the eight plaintiffs asserting Mr. Martin harassed them, only three complained about Martin's conduct to other city officials. *Id.* at 1212. One plaintiff complained in July of 1994, writing a letter to Martin's supervisor, Gary Gavin. The day after she sent the letter, Martin came to her house and confronted her with it. *Id.* Another plaintiff complained in the spring of 1995, visiting Garvin's office to personally report the incident. He promised to take care of it. *Id.* The third plaintiff complained to city officials in January 1996. *Id.* John Williamson, the City's Personnel Director, met with Martin and Martin resigned that same month. *Id.* In addition to the plaintiffs' complaints, an unidentified woman met with Williamson in 1993 about possible fraud involving the roofing of her house. Williamson referred her to the Muskogee Police Department, to whom she reported that Martin had made sexual remarks and engaged in unwanted sexual touching. *Id.*

On appeal from a district court order denying qualified immunity, the Tenth Circuit affirmed. It first rejected the defendants' argument that it was not clearly established that a public employee could be held liable for using governmental authority to sexually harass a nonemployee. *Id.* at 1215-16. The court acknowledged that case law during the relevant time period "all involve[d] alleged sexual harassment in an employment setting." *Id.* at 1217. However, "[t]here is no indication in those decisions that a public official's abuse of governmental authority in furtherance of sexual harassment in the employment setting is fundamentally different than when the abuse of authority occurs outside the workplace." *Id.* The court relied on the "obvious" proposition that "public officials frequently exercise governmental authority in many ways not involving their authority over subordinate employees." *Id.* at 1218. "[D]uring the period of time that Mr. Martin allegedly engaged in the acts of sexual harassment,

a public official's reasonable application of the prevailing law would lead him to conclude that to abuse any one of a number of kinds of authority for purpose of one's own sexual gratification (including the abuse of the authority granted a municipal building inspector) would violate the Equal Protection Clause." *Id.* (citing *Murrell*, 186 F.3d at 1251-52 as "concluding that supervisory school employees had sufficient notice that they could be held liable under the Equal Protection Clause even though prior cases involving supervisory liability did not involve school settings"). In other words, the constitutional violation is clearly established to be the abuse of government authority for sexual gratification (the conduct) without reference to whether the victim is an employee or nonemployee (the identity of the specific victim).

Turning to the question of supervisory liability, the Tenth Circuit again defined the violation at issue as knowledge of the harasser's conduct: "In instances in which a plaintiff demonstrates that a supervisor had actual knowledge of the harassment but failed to take any remedial action (e.g., by investigating the allegations and taking disciplinary action against the harassing subordinate employee), courts have concluded that the supervisor may be held liable." *Id.* at 1219. Accepting the statements of the plaintiffs as true, the court agreed that "Garvin knew about the allegations of sexual harassment in July 1994 but took no remedial action. Such knowledge and subsequent inaction is sufficient to establish supervisory liability under § 1983." *Id.* at 1220. Supervisory liability as to Williamson presented a closer call because the record was insufficiently developed as to the duties of his position. Nonetheless, the Tenth Circuit held that the plaintiffs had submitted enough evidence for a reasonable jury to find that Williamson's referral of the issue to another employee, while failing to take any action himself, "constituted an abdication of his responsibilities as the City's Personnel Director." *Id.* "Accordingly, viewing the record in the light most favorable to the plaintiffs, there is evidence from which a trier of fact

could conclude that Mr. Williamson 'knew about [the harassment] and acquiesced in that conduct by refusing to reasonably respond to it.'" *Id.* (alterations in original) (quoting *Murrell*, 186 F.3d at 1250).

Notably, the Tenth Circuit did not find that only the three plaintiffs who had complained to the city supervisors had a cause of action. It found that Garvin and Williamson knew about the unconstitutional conduct and were liable to the class of victims for failing to take any remedial action. This clearly establishes that supervisor liability in a claim for failure-to-prevent or failure-to-remedy sexual harassment turns on a supervisor's knowledge of a threat to the class at issue rather than knowledge of a threat to a specific individual within that class. Thus, Defendants were required to take action to remedy harassment of a class of individuals about which they knew, regardless of whether they were aware that T.R.'s behavior posed a danger to Plaintiff specifically.

Defendants' next argument addresses this point—they assert they did not fail to remedy harassment about which they knew. They argue this case is more like *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1125 (10th Cir. 2008). Doc. 317 at 30. The victim in *Rost*, K.C., was a middle school student receiving special education. 511 F.3d at 1117. K.C. disclosed sexual abuse to a counselor, who contacted the school resource officer (SRO), who interviewed K.C.; the counselor also reported the disclosure to the school principal. *Id.* at 1117-18. Because the incidents did not occur on school grounds, the principal determined that the SRO (who was a law enforcement officer) would investigate the alleged sexual assaults. *Id.* at 1118. Ultimately, the district attorney declined to prosecute the case. *Id.* The plaintiff sued, alleging that the school was deliberately indifferent to the harassment because the district failed

to investigate the incidents, did not interview the alleged perpetrator and victim, and failed to appropriately discipline the boys involved. *Id.* at 1121.

The Tenth Circuit disagreed:

Ms. Rost points to admissions by Principal Schmidt and Principal Bishop that there have been complaints of sexual harassment in the past. She also points to the discipline of one of the co-defendants, Nick Mangione, for sexual harassment. But the evidence that Ms. Rost identifies actually shows that the district is not acquiescing to the sexual harassment. As Ms. Rost notes, the district involved the police department in some of the harassment complaints and disciplined Nick Mangione. In addition, the high school conducted a survey to determine the scope of the sexual harassment problem. The evidence does not show that there was a widespread and persistent practice of failing to respond to student sexual harassment.

*Id.* at 1125.

Plaintiff's allegations establish that this case is not like *Rost*. To begin, Plaintiff's assault and Jane Doe 2's assault occurred on school grounds, so *Rost*'s holding about the extent of the duty to investigate off-campus assaults, and the appropriate delegation of duties to law-enforcement, is of limited relevance.

Defendants nevertheless argue that, like the officials in *Rost*, they did take action to "halt the misbehavior." Doc. 328 at 11. After Jane Doe 2 disclosed the assault, they argue, Defendants took remedial action by "putting T.R. in IAES for the remainder of the school year, and limiting his time on campus the following school year." Doc. 328 at 17. And Plaintiff does acknowledge that Defendants took some remedial actions before the 2018-2019 school year.

That Defendants did not impose the same, or in fact any, meaningful remedial actions in 2018-2019, however, diminishes their argument. The allegations in the complaint plausibly establish that Defendants abandoned the corrective measures they did take, despite knowing these measures were necessary for the safety of female students on campus. Specifically, Defendants knew that remedial measures—such as one-to-one supervision or a schedule that

kept T.R. off campus—were effective, in that no instances of harassment or assault were reported while these measures were in place. However, Defendants also knew the one-to-one supervision ended when Defendant Trujillo reassigned Mr. Winters in March 2017 without then assigning someone else to escort T.R. Doc. 297 ¶ 48. By April 2017, T.R. was again roaming the halls, disrupting class, and failing to adhere to his schedule. *Id.* ¶ 49.[10] At the beginning of the 2017-2018 school year, Defendants were aware through disciplinary referrals and other reports that T.R. continued to roam the halls, cut class, and leave his assigned classroom to stalk and sexually harass female students. *Id.* ¶¶ 59-64, 69. Defendants were also aware that this led to T.R.'s multiple sexual assaults against Jane Doe 2 at the beginning of the 2017-2018 school year. *Id.* ¶ 72.

Subsequently, as Defendants highlight, T.R. was placed on IAES—an off-campus class schedule. *Id.* ¶ 108. However, by the beginning of the 2018-2019 school year, T.R.'s "IAES" program switched from an off-campus schedule to a more loosely defined, on-campus, after-school program two days a week. *Id.* ¶¶ 107-108, 117. In addition to this on-campus "IAES" program, T.R. returned to attending classes at THS on a regular class schedule. *Id.* ¶¶ 107-108. By the beginning of the 2018-2019 school year, Defendants knew that T.R. was not complying with his schedule. Defendants knew T.R. was not abiding by his IAES program, was skipping class so that he could roam the THS campus, and had already sexually harassed at least one female student in the first month of the school year. *Id.* ¶¶ 109, 120-23. During this time, unlike

---

[10] Although the SAC does not give any instances of sexual harassment during the school year remaining after March 2017, it notes that "[a]dditional disciplinary referrals and documentation of teacher and student reports regarding T.R.'s behavior during the remainder of the 2016-2017 school year are either illegible or missing from the school records produced by Defendant TMS to date." Doc. 297 ¶ 49. And at least one teacher recalls that T.R. was sexually assaulting female students in the hallway "during the 2016/2017 school year." *Id.* ¶ 51.

previous years, T.R. had no BIP. *Id.* ¶ 107. It was during this time of lack of supervision and failure to abide by his IAES schedule that T.R. raped Plaintiff. *Id.* ¶¶ 131-53.

That is, Defendants are correct they took some remedial measures. But they also abandoned each remedial measure they took, despite being aware that T.R. had a pattern of engaging in sexual harassment and sexual assault when he had unsupervised access to the school campus. In other words, Defendants repeatedly failed to enforce remedial measures they knew were necessary to keep female students safe from T.R. As such, because Defendants failed to continue to enforce the remedial measures they knew were necessary to keep female students safe from T.R. on campus, *Murrell* and *Johnson* squarely govern this case.

In sum, the Court finds, taking Plaintiff's allegations as true, Defendants Trujillo and Abeyta-Valerio violated clearly established law and are therefore not entitled to qualified immunity on Plaintiff's equal protection claim.

Lastly, as to Defendant Torrez, as discussed above, the Court finds that the equal protection claim again Torrez fails on prong one of qualified immunity: the facts alleged in the SAC do not establish a constitutional violation. But, even if they did, the claim against Torrez would fail on prong two of qualified immunity. Plaintiffs' equal protection claim against Defendant Torrez is that Torrez delegated her role as compliance officer for documenting, investigating, and responding to sexual harassment complaints to Defendant Trujillo, without properly training Trujillo, resulting in lack of implementation of the sexual harassment policy. Plaintiff points to no cases showing that such a delegation is a clearly established violation of Plaintiff's right to equal protection. Defendant Torrez is thus entitled to qualified immunity at prong two of the qualified analysis as well as at prong one.

2.  **Individual Defendants: Substantive Due Process (Danger-Creation)**

"As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). "Foreseeability alone does not create an affirmative duty to protect on behalf of the State." *Matthews v. Bergdorf*, 889 F.3d 1136, 1150 (10th Cir. 2018). An exception exists, however, pursuant to which a "state official may be liable when 'a state actor affirmatively acts to create, or increase[] a plaintiff's vulnerability to, danger from private violence.'" *T.D.*, 868 F.3d at 1221 (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)). "Moreover, the conduct should be directed at a discrete plaintiff rather than at the public at large." *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002).

Once a plaintiff demonstrates the "precondition of affirmative conduct," *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013), she must also demonstrate:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
> (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscience shocking.

*T.D.*, 868 F.3d at 1221 (citing *Currier*, 242 F.3d at 918). Because Plaintiff's substantive due process claim fails at the first factor (creation of danger, which overlaps with the precondition of affirmative conduct directed to a particular person) and third factor (risk of serious, immediate, and proximate harm), the Court does not consider the remaining factors.

Unlike Plaintiff's equal protection claims, which required the Court to consider separately Plaintiff's allegations against each Defendant, analysis of Plaintiff's danger-creation

claims does not require such division—it fails as to each Defendant for the same reasons. In her SAC, Plaintiff alleges that Defendants merged the Chrysalis facilities with the THS campus and, upon the merger, failed to implement additional security measures at THS. Doc. 297 ¶¶ 15, 17. T.R. enrolled at THS starting in 2016 and engaged in a pattern of sexual harassment and misconduct that went unaddressed by Defendants through the 2018-2019 school year. *Id.* ¶¶ 28-29, 31-36, 51, 53, 55, 66, 104-105, 109. TMS did not have the proper procedures or training for reporting or resolving such reports of sexual harassment, sexual violence, or discrimination based on sex. *Id.* ¶¶ 20, 52, 68, 70, 88, 134, 173, 194-95, 197-99, 206.

Because of behavioral problems, in September 2016, T.R. was transferred to the Chrysalis Alternative School, which was within the main building of THS. *Id.* ¶ 30. T.R. had an escort for part of 2017 (starting in January), but after Defendant Trujillo reassigned the escort, T.R. was not provided a new one. *Id.* ¶¶ 39-40, 48, 57-58, 107. In September 2017, T.R. sexually assaulted a freshman, Jane Doe 2, on school premises on at least three occasions. *Id*. ¶¶ 70-72, 75-76, 78-83. After these assaults, T.R. was allowed to return to THS and Defendants downplayed his actions. *Id.* ¶¶ 84, 87, 93-96, 98-99, 101. Before the start of the next year, the 2018-2019 school year, Defendants failed to do anything (such as provide security cameras or assign additional staff) to monitor the locations where T.R. assaulted Jane Doe 2. *Id.* ¶¶ 128-29, 202-203, 207-208. In October 2018, T.R. sexually assaulted Plaintiff in the same locations he had assaulted Jane Doe 2 the previous year. *Id.* ¶¶ 137-145. Plaintiff disclosed the assault to a school social worker in January 2019. *Id.* ¶¶ 159-60. Meanwhile, T.R. continued to attend THS and participated in graduation at the end of the school year. *Id.* ¶¶ 156-58, 177-79.

Accepting these factual allegations as true, Plaintiff's danger-creation claim fails because she has not pled affirmative conduct that created an immediate threat directed to Plaintiff of

harm from private violence. *Est. of B.I.C.*, 710 F.3d at 1173 ("[A] showing of affirmative conduct and private violence are preconditions necessary to invoking the state-created danger theory."); *Matthews*, 889 F.3d at 1150 ("[A] state actor, *absent some prior affirmative act by the actor giving rise to a duty to protect*, cannot be held liable under the state-created danger exception for the *failure* to protect a plaintiff from harm.") (emphasis in original). "Affirmative conduct for purposes of § 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration." *Ruiz*, 299 F.3d at 1183. Here, many of Plaintiff's allegations amount to Defendants' failure to act: they failed to discipline or remove T.R. from THS campus following reports of misbehavior and sexual harassment; they failed to provide the proper procedures and training for dealing with reports of sexual harassment and sexual violence; they failed to implement additional security upon the merger of the Chrysalis and THS campuses; and they failed to monitor the areas where T.R. assaulted Jane Doe 2. "Such claims of inaction, no matter how prolific, are insufficient as a matter of law to result in liability under the state-created danger exception." *Matthews*, 889 F.3d at 1150 (internal quotation marks and citation omitted).

Relatedly, in *Dorothy J. v. Little Rock Sch. District*, an Eighth Circuit case which the Tenth Circuit positively cited,[11] the mother of a student sued the school district and two school employees after another student sexually assaulted her son in the boys' shower of the high school. 7 F.3d 729, 731 (8th Cir. 1993). The complaint alleged that the attacker "had a history of violent and sexually assaultive behavior" but that no defendant "took action sufficient to prevent" the son's attack. *Id.* The Eighth Circuit rejected a danger-creation claim, holding that

---

[11] *See Ruiz*, 299 F.3d at 1183.

the assault was "too remote a consequence" of enrolling an aggressive student, as it created an "indefinite risk." *Id.* at 733 & n.4; *see also id.* ("Plaintiff's general allegation that the Centers and DHS failed to make sure that LRSD would protect other students from Louis C.'s known assaultive behavior is the kind of 'traditional tort law' claim that the Supreme Court has refused to translate into a due process deprivation."). Here too, Plaintiff's allegations that Defendants failed to discipline or remove T.R. from THS campus over a period of three years created an ongoing, indefinite risk—not an immediate and proximate threat of harm to Plaintiff.

Plaintiff's response offers examples of ways in which "each Defendant's affirmative conduct was coupled with their failure to act in ways that combine to form a viable 'danger creation' theory":

> Affirmative conduct includes decisions such as moving the Chrysalis alternative school onto the THS campus, falsifying school records to make it appear that T.R. was being supervised, disciplined, or given alternative placements when he was not, giving preferential treatment to school employees, parents, and students within Defendants' personal clique, making personnel decisions to hire and assign school employees who lacked the necessary experience or qualifications, rejecting earlier complaints about T.R. without investigating them, and then making changes to T.R.'s IEP and placing him back on that campus during Plaintiff's freshman year under the totality of the circumstances described in her SAC.

Doc. 319 at 30. But of these allegations of affirmative conduct, none are directed at Plaintiff, "rather than at the public at large." *Cf. Ruiz*, 299 F.3d at 1183. Plaintiff's allegations, accepted as true, indicate that Defendants exposed all female students at THS to an ongoing, indefinite risk from T.R. The SAC includes no allegations that the Defendants were aware T.R. was targeting his behavior towards Plaintiff.

Addressing Plaintiff's allegations of affirmative conduct one-by-one, the Court starts with the decision to close the Chrysalis alternative school. Even assuming Plaintiff could attribute this decision to Defendants Torrez, Trujillo, and Abeyta-Valerio, this decision was

made during the 2015-2016 school year and implemented in the 2016-2017 school year—three years before T.R. assaulted Plaintiff. The decision to move Chrysalis thus did not place Plaintiff in proximate and immediate danger.

Next, the allegations in Plaintiff's complaint do not support Plaintiff's assertion that Defendants falsified school records or that, even assuming Defendants did, such falsification placed Plaintiff in proximate and immediate danger. The allegations in the complaint are merely that school records were not accurate on the topics of: whether T.R. was under one-to-one supervision; times when T.R. was roaming campus or hanging out in unassigned classrooms when he was supposed to be attending "work study" or in his after-school program; indicating that T.R. was placed at the Chrysalis Alternative School after it was closed; or failing to properly report instances of sexual misconduct by adults. Doc. 319 at 22 (citing Doc. 297 ¶¶ 50, 57, 68, 98, 109, 113-123, 173-77, 206, 223-24). These allegations amount to negligence rather than plausibly alleging an intentional cover-up (or reckless disregard of the substantial possibility of a cover-up). Plaintiff comes closer to intentional or reckless conduct with the allegations that Defendant Abeyta-Valerio documented T.R.'s disciplinary referrals as "disorderly conduct" and not "sexual harassment" to avoid unspecified reporting and investigatory obligations. Doc. 207 ¶¶ 68, 206. However, these allegations fail to demonstrate that Defendant Abeyta-Valerio's incorrect reporting placed *Plaintiff* in proximate and immediate danger, as opposed to the female student population of TMS as a whole.

The allegations of preferential treatment within a governing clique in the school, and not hiring qualified personnel, are vague and do not give specifics on how different treatment or hiring practices would have prevented T.R.'s harassment and assault. In other words, the

accusations do not amount to a specific and plausible threat of immediate, proximate harm to Plaintiff.

And finally, rejecting the complaint of T.R.'s first assault and placing him back on campus[12] with no additional precautions are, as above, allegations of affirmative conduct that placed the entire female school population in danger—relevant to an equal protection claim, but not a claim that Defendants created danger specific to or directed at Plaintiff. "[D]efendants did not create a hazardous situation by placing the aggressor and victim in the same location." *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994). "Notwithstanding defendants' specific knowledge of the propensities of the aggressors, any danger to the victims was too remote a consequence of defendants' action to hold them responsible under the federal civil rights law." *Id.* (cleaned up). For these reasons, the Court finds that the SAC fails to state a substantive due process claim under the danger-creation theory against the individual Defendants, and thus finds that it is unnecessary to address Defendants' additional arguments on this subject.

Additionally, even assuming Plaintiff met her burden on prong one of qualified immunity—pled facts to plausibly state a constitutional claim under the danger-creation theory of substantive due process—her claim against the individual Defendants fails under prong two because she does not point to any case in which the Tenth Circuit or the Supreme Court has found a claim for danger creation under similar facts. *See T.D. v. Patton*, 868 F.3d 1209, 1220

---

[12] In their motion, Defendants assert that "[p]er District policy, state law, and the IDEA, T.R. could not indefinitely remain on the IAES placement from prior years, but had the right to procedural safeguards." Doc. 317 at 14. The Court need not address this argument or decide whether doing so would require the Court to convert the present motion to dismiss into a motion for summary judgment. Plaintiff's danger-creation claim fails for a reason unrelated to this argument—placing T.R. back on campus is not conduct directed at Plaintiff.

(10th Cir. 2017) ("A plaintiff may show clearly established law by pointing to either a Supreme

Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time

of the alleged violation.").

### 3.  Defendant TMS

Under *Monell v. Department of Social Services of City of New York*, municipal liability

arises under Section 1983 where "the action that is alleged to be unconstitutional implements or

executes a policy statement, ordinance, regulation, or decision officially adopted and

promulgated by that body's officers." 436 U.S. 658, 690-91 (1978). Likewise, "governmental

entities may be held liable for a 'longstanding practice or custom which constitutes the standard

operating procedure of the local governmental entity.'" *Randle v. City of Aurora*, 69 F.3d 441,

447 (10th Cir. 1995) (quoting *Jett. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 736 (1989)). Thus,

"[t]o state a claim against the County, the plaintiffs must allege facts showing: (1) an official

policy or custom, (2) causation, and (3) deliberate indifference." *Quintana v. Santa Fe Cnty. Bd.*

*of Commissioners*, 973 F.3d 1022, 1034 (10th Cir. 2020). An official policy can consist of any of

the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a
> widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or
> usage with the force of law; (3) the decisions of employees with final
> policymaking authority; (4) the ratification by such final policymakers of the
> decisions—and the basis for them—of subordinates to whom authority was
> delegated subject to these policymakers' review and approval; or (5) the failure to
> adequately train or supervise employees, so long as that failure results from
> deliberate indifference to the injuries that may be caused.

*Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1184 (10th Cir. 2020).

The Court will address in turn the SAC's two municipal liability claims against

Defendant TMS (claims of equal protection and substantive due process violations).

a. Equal Protection

"A school district's liability for sexual harassment under the Equal Protection clause is analyzed under a municipal liability framework." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1124 (10th Cir. 2008). "A plaintiff stating a . . . claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009). Here, Plaintiff does not allege that the discriminatory conduct was the result of official policy, ordinance, regulation, or decision officially adopted.[13] To the contrary, she alleges that TMS had generic, formal documents titled "policies" on "sexual harassment," but that the individual Defendants acted in a way that created a disconnect between the policy and the actual practices in the district. Doc. 297 ¶ 194.

"In the absence of an official policy, a municipality may still be liable for the widespread and persistent practice of sexual harassment which constitutes a custom." *Rost*, 511 F.3d at 1125. Under the theory of a "custom of failure to receive, investigate, or act on complaints of constitutional violations . . . a plaintiff must prove (1) a continuing, widespread, and persistent pattern of misconduct by the state; (2) deliberate indifference to or tacit authorization of the conduct by policy-making officials after notice of the conduct; and (3) a resulting injury to the plaintiff." *Id.*

---

[13] Plaintiff's complaint does contain several conclusory statements that Defendants "established policy decisions, customs, practices, and patterns of behavior in the school's administration which served to dismiss, downplay, and minimize sexual harassment, sexual violence, and discrimination based on sex at the school, as well as to create danger for the school's female student population." Doc. 297 ¶ 185; *see also id.* ¶¶ 193, 215. In reviewing the sufficiency of the complaint, however, the Court cannot accept as true legal conclusions that are masquerading as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Accepting the factual allegations in the complaint as true, Plaintiff alleges that TMS, through the individual Defendants, was on notice and failed to properly address, over a sufficient period of time, student and staff concerns that T.R. was sexually harassing female students. *Id.* ¶¶ 31-35, 64, 66, 109. After T.R. sexually harassed and assaulted Jane Doe 2 on school grounds, he was allowed to return to THS, all while the individual Defendants downplayed his actions.[14] *Id.* ¶¶ 70-72, 84, 87, 89, 93-95, 101. The failure to address T.R.'s continued sexual harassment ultimately allowed him the opportunity to sexually harass Plaintiff, and sexually assault her in the same unmonitored and unsupervised fashion at the same locations where he assaulted Jane Doe 2. *Id.* ¶¶ 137-44, 203. Taking these facts as true, Plaintiff establishes that TMS employees engaged in a continuing, widespread, and persistent pattern of failing to address sexual harassment, and specifically sexual harassment by T.R. They abandoned every effective remedial measure that they initiated (such as one-to-one supervision and an off-campus or restricted class schedule).[15] This ultimately led to T.R. raping Plaintiff on campus.

Defendants argue that Plaintiff has failed to allege deliberate indifference, pointing to instances in which Defendants responded to T.R.'s behavior, such as providing him an escort, placing him on IAES off campus, and revising his IEP to minimize his time on campus. Doc. 317 at 24-25. However, accepting Plaintiff's allegations as true and viewing the facts in the light most favorable to her, the SAC also alleges that Defendants stopped following these measures.

---

[14] Specifically, Plaintiff alleges Defendants downplayed T.R.'s harassment and assault by telling teachers that the victims were equally guilty for being harassed; refusing to do anything to help enforce Jane Doe 2's TRO and failing to communicate with her mother after the assault; telling teachers nothing could be done regarding T.R. sharing sexually explicit images of underaged female students; and dismissing Jane Doe 2's assault as "unproven." *Id.* ¶¶ 84, 87, 93-96. Instead, Defendants' focus was on making sure T.R. could graduate. *Id.* ¶¶ 122, 177-79.

[15] A thorough discussion of this history and the supporting allegations in the operative complaint appears *supra*, pp. 26-32, 40-42.

Defendant Trujillo reassigned T.R.'s escort after two months and that T.R. was not provided a new one in the years following. After Jane Doe 2's assault, T.R. returned to a regular class schedule on campus during the 2018-2019 school year, where he was allowed to roam the grounds of THS unsupervised and unmonitored.

Defendants also argue that Plaintiff has not alleged that TMS's "actions were the moving force behind her injury." Doc. 317 at 26. The Court disagrees. The abandonment of each remedial measure amounts to a pattern and practice, as it happened multiple times and each time led to more sexual harassment and assault complaints. Specifically, the abandonment of any remedial measures at the start of the 2018-2019 school year is the moving force behind Plaintiff's injury in September 2018. T.R.'s return to campus, combined with the lack of any supervision or monitoring, enabled T.R. to assault Plaintiff in the same fashion and in the same location where he had previously assaulted Jane Doe 2.

The Court therefore finds that Plaintiff's SAC states a claim that Defendant TMS violated her right to equal protection.

   b.  Substantive Due Process (Failure to Screen, Hire, Train, and Supervise)

Plaintiff alleges in the SAC that Defendant TMS violated her right to substantive due process though its failure "to adequately screen, hire, train, and supervise the teachers, administrators, and staff assigned to educate and discipline T.R." Doc. 297 ¶ 262. In the briefing on the present motion, the parties only discuss failure to train and supervise. Doc. 317 at 26-27; Doc. 319 at 42-43.

"[M]unicipal liability may be based on injuries caused by a failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th

Cir. 2010). Such a failure to train claim requires a showing of: "1. the existence of a [district] policy or custom involving deficient training[;] 2. the policy or custom's causation of an injury[; and] 3. the [district's] adoption of a policy or custom with deliberate indifference." *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)).

Relevant to failure to train and supervise, the SAC alleges that, once the Chrysalis and THS campuses merged, Chrysalis staff was not adequately trained to handle students with behavioral problems. Doc. 297 ¶¶ 18-19, 54. In September 2018, T.R. was assigned to an after-school program with a special education teacher, Ms. Chavez, but Ms. Chavez was not provided clear direction on what she was supposed to be doing during the after-school program and T.R. would come and go from the after-school program as he pleased. *Id.* ¶¶ 112, 118-20, 200-201. T.R. sexually assaulted Plaintiff during the after-school period on October 9, 2018. *Id.* ¶¶ 137-44. Although Plaintiff alleges that T.R.'s behavior of sexual harassment and assaults on female students was reported in many disciplinary referrals, *id.* ¶¶ 28-29, 31-36, 55-56, 66-67, 86, 93, 104-105, 109, she also alleges that TMS did not have proper training for resolving reports of sexual harassment and sexual violence, *id.* ¶¶ 52, 70, 88, 197-99, 206. For example, Defendant Abeyta-Valerio did not document or report any of T.R.'s behavior or disciplinary referrals as sexual harassment, sexual violence, or discrimination based on sex. *Id.* ¶¶ 20, 68, 173, 195, 206.

Additionally, Defendant Trujillo had no training on how to be the compliance officer for sexual harassment complaints, even though Defendant Torrez delegated that duty to him. *Id.* ¶ 196.

The SAC does not, however, explain what or how additional training would have prevented the constitutional violations. The allegations concerning training for adult-employee sexual harassment does not have any obvious relevance to how to prevent one student from assaulting another. The teachers clearly knew how to report sexually aggressive behavior; they did it frequently in T.R.'s case. That the administration ignored or downplayed these reports is not alleged to be a failure of training but deliberate indifference to victims because of the administration's personal connections to T.R.'s family. *E.g.*, Doc. 297 ¶¶ 185-91. And although the complaint clearly alleges the teachers did not know how to handle T.R.'s behavioral problems, the allegation that more training could have enabled teachers to cure the problems is both speculative and conclusory.

That is, even viewing these facts in the light most favorable to Plaintiff, the pattern of permitting T.R. to harass and assault female students for years is alleged to be a deliberate and intentional failure on the administration's part, not a lack of training for teachers on how to report student-on-student sexual harassment to the administration. Plaintiff's allegations do not establish a causal connection between any training-not-given and T.R. raping Plaintiff. The Court therefore finds that Plaintiff's SAC fails to state a claim that Defendant TMS violated her right to substantive due process based on failure to train and supervise.[16]

---

[16] Defendants also allege that Plaintiff's failure to train claim fails because she does not identify a constitutional violation by any employee. Doc. 317 at 22. This argument fails because "even where no individual action by a single officer rises to a constitutional violation, a municipality may be held liable where the sum of actions nonetheless violates the plaintiff's constitutional rights." *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020). And here, Plaintiff alleges that, because no proper training and supervision occurred regarding how to

c. <u>Substantive Due Process (Danger-Creation)</u>

In addition to the failure to train claim, Plaintiff also brings a substantive due process claim against Defendant TMS under the danger-creation theory. As discussed above, the Court finds that Plaintiff's substantive due process danger-creation claim fails against the individual Defendants because she does not plead affirmative conduct directed at a discrete plaintiff. The same is true of her danger-creation claim against Defendant TMS.

Plaintiff asserts that Defendant TMS created "an actionable danger" by "deciding not to implement policies or training to prevent sexual assaults despite actual knowledge of a substantial risk." Doc. 319 at 29-30. But again, this argument fails to point to affirmative conduct that posed a direct threat to Plaintiff. *See Gray v. Univ. of Colorado Hosp. Auth.*, 672 F.3d 909, 926 (10th Cir. 2012) (rejecting an argument that established policies and customs created a danger to the plaintiff because "the act of establishing such policies and customs does not pose a direct threat to any one particular individual but affects a broader populace," and so the court deemed "such act too remote to establish the necessary causal link between the danger to the victim and the resulting harm."). Plaintiff has failed to state a substantive due process danger-creation claim against TMS.

### 4. Premises Liability under the NMTCA

Count III of Plaintiff's SAC alleges that all Defendants (the individual Defendants and TMS) are liable under state law for failing to keep the premises of THS safe.[17] Doc. 297 ¶ 290.

---

address complaints of sexual harassment, teachers and administrators at TMS failed to take any action despite years of complaints about T.R.

[17] In moving to dismiss Plaintiff's state-law claim, Defendants treat themselves as one collective group and do not discuss the facts alleged against Defendants individually. The Court will therefore do the same.

She asserts that NMTCA immunity "does not apply or is waived with respect to the negligent operation and maintenance of Defendant TMS's buildings, machinery, equipment, and furnishings by its public employees, including the three individual Defendants, Defendant TMS's Facilities Director, Mr. Valencia, and their staff at Taos High School." *Id.* ¶ 288.

The NMTCA provides immunity from tort claims to governmental entities and public employees acting within the scope of their duty. NMSA § 41-4-4(A). Immunity, however, is waived in limited circumstances, as enumerated in the NMTCA. *Id.* As at issue in this case, immunity "does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting in the scope of their duties in operation or maintenance of any building, public park, machinery, equipment, or furnishings." NMSA § 41-4-6(A). In other words, "for the waiver to apply, the negligent 'operation or maintenance' must create a dangerous condition that threatens the general public or a class of users of the building." *Upton v. Clovis Mun. School Dist.*, 2006-NMSC-040, ¶ 8, 141 P.3d 1259. The New Mexico Supreme Court has held that "[t]he waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building." *Id.* ¶ 9. For schools, this means that "a school simply cannot operate in a safe, reasonable, and prudent manner without affording, at the very least, the health and safety services that students have been promised, and upon which parents have relied." *Id.* ¶ 13.

To be sure, NMTCA does not "specify a tort waiver for negligent supervision" and without such a waiver, negligent supervision is not actionable. *Upton*, 2006-NMSC-040, ¶ 16. Rather, "Section 41-4-6 waives immunity for the operation or maintenance of a public building, which may include proof of negligent acts of employee supervision that is part of the operation

of the building." *Id.* Accordingly, to state a claim under the Section 41-4-6's waiver of immunity, the plaintiff must allege more than "a discrete administrative decision," affecting only a single person, but must instead allege "a general condition of unreasonable risk" affecting the general public. *See id.* ¶¶ 17, 20-21 (quoting *Archibeque v. Moya*, 1993-NMSC-079, ¶ 17, 866 P.2d 344 (Ransom, J., specially concurring)); *see also Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶¶ 13-14, 310 P.3d 611 (explaining that a single action, such as student-on-student violence, does not create an unsafe premise, but a school's failure to address a pattern of student violence might create an unsafe condition on the premise).

In *Gebler v. Valencia Regional Emergency Communications Center*, the New Mexico Court of Appeals summarized the case law on Section 41-4-6 waivers to include two factual scenarios: "First, an operational failure to respond to or discover conditions which can pose a danger to a class of persons involved in or affected by an activity on the property . . . . Second, a failure to create and/or to implement reasonably appropriate safety policies and operational procedures to make public properties safe for the public who use them." 2023-NMCA-70, ¶ 26, 535 P.3d 763, 769. Here, Plaintiff has alleged both conditions. First, she alleges that T.R. had a multi-year history of sexual harassment directed at female students which Defendants knew about and failed to address. And after T.R. raped Jane Doe 2, Defendants both failed to keep track of his location on campus and failed to monitor the locations of the previous assault, allowing T.R. the opportunity to rape Plaintiff in the same locations. Second, Plaintiff alleges that Defendants did not properly resolve sexual harassment complaints, leading to a pattern of unaddressed complaints against T.R. for years before he sexually assaulted Plaintiff.

Defendants argue that Plaintiff is alleging nothing more than one singular prior act of violence, and emphasize the "general rule that schools are not liable for one student's battery of

another." Doc. 328 at 16 (citing *Encinas*, 2013-NMSC-045, ¶ 13).[18] Plaintiff's allegations, however, are much more than that. They rely on a years-long pattern of sexual harassment and assault of numerous female students, and the rape of two different girls committed in the same manner and in the same place. Accordingly, Plaintiff has alleged more than a single instance of student-on-student violence. She has alleged that "the risk posed was to a group of people using the park or building." *Upton*, 2006-NMSC-040, ¶ 24; *see also Encinas*, 2013-NMSC-045, ¶ 17, 310 P.3d 611, 619 ("The government does not 'have the duty to do everything that might be done,' but it can be liable for the violent acts of a third party if the government reasonably should have discovered and could have prevented the incident." (quoting NMSA § 41-4-2(A)). The Court therefore denies the motion to dismiss as to Plaintiff's state-law claim.

## CONCLUSION

In sum, the Court grants in part and denies in part "Defendants Taos Municipal Schools, Lilian Torrez, Robert Trujillo, and Lisa Abeyta-Valerio's Motion to Dismiss Plaintiff's Second Amended Complaint for Civil Right Violations, Negligence, and Other Tortious Conduct and Motion to Dismiss Based on Qualified Immunity" (Docs. 308, 317). The Court grants the motion to dismiss as to Count IA (substantive due process against the individual Defendants), Count IB as to Defendant Torrez only (equal protection against the individual Defendants), and Count IIA (substantive due process against Defendant TMS). The Court denies the motion to dismiss as to Count IB against Defendants Trujillo and Abeyta-Valerio (equal protection against the individual

---

[18] Defendants also rely on *Pemberton v. Cordova*, 1987-NMCA-020, 734 P.2d 254, one in a series of New Mexico Court of Appeals cases which were overturned by the New Mexico Supreme Court for being too "narrow" a view of the waiver. *Bober v. New Mexico State Fair*, 1991-NMSC-031, ¶¶ 26-27 & n.9, 808 P.2d 614, 622-23 & n.9.

Defendants), Count IIB (equal protection against Defendant TMS), and Count III (state law claims against all Defendants).

Lastly, Plaintiff asserts that "[t]o the extent Plaintiff's pleading requires additional facts or further clarification, the appropriate remedy is to grant leave to further amend the complaint, supplement her briefing for that purpose, and/or allow further discovery." Doc. 319 at 8. As evidenced by the name, Plaintiff's SAC is the third iteration of her complaint. *See* Docs. 1, 202, 297. After Plaintiff filed her First Amended Complaint ("FAC"), Defendants moved to dismiss it on similar grounds to the ones raised in the present briefing. Docs. 232, 233. Shortly after the parties finished briefing the motion to dismiss the FAC, but before the Court issued an order, Plaintiff filed a motion for leave to file the SAC. Doc. 257. In granting Plaintiff leave to file the SAC (and therefore denying as moot the motion to dismiss the FAC), the Court advised Plaintiff that "[g]iven the age of this case, the close of fact discovery, and three complaints having now been filed, it will be difficult for Plaintiff to justify any further motion to amend." Doc. 278 at 8 n.3. In the present briefing, Plaintiff makes no further attempt to meet this difficult burden and so the Court denies her request to amend.

IT IS SO ORDERED.


STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent